AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of New Mexico ▾

**FILED**
United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | )    Case No.    23-MR-1658 through 23-MR-1682 |
| See Attachment A for the full description of the twenty-five locations and persons to be searched. | ) ) ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ District of _____ New Mexico _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 USC §§ 1962(c), 1959(a), 1951, 931, 924(c), 922(g), 922 (j), 875, 2312, 2313, 371, 2, & 21 USC §§ 841(a)(1) & 846. | RICO Act, VICAR, Extortion/Robbery, violent felon possess body armor, use of a firearm in violent crime or drug trafficking, possess stolen firearm, threatening communications, transport & sale of stolen vehicles, conspiracy, aiding and abetting, possess controlled substances w/intent to distribute and conspiracy. |

The application is based on these facts:

Refer to the attached 145-page Affidavit in Support of an Application for Search Warrants.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Bryan Acee, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ email and telephone _____ *(specify reliable electronic means)*.

Date: _____ 08/28/2023 _____

_____
*Judge's signature*

City and state: Albuquerque, New Mexico

Karen B. Molzen, United States Magistrate Judge
*Printed name and title*

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

## Table of Contents

SEARCH WARRANT LOCATION CHART                                                    2

GLOSSARY OF TERMS AND ENTITIES                                                   3

INTRODUCTION                                                                     4

TRAINING, EXPERIENCE, AND PRIOR EXPERT WITNESS QUALIFICATIONS                    8

OVERVIEW OF THE INVESTIGATION                                                   10

BACKGROUND ALLEGATIONS RE: RACKETEERING OFFENSES, DRUG AND FIREARM
OFFENSES AND OFFENDER CHARACTERISTICS                                           21

THE BANDIDOS MOTORCYCLE CLUB CRIMINAL ENTERPRISE                                28

THE HISTORY OF THE BANDIDOS MOTORCYCLE CLUB                                     30

BANDIDOS MOTORCYCLE CLUB PATCHES AND INSIGNIA                                   40

BANDIDOS MOTORCYCLE CLUB SUPPORT PATCHES                                        42

PURPOSES OF THE ENTERPRISE                                                      43

MEANS AND METHODS OF THE ENTERPRISE                                            43

PUBLIC CORRUPTION: OUTLAW MOTORCYCLE GANGS AND LAW ENFORCEMENT                  44

THE CONFIDENTIAL HUMAN SOURCES                                                  45

STATEMENT OF PROBABLE CAUSE                                                     55

    Conspiracy to Commit Murder and Assault in Aid of Racketeering             56

    Unlawful Firearms Possession and Use of Firearms in Furtherance of Violent Crime   69

    Possession of Body Armor by Violent Felons                                 73

    Firearms Trafficking                                                       74

    Conspiracy to Distribute Controlled Substances                             77

    Extortion, Robbery, and Theft of Motorcycle Vests and Patches              80

    Motorcycle Theft                                                           84

THE TARGET SUBJECTS                                                             86

THE SUBJECT PREMISES                                                           111

SEARCHING FOR GANG TATTOOS                                                     129

SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS                            131

BIOMETRIC ACCESS TO DEVICES                                                    139

EVIDENCE SOUGHT PURSUANT TO THE REQUESTED SEARCH WARRANTS                      142

NIGHTIME SERVICE REQUEST                                                       143

CONCLUSION                                                                     144

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

## <u>SEARCH WARRANT LOCATIONS</u>

| SUBJECT PREMISES | TARGET SUBJECTS | ADDRESS OF SUBJECT PREMISES |
|---|---|---|
| A-1 | JOAQUIN MARTINEZ | 109 Bellrose Avenue NW, Albuquerque, New Mexico |
| A-2 | LEVI LUCERO | 315 63rd Street SW, Albuquerque, New Mexico |
| A-3 | ROBERT SALAZAR | 10200 2nd Street NW, #120, Albuquerque, New Mexico |
| A-4 | JOEL GUTIERREZ | 7300 Hanover Road NW, Albuquerque, New Mexico |
| A-5 | ERIK ASTORGA | 824 Cagua Drive SE, Albuquerque, New Mexico |
| A-6 | GREGORY ARMENTA | 7600 Via Belleza SW, Albuquerque New Mexico |
| A-7 | ALBERT ARMIJO | 913 Perry Meadows Drive NE, Rio Rancho, New Mexico |
| A-8 | DONNY CRAPSE | 1523 Tierra Verde Loop NW, Los Lunas, New Mexico |
| A-9 | ED SANCHEZ SOLIS | 108 Horner Street, Belen, New Mexico |
| A-10 | LAWRENCE SELVA | 1 Buckskin Lane, Tome, New Mexico |
| A-11 | CHARLES RUSSELL | 900 Jackson Avenue, Grants, New Mexico |
| A-12 | JOSE MAESTAS | 107 Main Street, San Rafael, New Mexico |
| A-13 | KENNETH MARTINEZ | 616 East Princeton Avenue, Gallup, New Mexico |
| A-14 | SKYLER ELWESS | 1101 North Laguna Avenue, Farmington, New Mexico |
| A-15 | LEX BLUEEYES | 3005 Bella Donna Lane, Farmington, New Mexico |
| A-16 | JESUS RODRIGUEZ | 901 East Lincoln Road, Hobbs, New Mexico |
| A-17 | JONATHAN BIVINS | 1503 Park Avenue, Alamogordo, New Mexico |
| A-18 | WILLIAM ROMERO | 1432 Vermont Avenue, Alamogordo, New Mexico |
| A-19 | ALCARIO BUSTAMANTES | 1503 Hawaii Avenue, Alamogordo, New Mexico |
| A-20 | RICARDO SAUCEDO | 715 Maryland Avenue, Alamogordo, New Mexico |
| A-21 | MICHAEL SAUCEDO | 711 ½ Maryland Avenue, Alamogordo, New Mexico |
| A-22 | BILLY DOZER | 2302 Pine Drive, Alamogordo, New Mexico |
| A-23 | SCOTT STEVENS | 145 Willie Horton Drive, Ruidoso, New Mexico |
| A-24 | TERRY CLAUNCH | 113 West Fourth Street, Capitan, New Mexico |
| A-25 | ZACHARY CARRIZAL | 1896 Arabela Road, Arabela, New Mexico |

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

## GLOSSARY OF KEY TERMS AND ENTITIES

| | |
|---|---|
| 1%er | Most outlaw motorcycle clubs can be distinguished by a "1%" patch worn on their colors. This is said to refer to a comment made in 1960 by William Berry, a former president of the American Motorcyclist Association (AMA), that 99% of motorcyclists were law-abiding citizens, implying the last one percent were outlaws. The outlaw motorcycle gangs embraced the 1% symbol. |
| AMA | American Motorcyclist Association, protect and promote motorcycling. |
| APD | Albuquerque Police Department, New Mexico |
| BCSO | Bernalillo County Sheriff's Office, New Mexico |
| BMC | Bandidos Motorcycle Club |
| Burqueños | A security threat group, comprised of street gang members from Albuquerque, who band together for protection in prison and jail. |
| CHS | Confidential Human Source, CHS for both plural and singular. |
| COC | The Council of Clubs promote motorcycle rights and club communication. |
| DTO | Drug trafficking organization |
| ECSO | Eddy County Sheriff's Office, New Mexico |
| Greenlight | A reference to a person or group who have been approved for violent assault or death by a gang or criminal group. |
| Hang-around | A friend of the club who has no official status with the club. The hang-around process is often where a person begins their journey to become an MC member. |
| LCSO | Lincoln County Sheriff's Office, New Mexico |
| MC | Motorcycle Club |
| MMC | Mongols Motorcycle Club |
| NMSP | New Mexico State Police |
| OCSO | Otero County Sheriff's Office |
| Old Lady | Wife or girlfriend of a motorcycle club member. |
| OMG | Outlaw Motorcycle Gang |
| OMGTF | Outlaw Motorcycle Gang Task Force, New Mexico |
| Prospect | Prospective member of a motorcycle club. |
| RC | Riding Club |
| RICO | Racketeering Influenced and Corrupt Organizations. |
| RPD | Ruidoso Police Department, New Mexico |
| RRPD | Rio Rancho Police Department, New Mexico |
| SNM | Syndicato de Nuevo Mexico, a New Mexico based prison gang. |
| Support Club | A smaller motorcycle club that is subservient to one of the dominant motorcycle gangs. These clubs are referred to as support clubs, satellite clubs or puppet clubs. They provide support to the dominant club by propelling their influence and serving as a source of recruitment. |
| USAO | United States Attorney's Office. |
| VCSO | Valencia County Sheriff's Office, New Mexico |
| VGTF | FBI Violent Gang Task Force |
| VICAR | Violent Crime in Aid of Racketeering. |

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

I, Bryan Acee, being duly sworn, do hereby depose and state as follows:

## INTRODUCTION

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and am recognized as a "federal law enforcement officer" within the meaning of Rule 41 of the Federal Rules of Criminal Procedure. I am submitting this affidavit in support of warrants to search the twenty-five persons and residences listed below:

   a) JOAQUIN MARTINEZ, associated with Subject Premises A-1 located at 109 Bellrose Avenue NW, Albuquerque, New Mexico;

   b) LEVI LUCERO, associated with Subject Premises A-2 located at 315 63rd Street SW, Albuquerque, New Mexico;

   c) ROBERT SALAZAR, associated with Subject Premises A-3 located at 10200 2nd Street NW, #120, Albuquerque, New Mexico;

   d) JOEL GUTIERREZ, associated with Subject Premises A-4 located at 7300 Hanover Road NW, Albuquerque, New Mexico;

   e) ERIK ASTORGA associated with Subject Premises A-5 located at 824 Cagua Drive SE, Albuquerque, New Mexico;

   f) GREGORY ARMENTA associated with Subject Premises A-6 located at 7600 Via Belleza SW, Albuquerque New Mexico;

   g) ALBERT ARMIJO, associated with Subject Premises A-7 located at 913 Perry Meadows Drive NE, Rio Rancho, New Mexico;

   h) DONNY CRAPSE, associated with Subject Premises A-8 located at 1523 Tierra Verde Loop NW, Los Lunas, New Mexico;

   i) ED SANCHEZ SOLIS, associated with Subject Premises A-9 located at 108 Horner Street, Belen, New Mexico;

   j) LAWRENCE SELVA associated with Subject Premises A-10 located at 1 Buckskin Lane, Tome, New Mexico;

   k) CHARLES RUSSELL associated with Subject Premises A-11 located at 900 Jackson Avenue, Grants, New Mexico;

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

l)  JOSE MAESTAS associated with Subject Premises A-12 located at 107 Main Street, San Rafael, New Mexico;

m) KENNETH MARTINEZ associated with Subject Premises A-13 located at 616 East Princeton Avenue, Gallup, New Mexico;

n)  SKYLER ELWESS associated with Subject Premises A-14 located at 1101 North Laguna Avenue, Farmington, New Mexico;

o)  LEX BLUEEYES associated with Subject Premises A-15 located at 3005 Bella Donna Lane, Farmington, New Mexico;

p)  JESUS RODRIGUEZ, associated with Subject Premises A-16 located at 901 East Lincoln Road, Hobbs, New Mexico;

q)  JONATHAN BIVINS associated with Subject Premises A-17 located at 1503 Park Avenue, Alamogordo, New Mexico;

r)  WILLIAM ROMERO, associated with Subject Premises A-18 located at 1432 Vermont Avenue, Alamogordo, New Mexico;

s)  ALCARIO BUSTAMANTES, associated with Subject Premises A-19 located at 1503 Hawaii Avenue, Alamogordo, New Mexico;

t)  RICARDO SAUCEDO, associated with Subject Premises A-20 located at 715 Maryland Avenue, Alamogordo, New Mexico;

u)  MICHAEL SAUCEDO, associated with Subject Premises A-21 located at 711 ½ Maryland Avenue, Alamogordo, New Mexico;

v)  BILLY DOZER, associated with Subject Premises A-22 located at 2302 Pine Drive, Alamogordo, New Mexico;

w) SCOTT STEVENS, associated with Subject Premises A-23 located at 145 Willie Horton Drive, Ruidoso, New Mexico;

x)  TERRY CLAUNCH, associated with Subject Premises A-24 located at 113 West Fourth Street, Capitan, New Mexico;

y)  ZACHARY CARRIZAL, associated with Subject Premises A-25 located at 1896 Arabela Road, Arabela, New Mexico;

2.      Hereinafter I will refer to the aforementioned persons collectively as the "Target Subjects." Based on the evidence obtained in this investigation, and as described herein, I believe

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

there is probable cause to believe the Subject Premises contain evidence fruits, and instrumentalities of violations of:

    a) 18 U.S.C. § 1962(c): Racketeer Influenced and Corrupt Organizations (RICO);

    b) 18 U.S.C. § 1959(a): Violent Crimes in Aid of Racketeering (VICAR);

    c) 18 U.S.C. § 1951: Interference with commerce by threats or violence;

    d) 18 U.S.C. § 931: Possession of body armor by a violent felon;

    e) 18 U.S.C. § 924(c): Use of a firearm in furtherance of a crime of violence or drug trafficking crime;

    f) 18 U.S.C. § 922(g): Prohibited person in possession of a firearm or ammunition;

    g) 18 U.S.C. § 922(j): Possession of a stolen firearm;

    h) 18 U.S.C. § 875: Transmitting threatening communications;

    i) 18 U.S.C. § 2312: Transportation of stolen vehicles or property;

    j) 18 U.S.C. § 2313: Sale or receipt of stolen vehicles or property;

    k) 18 U.S.C. § 371: Conspiracy;

    l) 18 U.S.C. § 2: Aiding and abetting;

    m) 21 U.S.C. § 846: Conspiracy to distribute a controlled substance; and

    n) 21 U.S.C. § 841(a)(1): Possession with intent to distribute a controlled substance.

Hereinafter I will refer to the aforementioned violations as the "Target Offenses."

3.     The specific premises to be searched have been described in Attachments A-1 through A-25, which have been attached hereto and incorporated herein by reference and are collectively referred to as the "Subject Premises." The particular evidence, fruits, and instrumentalities to be seized by agents are set forth in Attachment B, which has been attached hereto and incorporated herein.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

4.     This affidavit also seeks the Court's permission to allow the law enforcement agents executing the search warrants to search the bodies of the Target Subjects for tattoos evidencing membership in or association with the BANDIDOS MOTORCYCLE CLUB, and to photograph those tattoos. I believe such tattoos may constitute a conspiratorial overt act and have utilized such photographic evidence during gang-racketeering jury trials in the past.

5.     I am submitting this affidavit based upon my experience and familiarity with the investigation of the Target Subjects. This affidavit does not set forth all of my knowledge or summarize all of the fact-finding efforts in the overall investigation; rather, this affidavit sets forth facts that support probable cause to search the requested locations and persons, as well as relevant background information.

6.     During my investigation, I have developed information I believe to be reliable from the following agencies and sources: information provided by the FBI, United States Bureau of Prisons (BOP); United States Probation Office (USPO); New Mexico Corrections Department (NMCD); New Mexico State Police (NMSP); New Mexico Organized Crime Commission; Albuquerque Police Department (APD); Rio Rancho Police Department (RRPD); Ruidoso Police Department (RPD); Bernalillo County Sheriff's Office (BCSO); Valencia County Sheriff's Office (VCSO); Eddy County Sheriff's Office (ECSO); Otero County Sheriff's Office (OCSO); Lincoln County Sheriff's Office (LCSO); Texas Department of Public Safety (TXDPS); Second Judicial District Attorney's Office (Bernalillo County); Eighth Judicial District Attorney's Office (Taos, Colfax, & Union Counties) Twelfth Judicial District Attorney's Office (Otero & Lincoln Counties) and other law enforcement or corrections agencies; including oral and written reports pertaining to physical surveillance; information provided by undercover agents and informants; information provided by cooperating defendants and/or the defense attorneys representing those

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

persons; information derived from lawfully intercepted wire communications, to include telephone, text and email; and records from the FBI National Crime Information Center (NCIC), United States District Court, New Mexico courts, Texas courts; and the New Mexico Motor Vehicle Division.

7.      Where I refer to conversations herein, they are related in substance and, in-part, based on conversations between fellow agents, task force officers, other law enforcement personnel, or confidential human sources that assisted law enforcement. Any observations referenced herein that I did not personally witness were relayed to me in oral and/or written reports by agents of the FBI or other law enforcement agencies.

**TRAINING, EXPERIENCE, AND PRIOR EXPERT WITNESS QUALIFICATIONS**

8.      I have been a law enforcement officer for more than twenty-three years, serving as a police officer, detective, task force officer and special agent. I have been with the FBI since 2009 and am currently assigned to the Albuquerque Violent Gang Task Force (VGTF),[1] where I primarily investigate prison, street, and motorcycle gangs, as well as violent repeat offenders involved in federal drug and firearm related crimes. Prior to my assignment to the VGTF, I served as the Coordinator of the FBI Violent Crime Task Force in Albuquerque and the FBI-DEA Hybrid Cross Border Drug Violence Squad in Las Cruces, New Mexico. I was the lead case agent in the government's 2010-2014 Continuing Criminal Enterprise Drug Kingpin Act case against the Juarez Cartel, which resulted in extensive seizures of drugs, U.S. currency, firearms, explosives, and the indictment of multiple cartel members and leaders.

---

[1] The VGTF is an FBI-sponsored gang task force comprised of investigators from the FBI, NMSP and RRPD.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

9.      For the past eight years, I have served as the lead case agent in the government's RICO/VICAR investigation into the illegal activities of the New Mexico Syndicate, more commonly referred to as the "Syndicato de Nuevo Mexico" or "SNM" gang. Over the course of the SNM investigation, case agents solved and charged eleven gang-related homicides, seized more than 1.4 million fentanyl pills, 200 pounds of methamphetamine, $2.2. million dollars, 350 firearms, and have arrested more than 170 SNM members and associates.

10.      Over the past twenty-three years, I have primarily worked investigations pertaining to gangs and drug trafficking organizations (DTOs). I have interviewed hundreds of gang members and drug traffickers about the various aspects of their criminal activities. I have developed and managed numerous informants who have been members of gangs or DTOs and monitored dozens of wiretaps and electronic surveillance recordings targeting gang members or drug distributors. I have also worked in an undercover capacity to infiltrate such criminal organizations.

11.      I have received hundreds of hours of formal training in the area of gang, drug, and organized crime investigations from federal, state, and local law enforcement agencies. I've participated in hundreds of investigations pertaining to drug distribution, money laundering, firearms trafficking, gangs and criminal enterprises. My investigative experience includes; conducting surveillance; interviewing subjects, targets and witnesses; drafting and executing search and arrest warrants; acting in an undercover capacity; supervising cooperating sources; managing undercover agents; issuing subpoenas; analyzing phone records, financial records, telephone tolls, and Title III and consensual wiretap investigations. Through my training and experience, I am familiar with the methods used by individuals, DTOs, gangs, and criminal

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

enterprises to distribute controlled substances. I am also familiar with how those individuals and organizations hide the often-substantial profits generated from their criminal activities.

12.     I have served as an adjunct professor; law enforcement instructor; and presenter on drug and gang investigations at the California Highway Patrol, Los Angeles Police Department, New Mexico State Police, and Bernalillo County Sheriff's Office Academies. I have provided training classes and seminars for the Organized Crime Drug Enforcement Task Force, International Outlaw Motorcycle Gang Investigator's Association, California Narcotic Officer's Association, California Gang Investigator's Association, New Mexico Gang Task Force, New Mexico State University and University of New Mexico.

13.     I have qualified, in federal and state courts, as an expert witness on drug trafficking and possession with intent to distribute controlled substances. I have qualified in federal court as an expert witness on the Juarez Cartel, firearms, interstate nexus, and firearm utilization in relation to crimes of violence and drug trafficking. I have qualified in New Mexico state court as an expert on outlaw motorcycle gang culture, modus operandi, and modus vivendi. I am an FBI subject matter expert on the Juarez Cartel, drug trafficking, and gangs, including outlaw motorcycle gangs.

## OVERVIEW OF THE INVESTIGATION

14.     In early 2020, a BCSO detective with the Gang Recognition Intelligence Patrol (GRIP) unit contacted me and requested assistance with the investigation of a potential "war" between two rival motorcycle clubs in Albuquerque. BCSO intelligence information indicated members of the BANDIDOS MOTORCYCLE CLUB (hereinafter "BMC") were involved in an escalating conflict with members of the MONGOLS MOTORCYCLE CLUB (hereinafter "MMC") over the expansion of the MMC into New Mexico.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

 
[2]

15.     By way of background, the State of New Mexico has traditionally been dominated by the BMC. In early 2020, BCSO investigators learned members of the MMC were stockpiling firearms and ammunition, conducting surveillance on BMC members with the intention of assaulting them, and aggressively recruiting new MMC members.

16.     I partnered with BCSO detectives and cultivated several informants associated with the MMC. Shortly thereafter, I obtained federal search warrants for the Albuquerque residences of the MMC Albuquerque Chapter President, Sergeant-at-Arms, and a third MMC member.

17.     On April 15, 2020, FBI and BCSO investigators executed the federal search warrants and recovered seven firearms. MMC Sergeant at Arms WILLIAM WESTFALL, aka: "Shots," was arrested and charged with being a felon in possession of a firearm (Case No. 20MJ986).

18.     MMC members were interviewed, and many described the MMC as being at war with the BMC. The MMC members claimed the BMC started the conflict and pointed out the BMC vastly

---

[2] BMC and MMC "colors," or patches worn on the back of a member's vest.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

outnumbered the MMC in New Mexico. MMC leaders related that the MMC was expanding and trying to start chapters in other parts of the state.[3]

19.     I am aware that some of the MMC members and supporters are themselves former BMC members, who were thrown out of the BMC or quit the club. In some instances, the hatred MMC and BMC members have for one another is deeply personal and goes back many years.

20.     Law enforcement officials in New Mexico, Texas, and Oklahoma have observed a sharp increase in violence between the BMC and MMC over the past four years. The violence did not start four years ago, rather it seems to have escalated during that timeframe and remains on-going. In the pages that follow, I have detailed some of the violent occurrences between the BMC and MMC, as well as the BMC and other motorcycle clubs (MC). The following examples of violence are not all inclusive, as many incidents were not reported to law enforcement. Some of the more recent violent incidents occurring in and around New Mexico include:

a) In January 2019, MMC established a public presence in Albuquerque, in open defiance of the BMC. Almost immediately, the BMC told the MMC to cease and desist in New Mexico or face an all-out war. BMC and MMC members began collecting intelligence on one another.

---

[3] An example of further MMC expansion into New Mexico occurred in October 2021 when Las Vegas, Nevada, MMC member SHAWN NORTON met with seven MMC prospective members/associates in Las Vegas, NM, at a saloon to discuss the opening of a new MMC chapter in Las Vegas, NM. The meeting was surveilled by law enforcement investigators who had been searching for two of the MMC associates because they were wanted for aggravated assault with firearms and conspiracy. Officers surrounded the location and detained all eight MMC members/associates. Officers arrested the two fugitives and recovered three firearms. NORTON was arrested for having a firearm in a liquor establishment. NORTON's case was subsequently adopted by the FBI VGTF and NORTON was charged with being a felon in possession of a firearm and ammunition, Case # 21-CR-1927-WJ.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

b) In February 2019, in San Antonio, TX, a BMC member was arrested for threatening to harm a witness who had testified in a federal racketeering trial against some of the BMC's top leadership.

c) In April 2019, in El Paso, TX, the president of the BMC El Paso chapter assaulted a rival biker and caused great bodily harm to the victim.

d) In August 2019, in Albuquerque, an MMC Southwest member resisted arrest and assaulted a BCSO detective.

e) In September 2019, in Albuquerque, MMC members from the Southwest and Duke City chapters robbed a citizen biker, at gunpoint, of his leather vest and a pistol. The assailants also damaged the victim's motorcycle.

f) In January 2020, in downtown Albuquerque, several BMC and MMC members got into a fight. A BMC prospective member shot and killed a MMC prospective member during the brawl. The BMC prospect was made a member of the club after the shooting.

g) In February 2020, in Midland, TX, BMC and MMC members got into a fight. Four men were shot, and one BMC member was killed.

h) In March 2020, in Albuquerque, the MMC Duke City Chapter Sergeant at Arms told other members of the MMC he had run a lone BMC member off the road and the BMC member subsequently died.

i) In July 2020, in Albuquerque, a group of BMC supporters were shot at six to seven times by an unknown person(s). One of the motorcyclists was struck in the back.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

j)  In April 2022, in Madisonville, TX, a group of Homietos MC members shot at a group of BMC members.

k)  In June 2022, in Albuquerque, two BMC members and two MMC members got into a fight in downtown Albuquerque. A BMC member shot and injured an MMC member.

l)  In November 2022, in Georgetown, TX, members and supporters of the BMC and MMC got into an altercation at a bar and a member of an MMC support club was shot.

m)  In November 2022, in Moss Bluff, TX, BMC members got into a fight with members of the Misfits MC. Several shots were fired and a woman at the scene was struck by gunfire.

n)  In March 2023, in Pflugerville, TX, the BMC got into a physical altercation with members of an unknown club. All participants departed the scene prior to the arrival of law enforcement.

o)  In March 2023, in Albuquerque, a BMC member in a truck ran an MMC member on a motorcycle off the road.

p)  In March 2023, in Killeen, TX, members of the BMC and Chosen Few MC were involved in a dispute with shots fired.

q)  In March 2023, in Albuquerque, an unknown person(s) shot at a BMC support club member and a prospective member. The BMC support club member died from the resulting gunshot wounds.

r)  In April 2023, in Oklahoma City, OK, a gun fight occurred between the BMC and the Homietos MC, which resulted in three killed and eleven injured.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

s)  In April 2023, in Montgomery and Waler counties, TX, several BMC members were shot, and three members were killed after an unknown person(s) ambushed them while traveling on Interstate 45.

t)  In May 2023, in Plainview, TX, a BMC member was assaulted by an MMC member.

u)  In May 2023, in Lubbock, TX, two BMC members conducted a drive by shooting at the home of a rival MC member.

v)  In May 2023, in Red River, NM, several BMC members from New Mexico and Texas confronted a group of Water Dogs MC members. The BMC had approximately 400-500 members in Red River at the time, while the Water Dogs had only seven members. The confrontation was the continuation of months of harassment by the BMC concerning whether the Water Dogs MC had aligned itself with the BMC or MMC. Social media photographs from 2021 supposedly suggested the Water Dogs were associated with the MMC and its support clubs. In Red River, BMC members surrounded the Water Dogs MC members, and three BMC members attacked a Water Dogs member. The fight escalated and two BMC members were shot and killed. One Water Dogs member was killed by gunfire. Five additional people were wounded in the incident.

21.     Eleven people were killed in the aforementioned incidents, all of which occurred in the past three and a half years. In most of these occurrences, BMC members and other motorcycle club members refused to cooperate with law enforcement. The BMC maintain a code of silence and typically do not call law enforcement for assistance. In fact, the BMC rewards members for "taking care of business," which is the basis for the "TCB" (Taking Care of Business) patch

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

worn by many BMC members.  One of the BMC's main mottos, which is also memorialized as a standard patch worn by BMC members is "God Forgives, Bandidos Don't."

22.     On May 17, 2015, in Waco, Texas, a shootout erupted between the BMC and Cossacks MC at a Twin Peaks restaurant during a coalition of clubs meeting.  Nine bikers were killed, and eighteen others were wounded. *Below*: the crime scene at Twin Peaks.





AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

 

23.     I am aware the BMC, like other outlaw motorcycle gangs, strives to be the dominant club within the states in which it exists. Such supremacy enables the gang to govern all other motorcycle clubs, maintain strength and recruitment goals, prolong criminal activities, and prevent other one percenter (1%er) clubs from establishing themselves.[4] If other 1%er clubs attempt to get a foothold in New Mexico, the BMC intimidate and attack. This was the case in 2013, when the Vagos MC (a 1%er club from California) established an Albuquerque chapter.[5]

24.     Following the May 2023, Red River shooting, NMSP Chief Tim Johnson contacted me and requested assistance conducting a statewide investigation of the BMC.

---

[4] The outlaw motorcycle gangs embrace the 1% symbol and most wear it as a patch on their colors. The BMC wear a red and yellow colored diamond shaped patch with "1%" or "1%er" inside the diamond. The 1% image is said to refer to a comment made in 1960 by William Berry, a former president of the American Motorcyclist Association (AMA), that 99% of motorcyclists were law-abiding citizens, implying the last one percent were outlaws.

[5] The first reported BMC versus Vagos MC incident occurred in 2013 when the wife of a BMC member drove her truck into a Vagos member in an Albuquerque parking lot. The Vagos member went down and was injured; however, was able to shoot at the female as she fled the area. In August 2013, in Albuquerque, members of a BMC support club started a fight with members of the Vagos, which resulted in one Vagos' member being shot and killed. In March 2015, in Albuquerque, members of a Vagos support club got into a fight with members of the BMC. The president of the Vagos support club was shot in the leg by a BMC member. In September 2015, in Los Chavez, NM, members of the BMC and a Vagos support club got into a gunfight and one BMC member and one Vagos support club member were killed. In July 2017, in Santa Fe, NM, members of the BMC and Vagos got into a shooting with one another. One man was injured as a result of the gunfire. The Vagos MC has been nonexistent in New Mexico since 2017. *See* U.S. Department of Justice, Outlaw Motorcycle Gangs (OMGS) (April 29, 2021), *available at* https://www.justice.gov/criminal-ocgs/gallery/outlaw-motorcycel-gangs-omgs.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

25.     In June 2023, an ad hoc Outlaw Motorcycle Gang Task Force (OMGTF) was created that included investigators and analysts from the FBI, NMSP, NMCD, APD, RPD, RRPD, BCSO, VCSO, ECSO, OCSO, and LCSO. The purpose of the task force was to address motorcycle gang violence in New Mexico. The task force established liaison points of contact with local law enforcement officers around the state to accomplish this objective. The task force set its sights on the BMC given the organization's continued participation in murders, shootings, extortion, and other violent acts.

26.     There are twelve BMC chapters in New Mexico with approximately seventy-five to one hundred members. The OMGTF investigation focused on a little more than two dozen members within the New Mexico chapters who appeared to be the most criminally active and loudest voices advocating for continued violence. The investigation was predicated on stopping violent crime between motorcycle clubs.

27.     Over the past twenty-three years, I have investigated numerous gangs, to include motorcycle gangs. I have been involved in various investigations of the MMC since 2002 and have arrested MMC members in California, Washington, and New Mexico. I have investigated and arrested members of the BMC in New Mexico over the past fourteen years. I am familiar with the BMC and MMC, and believe both organizations are similar in structure, purpose, and "outlaw" ideology.

28.     The BMC and MMC have dozens of regional chapters around the United States, as well as in several foreign countries. Both clubs have a large body of members and a vast network of supporters, associates, and recruits. Members of both organizations are fiercely loyal to their respective clubs and to one another. The BMC and MMC represent themselves as "motorcycle

clubs;" however, I believe they may more accurately be described as outlaw motorcycle gangs (OMGs).[6]

29.     I have spoken with members of both organizations and am aware both OMGs believe themselves to be "at war" with the other. Based on my investigation, I believe members of the BMC are preparing to attack members of the MMC and Water Dogs MC. Through my conversations with members of the BMC, I believe the Target Subjects identified herein have been the most aggressive proponents of violent conflict. Coupled with the fact those same Target Subjects are believed to be actively conducting reconnaissance on their rivals; acquiring and trafficking in firearms, encouraging others to join them in assaulting and killing rivals; and in possession of firearms, ammunition, and ballistic vests; I believe the requested search warrants will mitigate the current threat and result in the seizure of valuable evidence. Investigators have also developed information indicating BMC members are conspiring to distribute controlled substances and transferring stolen motorcycles and motorcycle parts between BMC chapters in different states. The facts and circumstances supporting these assertions are detailed in the pages that follow.

-------------------------------------------------------

[6] The United States Department of Justice defines a gang as: (1) an association of three or more individuals; (2) whose members collectively identify themselves by adopting a group identity which they use to create an atmosphere of fear or intimidation frequently by employing one or more of the following: a common name, slogan, identifying sign, symbol, tattoo or other physical marking, style or color of clothing, hairstyle, hand sign or graffiti; (3) the association's purpose, in part, is to engage in criminal activity and the association uses violence or intimidation to further its criminal objectives; (4) its members engage in criminal activity, or acts of juvenile delinquency that if committed by an adult would be crimes; (5) with the intent to enhance or preserve the association's power, reputation, or economic resources; (6) the association may also possess some of the following characteristics: (a) the members employ rules for joining and operating within the association; (b) the members meet on a recurring basis; (c) the association provides physical protection of its members from other criminals and gangs; (d) the association seeks to exercise control over a particular location or region, or it may simply defend its perceived interests against rivals; or (e) the association has an identifiable structure.
Source: https://www.justice.gov/criminal-ocgs/gallery/outlaw-motorcycle-gangs-omgs

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

30.   The requested search warrants are based on three sets of criteria:

    a)  information from seventeen confidential human sources, all of whom are current or former members or close associates of the BMC;

    b)  information from law enforcement officers who have investigated the BMC and the Target Subjects; and

    c)  information derived from my knowledge about the BMC, and criminal enterprises in general.

31.   I believe all seventeen informants utilized in the present-day investigation to be reliable. I recognize their cooperation with the FBI is a serious betrayal to the BMC, which could result in their injury or death, should their identities be revealed.

32.   With the execution of the requested search warrants, I believe law enforcement will be able to:

    a)  mitigate planned violent attacks by BMC members;

    b)  seize BMC firearms and compare them to weapons utilized in unsolved homicides and other shootings;

    c)  analyze BMC communication devices to collect evidence related to racketeering offenses, drug distribution, firearms trafficking, robbery, theft, extortion, as well as past and future violent incidents;

    d)  seize controlled substances and drug proceeds;

    e)  recover stolen property; and

    f)  disrupt overall BMC criminal activities and arrest offenders.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

## BACKGROUND ALLEGATIONS ON RACKETEERING
## OFFENSES AND OFFENDER CHARACTERISTICS

33.     Based upon my training, experience, and participation in this investigation, as well as the investigation of other OMGs I am aware that members of the BMC keep intelligence files on members of rival motorcycle gangs. These files include names, nicknames, photographs, home and business addresses, and vehicles attributed to the BMC "enemies." Similarly, BMC members keep personnel files on their own members and prospective members as part of the BMC's background checks and general application processes. I have learned the files on rival BMC members and files on their own members are kept in electronic form on members mobile phones, computers, and in paper form inside their residences.

34.     I am aware BMC members often take, or cause to be taken, photographs and/or videos of themselves, their associates, other club members, and their property. They usually maintain these photographs and/or videos on their person or in their businesses, residences, or cars; on computers; or in the residences of friends or relatives.  Smartphones, tablets, cellular phones, digital cameras, and other digital devices, often have the capability to take still photos and videos and save them indefinitely on the device's storage medium. BMC members frequently use these devices to take their photographs and videos.

35.     Based upon my experiences investigating OMGs, DTOs, and gangs in general, I am aware individuals engaged in the type of criminal conduct constituting the Target Offenses maintain documents, letters and records relating to their illegal activities for long periods of time. This documentary evidence is usually secreted in their place of residence, or the residences of family members, friends or associates, in their business locations, or in stash houses. This documentary evidence includes: telephone numbers, address books, travel receipts, notes

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

referencing aliases or coded names, false identification, money order receipts, money orders, money remittance receipts, pre-paid money cards such as, MoneyPak, Wal-Mart, Green Dot, or other debit cards, bulk U.S currency, money collection logs, such as "tally" sheets, drug load sheets, shipping/mailing receipts, detention facility inmate number lists or addresses for inmates or detention facilities.

36.     I have learned individuals engaged in gang activity and the type of criminal conduct constituting the Target Offenses maintain regular contact with one another. This contact does not terminate once an individual is incarcerated. Members of gang/criminal enterprises routinely send and receive letters from other members of the organization in which they discuss ongoing criminal activities and request various forms of assistance, to include financial help and/or witness intimidation or elimination (as is the case in the instant investigation). Incarcerated members of gang/criminal enterprises communicate via telephone calls, some of which are generated via third parties. In addition, incarcerated members often keep photographs of themselves and other members of the gang/criminal enterprise in order to impress or intimidate others.

37.     I am aware that members of international outlaw motorcycle gangs, such as the BMC, often travel domestically and internationally to facilitate gang meetings, financial transactions, drug distribution, firearms trafficking, and other racketeering offenses. Evidence of foreign and domestic travel by persons engaged in such illegal activities includes travel receipts, airline tickets, receipts, passports, and visas. These items are stored by suspects on their persons or in their residences, businesses, and surrounding garages, outbuildings, carports, yards, the residences of relatives and in vehicles. Many of these items are accessible via the internet and can be downloaded and saved on computer or other digital media and on storage media.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

38.    The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware. The term "digital media" includes personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones.  The term "storage media" includes any physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium.

39.    I know that members and associates of gang/criminal enterprises and DTOs have access to numerous cellular phones, often at the same time, in an effort to avoid law enforcement monitoring. I have observed gang members, who are involved in drug trafficking, routinely use pre-paid phones requiring no subscriber information, or fictitious subscriber names, to advance their unlawful activities. These cellular telephones often contain names and phone numbers of other co-conspirators, text messages utilized to further their illicit activities, photographs and videos of gang members, controlled substances, drug proceeds, or firearms. I have observed incarcerated members of gang/criminal enterprises utilize non-gang members personal identification number when making prison/jail telephone calls to mask their conversations and decrease the likelihood institutional gang officers will monitor the call.

40.    In addition, I am also familiar with the use of text messaging, instant messaging, and messaging applications, used by gang/criminal enterprises and DTOs to advance their unlawful activities.  Members of gang/criminal enterprises and DTOs often utilize the names of others to mask their ownership of vehicles, real property, and utility services, in an effort to avoid detection by law enforcement.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

41.     I am aware that members of OMGs frequently steal motorcycles and traffic in stolen motorcycle parts. Motorcycle theft is particularly lucrative because the motorcycles themselves are expensive, relatively easy to work on, have interchangeable parts, and only a couple of the parts on a motorcycle have identification numbers that can be tracked by law enforcement.

42.     I am aware individuals engaged in the type of criminal conduct constituting the Target Offenses often use storage facilities for drugs, firearms, stolen property, and other items related to drug and firearms trafficking that are at a location away from their residences and businesses. These off-site storage facilities are often commercial storage lockers and rooms. These locations are often used to store or hide drugs, firearms, contraband, money, and other valuables.  Drug and firearms traffickers often keep documents and other items tending to show the existence of other stored drugs, contraband, money, and other valuables in areas such as storage facilities. Those documents and other items include rental agreements, receipts, keys, notes and maps specifically concerning off-site storage rooms, lockers, and safety deposit boxes.  This evidence may be found on their person or in their businesses, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars.  This type of documentation can be stored on digital media and concealed virtually anywhere.

43.     Other evidence of transportation, ordering, possession and sale of drugs, firearms, and stolen property can include the following:  telephone bills to show numbers called by criminals (and hence potential associates), overnight mail receipts, bank statements, deposit and withdrawal slips, savings books, investment statements, loan statements, other financial institution statements, and federal and state tax returns.  The above items are stored by racketeering suspects on their person or in their business, residences and surrounding garages,

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

outbuildings, carports and yards, the residences of friends or relatives, and cars.  This type of documentation can be stored on digital media and concealed virtually anywhere.

44.     Drug distributors, firearms traffickers, and people who sell stolen motorcycles usually sell their products for cash.  Because large quantities of drugs, firearms, or stolen motorcycles can sell for thousands of dollars at the wholesale level, dealers may have thousands of dollars in cash on hand both as proceeds of sales and to purchase supplies/inventory.  In addition, drug dealers and firearms traffickers often have other assets generated by their illicit business, or purchased with cash earned, such as precious metals and stones, jewelry, real estate, vehicles, and other valuables.

45.     Individuals involved in drug and/or firearm trafficking often try to legitimize these profits from the sale of drugs, firearms, or stolen motorcycles. To accomplish this goal, traffickers may utilize foreign and/or domestic banking institutions and their attendant services, real estate, and businesses, both real and fictitious.  They also try to secrete, transfer, and conceal the money by (a) placing assets in names other than their own to avoid detection while maintaining control, (b) laundering money through what appears to be a legitimate business or businesses, (c) hiding the money in their homes, safes and safety deposit boxes, and/or (d) using the money to buy assets which are difficult to trace.  This evidence is useful in a criminal prosecution, and it also is useful in identifying real and personal property that can be seized and forfeited by the government under existing laws.  Documentation concerning this type of activity can be stored on digital media and concealed virtually anywhere.

46.     Evidence of significant, unexplained income of drug and/or gun dealers, or for the acquisition and concealment of money and assets of drug sales, can be found on banking and investment account statements, credit card account statements, canceled checks, money orders,

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

deposit slips, check and savings books, business and personal ledgers, accounting records, safe deposit box records and keys, federal and state tax records, rental receipts, rental agreements, utility bills, overnight mail receipts, telephone bills, loan statements records reflecting ownership of real or personal property (such as deeds of trust or vehicle registration, insurance, and ownership information), vehicle and property rental records, lease and purchase agreements, and canceled mail.   These records can be maintained on paper, but also can be maintained as electronic data on computers and other digital media.  The above items are typically kept by drug dealers on their person or in their businesses, residences and surrounding garages, outbuildings, carports, and yards, the residences of friends or relatives, and vehicles.

47.     The use of digital media, including smartphones, tablets, cellular phones, and digital devices, has become part of everyday life. This is also true for drug distributors, firearms traffickers, stolen vehicle dealers, and gang members. Information stored in electronic form on all of the above devices can provide evidence of criminal activity and conspiracy. Individuals engaged in the type of criminal conduct constituting the Target Offenses frequently use some or all of these devices to communicate with co-conspirators, customers, sources of supply, and others involved in organized crime. These communications include, but are not limited to, phone calls, text messages, SMS (Short Message Service) messaging, MMS (Multimedia Messaging Service) messaging, social media posts and messaging, and smartphone application messaging services. Smartphones, tablets, cellular phones, and digital devices are frequently capable of storing messages, emails, social media communications, and communications made over smartphone applications. The content of these communications will often provide evidence of the Target Offenses. Numbers stored on a telephone (such as Caller ID lists reflecting recently received calls, speed dial lists of names and/or telephone numbers, and logs of outgoing and

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

incoming calls) can provide evidence of who the suspect(s) are calling, and thus the identity of potential associates.

48.    I have observed individuals involved in the distribution of controlled substances, firearms, and stolen vehicles often conceal evidence of their activities in their residences and businesses, or the residences of friends or relatives, and in surrounding areas to which they have ready access, such as garages, carports and outbuildings.  They also conceal evidence in vehicles, including vehicles outside of their residences, so that they have ready access to it and so that they can hide it from law enforcement officers executing search warrants at their residences or businesses.  I have also observed individuals involved in drug trafficking bury evidence underground in containers on their property.

49.    I believe members of gang/criminal enterprises and DTOs often maintain records of their transactions in a manner similar to the record keeping procedures of legitimate businesses.  Even after the drugs are sold, documentary records often remain for long periods of time, even years, to memorialize past transactions, especially when debts remain open. I have located notes documenting the status of accounts receivable and accounts payable, and the names and phone numbers of suppliers, customers, and co-conspirators, and other associates who have assisted drug traffickers in other ways, such as helping with the cleansing of otherwise "dirty" money. I am aware such proceeds may be made to appear "clean" through a variety of means, including investments into legitimate enterprises and structuring deposits of large amounts of U.S. Currency into financial institutions in such a way so as to avoid the detection by law enforcement, as well as reporting requirements of banking institutions. These records can be maintained on paper, in the form of business and personal ledgers and diaries, calendars,

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

memoranda, pay-owe sheets, drug ledgers, IOUs, miscellaneous notes, money orders, customer lists, and phone address books, both in hard copy and electronic form.

50.     I am aware that members of the BMC use and possess firearms and other weapons, such as large knives, edged weapons, metal bats/pipes, hammers and other weapons. These weapons are used and possessed by members of the gang to commit murders, attempted murders, assaults, robberies, to protect illicit drug supplies, to avoid arrest or escape from custody, to intimidate rivals, victims, witnesses, and persons who have aggravated or disrespected the BMC. I know that firearms are instrumentalities of the acts of violent crime in aid of racketeering and drug trafficking, and that firearms are critical "tools of the trade" for the BMC. I am aware members of the BMC are expected to possess and maintain weapons and firearms, and that these weapons are routinely kept in the residences of BMC members.

51.     It has been my experience that the items described above are often stored by members of gang/criminal enterprises and DTOs on their person, in their businesses, residences and surrounding garages, outbuildings, and yards, the residences of friends or relatives, and vehicles.

52.     A list of items agents seek authority to seize are listed in Attachment B.

## THE BANDIDOS MOTORCYCLE CLUB CRIMINAL ENTERPRISE

53.     The BMC is an outlaw motorcycle gang, whose members and associates seek to maintain and proliferate the gang through criminal activity. Members of the BMC, to include the Target Subjects, are believed to have violated federal statutes by engaging in criminal activities including conspiracy to commit murder, assault with a deadly weapon, extortion, robbery, sale and possession for sale of controlled substances, using firearms in connection with violent crimes and drug trafficking, possession of stolen firearms, possession of stolen motorcycles, and possession of firearms by prohibited persons.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

54.     The BMC is a highly organized criminal enterprise, with a defined multi-level chain of command. The BMC have established regional chapters around the world, with their headquarters being based in Texas. Each local chapter has a President, Vice President, Secretary/Treasurer and Sergeant at Arms. The gang has an estimated worldwide membership of approximately 2,000-2,500 members. Various federal and state jurisdictions around the country have prosecuted members of the BMC in recent years.[7]

55.     I believe the BMC, including its leadership, membership, prospects, and associates, constitutes an enterprise as defined in 18 U.S.C. § 1959(b)(2), that is, a group of individuals

---

[7] The information contained within the following media reports is hereby incorporated herein:

a.  Associated Press, Bandidos biker gang president sentenced to life in prison (Sept. 28, 2018), *available at* https://www.nbcnews.com/news/us-news/bandidos-biker-gang-president-sentenced-life-prison-n913561

b.  Department of Justice, Jury Convicts Bandidos Outlaw Motorcycle Organization Leadership on All Federal Charges (May 17, 2018), *available at,* https://www.justice.gov/usao-wdtx/pr/jury-convicts-bandidos-outlaw-motorcycle-organization-leadership-all-federal-charges

c.  Department of Justice, Nearly 40 Members and Associates of Bandido Outlaw Motorcycle Gang Charged in Three Districts for Alleged Drug and Firearm Offenses (Sept. 27, 2011), *available at,* https://www.justice.gov/opa/pr/nearly-40-members-and-associates-bandido-outlaw-motorcycle-gang-charged-three-districts#:~:text=WASHINGTON%20%E2%80%93%20Nearly%2040%20members%20and,of%20Justice%20and%20the%20FBI

d.  Department of Justice, A Federal Grand Jury in Seattle has indicted twenty-six members and associates of the Bandidos Motorcycle Organization for serious violent offenses (June 10, 2005), *available at*, https://www.justice.gov/archive/usao/waw/press/2005/jun/bandidos.html

e.  Guillermo Contreras, San Antonio Express News, Bandido gets 13 years without parole for retaliation killing near San Antonio (Oct. 2, 2018), *available at*, https://www.expressnews.com/news/local/article/Bandido-gets-13-years-without-parole-for-13276624.php

associated in fact that engaged in, and the activities of which, affect interstate commerce. The enterprise constitutes an ongoing organization whose members and associates functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

## THE HISTORY OF THE BANDIDOS MOTORCYCLE CLUB

56.     The BMC was established in 1966 in Texas and identifies itself as an outlaw motorcycle club. The BMC is an international organization with approximately 175 chapters in fifteen countries. There are approximately 107 chapters in the United States, including twelve chapters in New Mexico. The New Mexico chapters include North Albuquerque, South Albuquerque, East Albuquerque, West Albuquerque, Duke City, Uptown, Los Lunas, Las Cruces, Ruidoso, Alamogordo, Four Corners, Santa Fe, and Carlsbad/Hobbs.[8]

57.     The BMC worldwide membership is estimated at between 2,000 and 2,500 members. The BMC in the United States is a highly organized criminal organization which adheres to a tiered chain of command both nationally and locally. National officers are the most powerful and influential members of the enterprise. National officers comprise the National Chapter and include the President, Vice President, Secretary, Treasurer, and Sergeant at Arms. In addition to the National Chapter is a Nomad Chapter, which is located throughout the United States. The Nomad Chapter is involved in gathering intelligence for the BMC and meeting with the National officers to provide information that relates to the enterprise.

---

[8] Recent CHS reporting indicated the Carlsbad, NM, chapter of the BMC, also known as the "Cave City chapter," was dissolved and several BMC members in Carlsbad were "out bad," which means they were thrown out of the club. Sources reported members of the BMC San Antonio chapter came up to Carlsbad and assaulted the Cave City members, stripped them of their BMC patches and took their motorcycles. The incident was not reported to the police, which is not uncommon within 1%er clubs. CHS reported BMC members in Hobbs are presently running all BMC related activities in Carlsbad.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

58.     The local Chapter Presidents report directly to the National Sergeant at Arms for the region or to other National officers in the region. If the local Chapter President reports to a national officer, that officer reports to the National Vice President. The Nomad Chapter reports directly to the National Vice President as well. The National Vice President reports to the National President.

59.     Each BMC regional chapter is led by a Chapter President, Vice President, Sergeant at Arms, and Secretary/Treasurer. The Sergeants at Arms are considered the "enforcers" among the club members and are responsible for enforcing club rules and administering consequences when rules are broken. The Secretary/Treasurers perform the recordkeeping functions of the organization and take notes during weekly chapter meetings. I am aware members of the BMC in New Mexico have discussed firearms acquisition and distribution, the disbursement of ballistic vests, the targeting of MMC members for violent acts, and the identities of suspected informants with ties to the BMC.

60.     BMC members typically maintain these documents in a secure location, such as their residences. Those records include chapter meeting minutes, the chapter's bank accounting details, the collection and receipt of dues and fines, and forwarding of funds to the national secretary/treasurer. These documents, including minutes from chapter meetings and financial records, often reflect criminal activity.

61.     Each local chapter President is responsible for support clubs that affiliate with the BMC as well as the American Motorcycle Association clubs operating in the same geographical area. Some support clubs wear the reverse color scheme patch (yellow letters on a red background) to show their allegiance to the BMC. These support clubs are also referred to as "farm clubs"

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

because this is the recruiting pool for the BMC to pick individuals to prospect and become members of the BMC.

62.    Example BMC support club colors are depicted below. Note that the colors are the inverse of the BMC colors (yellow lettering on a red background for support clubs, versus red lettering on a yellow background for BMC members).

  

 

 

The "I support Bandidos MC Worldwide" cookie-cutter patch is worn above their own club patches on the front of the vest. The "Known Associate" is another BMC support patch.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

63.     The President is the highest-ranking officer in each chapter. Each President is responsible for holding regular chapter meetings, also known as "church." Presidents are required to attend regularly held national Presidents' meetings and the mandatory BMC "runs" (i.e., when members wear their "colors" and travel in groups on their motorcycles to a meeting location). The Sergeant at Arms of each chapter oversees security and enforcement activities related to the chapter. The Secretary and/or Treasurer for the chapter is responsible for keeping current contact information for all their members as well as for all the other Secretaries/Treasurers so that information can be disseminated, maintaining the patches of retired BMC members, maintaining records of bank accounts and club funds, collecting fines, collecting dues, and collecting "donations" from support clubs and paying the monies to the National Secretary. Each BMC member is required to attend meetings, runs, and pay chapter and national dues. Each member is also required a fine up to $1,000 if a mandatory run is missed and is obligated to pledge their motorcycle and title to the enterprise.

64.     BMC members, prospects, and members of support clubs are required to pay dues on a monthly basis. A portion of these dues are forwarded to the national leadership. Support club dues are often referred to as "donations." "Taxes" are assessed on individual members at various times, with the proceeds also being funneled up the BMC chain to the national leadership. The dues and taxes help fund the continued operation of the enterprise and are used for a variety of purposes, including the payment of expenses to the national leadership, covering funeral expenses of members, contributing to the legal fees for any BMC members arrested while conducting club business, and paying costs associated with planned trips or "runs." The enterprise also raises funds for its activities and legal defense through unlawful gambling activities, namely raffles.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

65.     The BMC is a closed society. Allegiance to this organization and fellow brothers is valued above all else. Witnesses to their criminal acts are typically the victims of acts of intimidation or harassment and are too afraid to approach law enforcement or testify in court proceedings. BMC members do not fear authority and have a complete disdain for the rules of society. The BMC is very careful about admitting individuals into the enterprise. There is a lengthy process before one can become a "full patch" member, as defined below. This process is designed to guard against law enforcement infiltration into the BMC. Initially, the prospective member is allowed to associate with BMC members. After some time, they are identified as a "hang around" and obligated to do menial tasks for full club members. The next phase is that the person becomes a "prospect" which requires being sponsored by a full patch member. The club members then vote on whether the "prospect" can become a full patch member.

66.     Prospective members of the BMC must submit a detailed written application and pass a background check. BMC attorneys and private investigators have been utilized to validate the backgrounds of prospects and associates. BMC associates seeking to become full-fledged BMC members are referred to as "prospects' and frequently wear red and yellow flannel shirts, jackets and t-shirts that bear "Support Your Local Bandidos" or "S.Y.L.B.' Once a prospective member passes a background check, they may be accepted into the BMC as a "prospect" and wear patches identifying them as such. The prospect is then placed on a probationary period and serves as an assistant to the BMC members.

67.     BMC members are well organized and maintain an established structure and hierarchy. The BMC upholds a written constitution and by-laws, which dictate the rules of membership and a strict code of conduct for the group. The BMC by-laws also articulate the consequences and penalties for noncompliance with BMC rules and traditions.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

68.     Full patch members are required to either own Harley Davidson or Indian motorcycles and wear clothing with patches that symbolize the club. These patches are commonly known as club "colors." The color scheme for the BMC patch utilizes red letters on a gold (yellow) background. The colors consist of an upper patch (top rocker patch) that identifies the BMC name, a center patch which contains the emblem of the club, and a bottom patch (bottom rocker patch) which is representative of the State in which the members' chapter is located, or in the case of the National Officers, the title of their office. Full patch members also wear a diamond-shaped "1%" patch. The "1%" symbol is derived from a public statement coined many years ago that 99% of the country's motorcyclists are law-abiding individuals.

69.     The "1%" symbol has become the symbol of the outlaw biker. Members who wear their BMC "colors" do so with the authority of the BMC. Members are required to wear their "colors" when riding their motorcycles and when attending a National Run or other BMC events. When attending a National Run, and at other times, some BMC members travel with BMC merchandise to sell at the destination. Only BMC members and close associates are authorized to sell BMC merchandise, and a portion of the sales is funneled back to the enterprise.

70.     The BMC has a well-documented history of criminal activity, including: murder; battery; assault with a deadly weapon; robbery; firearms trafficking; unlawful possession and/or use of firearms; drug distribution; extortion; motorcycle theft; and hate crimes directed at African Americans who run afoul of the BMC. Several BMC patches depict Nazi symbolism, to include the swastika and SS lightning bolts (see BMC patches depicted herein). Members of the gang often intimidate witnesses, victims, and the public to cause fear and prevent persons from reporting BMC-related crime to law enforcement. As such, many BMC members believe they can commit their crimes with impunity because the BMC is a large and powerful organization,

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

with members around the world. BMC members, prospective members, and associates often use the reputation of the BMC to threaten and intimidate victims and witnesses and protect BMC members from criminal prosecution.

71.     BMC members, like most other outlaw motorcycle gang members, direct attacks at their rivals, as well as members of the public who might unwittingly come into contact with the BMC in a way that might be deemed disrespectful to the organization. Such circumstances often occur when members of the motoring public do not move out of the way of BMC motorcycle riders, follow them too closely, or otherwise show contempt in the eyes of the BMC members.



Above: BMC riders traveling on Interstate 25 in New Mexico.

72.     Several of the informants utilized in this investigation described circumstances in which BMC members assaulted or damaged the motorcycles of riders who pulled up next to BMC

members at traffic lights, accelerated through intersections before BMC members, or passed BMC members on the roadway.[9]

73.    BMC members refer to one another as "brothers" and describe the BMC as a "brotherhood." Law enforcement officers, suspected informants, witnesses who have cooperated with the police, persons who have testified for the prosecution, homosexuals, and African Americans are not allowed to join the BMC. Women cannot become members of the BMC but bear the distinction of being referred to as "Property of (insert member's name)," and wear

---

[9] One of the more egregious examples of this occurred in July 2022, when BMC member CHRISTOPHER ORTEGA, aka: "Hoss," of Carlsbad, NM, ran a female motorcycle rider off the road and punched her in the face and head several times. A summary of the incident, according to court documents: A female victim was riding her motorcycle in Carlsbad, NM, and on her way to a friends' house. The female victim approached an intersection and began slowing because the light was red. As she got closer to the intersection the light turned green and she accelerated through the intersection. She passed another motorcycle, in another lane, as she did so, she observed a male rider and female passenger on the motorcycle. The female then noticed the male rider following her very closely. The female made a series of turns; however, the male rider remained directly behind her. The male rider then pulled in front of her and cut her off. The female fell off her bike as a result. The male, identified by the victim as, BMC member, CHRISTOPHER ORTEGA, approached her and punched her in the mouth. The female fell to the ground and ORTEGA punched her in the ear and back of her head. The female lost consciousness briefly. The female regained her senses and retrieved a flashlight from her motorcycle. ORTEGA moved closer to her and threatened to kill her. The female backed away from ORTEGA and crossed the street to create distance. The female observed ORTEGA cut her spark plug cable before departing the scene with his passenger. The victim's motorcycle would not start. She suffered moderate facial injuries from the assault, to include the loss of a front tooth. The female victim told officers ORTEGA assaulted her because the Bandidos had a rule that you should never pass a Bandido while driving a motorcycle. She went on to explain ORTEGA beat her up because she passed ORTEGA at the intersection when the light turned green. The female could not have clearly observed ORTEGA to be a BMC member because he had a passenger on his motorcycle, which would have obstructed his colors. The female told officers that she should not have to follow the BMC's rules because she was not affiliated with them. Moreover, the victim was a female, and a "civilian" (not affiliated with a club). ORTEGA was charged in that incident; however, it appears the district attorney's office is no longer pursuing the case, D-503-CR-2022-00341.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

leather vests that denote the same. Women also wear patches with the letters "PBOL," which stands for "Proud Bandidos Old Lady" (see image below).



74.     BMC members identify themselves with patches, tattoos and insignia, identifying their connection to the BMC and status within the organization. BMC members signify their membership with the gang by wearing leather vests, tee-shirts, hats, jewelry demonstrating the BMC trademark logo and specific patches. The most prominent images are that of "the fat Mexican" wearing a sombrero and holding a pistol and sword. The 1%er image is a declaration used to distinguish BMC members from the other "99%" of "regular citizen" motorcycle clubs around the world. BMC members define themselves as within the "1%" who are not ordinary and do not adhere to the law or the rights of others. BMC members also wear a patch that indicates which chapter they are from, for example: "E. Albuquerque," "Santa Fe," "Ruidoso," etc. BMC members can earn the "TCB," (Taking care of Business) patch for "showing heart" or committing violence on behalf of the gang. BMC members who have spilled blood for the club wear the "Expect No Mercy" patch.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

75.     The BMC maintain a steady supply of firearms in order to enforce the authority of the gang and protect its members, prospects, associates and women. Some firearms are lawfully owned and possessed by members, while other firearms are stolen or untraceable. The latter are maintained to be utilized when confronting rivals or conducting shootings on behalf of the BMC. Such weapons are utilized so they may not be readily connected to the BMC member who used them. Weapons are often discarded or destroyed after an incident.

76.     BMC members also carry other weapons on their person and motorcycles, to include knives, hammers, metal chains, and metal laced ropes. Metal chains are also affixed to member's motorcycle handlebars so BMC riders can strike persons or vehicles while chasing or passing them on the roadway.

77.     BMC members are attentive to the presence of rival motorcycle gangs, law enforcement, and suspected informants. Bandidos are likely to identify such persons, and in the instances where rivals or informants might be present, BMC members assault them. BMC members have been known to confront law enforcement officers on patrol or during surveillance operations targeting the BMC. BMC members frequently challenge persons wearing clothing supporting rival OMGs and have threatened to assault them if they do not remove the insignia (such as black and white colored tee-shirts, hats, pins or patches, which are associated with rival clubs).

78.     BMC members who are "out bad," or thrown out of the gang, must give up their patches and BMC memorabilia. They are also subject to beatings by the BMC and may have to give up their motorcycle(s), as such conveyances are considered property of the BMC.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

## BANDIDOS MOTORCYCLE CLUB PATCHES AND INSIGNIA

### Bandidos Patches: Front of Vest

    BMC member, rank and chapter designation

    One Percenter (1%er) patch

    Expect No Mercy patch

    God Forgives Bandidos Don't patch

    Bandidos Sombrero with Nazi SS Lighting Bolts patch

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

   BMC FTW (Fuck The World) patch

**Bandidos Patches: Back of Vest**

   Three-piece patch designating BMC, the Fat Mexican logo, and the state the member is from.



AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

### BANDIDOS MOTORCYCLE CLUB PATCHES AND INSIGNIA




BMC member with Hells Angels MC member inside a Texas BMC clubhouse, with Nazi flag in background (upper left).

Group of BMC members posing together. The member in the middle is wearing a Nazi shirt and "war pants," which contain patches taken from other clubs and displayed upside down.

### BANDIDOS MOTORCYCLE CLUB SUPPORT PATCHES

The BMC in New Mexico require all New Mexico motorcycle clubs to wear a BMC support patch on their cuts. The BMC also suggest motorcycle clubs in New Mexico display BMC support stickers on their motorcycles.  The BMC sell the support patches and stickers. Example support patches are depicted below:



AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

## PURPOSES OF THE ENTERPRISE

79.     The purposes of the BMC criminal enterprise, including its members and associates, include, but are not limited to, the following:

a)  Enriching the leaders, members, associates, and prospects of the BMC through, among other things, establishing and distributing controlled substances in territory controlled by the BMC.

b)  Maintaining the control and authority of the BMC over the territory claimed by the BMC.

c)  Preserving, protecting, and expanding the power of the BMC using intimidation, violence, threats of violence, assault, kidnapping, and murder.

d)  Promoting and enhancing the enterprise and the authority and activities of the leaders, members, associates, and prospects of the BMC.

## MEANS AND METHODS OF THE ENTERPRISE

80.     The means and methods by which the defendants and their co-conspirators conduct and participate in the conduct of the affairs of the BMC include:

a)  Members of the BMC commit, attempt to commit, and threaten to commit acts of violence to protect and expand the enterprise's criminal operation, which includes murder, assaults, intimidation, robbery, extortion, money laundering, drug trafficking, and threats of violence directed against rival gang members, law enforcement, and potential witnesses to the crimes of the enterprise.

b)  Members of the BMC and their associates promote a climate of fear through intimidation, violence, and threats of violence intended to promote the authority

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

of the BMC and insulate its members from liability for drug-trafficking and violent crimes committed on behalf of the organization.

c) Members of the BMC use the enterprise to murder, attempt to murder, kidnap, assault, intimidate, and threaten those who pose a threat to the enterprise.

d) Members and associates of the BMC engage in the interstate and intrastate theft of motorcycles and trafficking of controlled substances as a means to generate income for themselves and the organization.

## PUBLIC CORRUPTION:

## OUTLAW MOTORCYCLE GANGS AND LAW ENFORCEMENT

81.     Over the past twenty-three years, I have observed individuals, whether sworn officers, 911 dispatchers, or law enforcement support employees, maintain friendly relationships with OMG members. The biker gang members sometimes referred to the law enforcement personnel as "inside sources." Additionally, my experience has confirmed that some law enforcement officials maintain sociable friendly and unprofessional relationships with members of OMGs. This is an unfortunate phenomenon that frequently compromises OMG investigations around the country. I have had conversations with OMG members who relayed questions and concern as to why some law enforcement and corrections officers establish motorcycle clubs akin to OMGs, to include the wearing of three-piece patches on the back of their vests.

82.     BMC and MMC members with whom I have spoken have expressed dismay and frustration with "biker cop clubs" impersonating outlaws. Both BMC and MMC members have asked what might happen if they were to wear black or olive drab vests with police or FBI patches, pointing out the disparity between the outlaws and the cops who imitate them.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

83.     With the popularity of television programs and books that glamorize the OMG culture,

the desire for some law enforcement officials to maintain close, unprofessional, and sometimes

criminal relationships with OMG members will not likely disappear. It is through these close and

inappropriate relationships that OMG members often gain information that is disruptive to law

enforcement investigations and dangerous to the safety of confidential human sources.

### THE CONFIDENTIAL HUMAN SOURCES

84.     During this investigation, FBI case agents utilized several Confidential Human Sources

("CHS" is used for both the singular and plural use of the term) to infiltrate and disrupt the BMC

in New Mexico. Agents encouraged the various CHS to maintain contact with BMC members

and associates who were engaged in ongoing criminal activity. Seventeen CHS were utilized in

the instant investigation. By cooperating with the FBI, the CHS have exposed themselves to a

violent death by the BMC, should their identities become known.[10] I have sought to provide the

Court with some of the underlying circumstances and background information I relied upon in

determining the information from the various CHS was reliable. In the paragraphs that follow, I

have provided an overview of each CHS, to include:

      a)  their basis of knowledge concerning the criminal conduct;

      b)  motivation to assist the FBI;

      c)  criminal history;

---

[10] On April 7, 2006, eight members of the BMC from Toronto, Canada, were murdered and their bodies discovered in a barn in southwest Ontario. The murders were orchestrated by a BMC chapter president who accused the victims of being disloyal before they were executed by fellow BMC members. Six BMC members were subsequently convicted of first degree murder as a result of the slayings.

Associated Press, "8 deaths in Canada linked to biker gang" (April 10, 2006), *available at,* https://www.nbcnews.com/id/wbna12255286

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

    d)  any compensation received from the government; and

    e)  a statement concerning their reliability.

85.    I have attempted to provide sufficient information to the Court, while balancing the anonymity and safety of the CHS.[11]

86.    **CHS-1** is a citizen informant who previously worked for the ATF as a source of information. ATF case agents described CHS-1 as a reliable informant whose information contributed to numerous investigative leads and search warrants. CHS-1 provided me with background information on the Target Subjects and the BMC, to include the gang's history, structure, goals, recruiting and intelligence collection efforts on rival OMG members. CHS-1 is motivated to assist the FBI to help prevent bloodshed between the BMC and MMC. CHS-1 has not received monetary compensation from the FBI, nor does CHS-1 have pending criminal charges. CHS-1 does not have any felony convictions. I consider the information CHS-1 provided to be reliable because much of it was corroborated through law enforcement investigation, information from other CHS, social media postings, and physical surveillance. To my knowledge, CHS-1's information has not been found to be false or misleading.

87.    **CHS-2** is a citizen informant who cooperated with the FBI in 2019. CHS-2 is a member of the BMC and provided me with background information on the Target Subjects, with whom CHS-2 is closely associated. CHS-2 is motivated to assist the FBI to help prevent bloodshed between the BMC and MMC. CHS-2 has not received monetary compensation from the FBI and has prior felony convictions for larceny, auto burglary, violent, firearms, and narcotics crimes.

---

[11] I am aware that members of the BMC use publicly available tools to research the criminal histories of suspected informants. Providing the precise criminal history of each CHS would expose various CHS to immediate identification and execution. To avoid this result, I have described some of the relevant criminal histories without providing the specific crimes and dates of conviction.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

CHS-2 has utilized a cellular telephone equipped with a consensual wiretap to converse with targets of FBI investigations. I consider the information CHS-2 provided to be reliable because much of it was corroborated through law enforcement investigation, information from other CHS, social media postings, and physical and electronic surveillance. To my knowledge, CHS-2's information has not been found to be false or misleading.

88.     **CHS-3** is a citizen informant who cooperated with the FBI in 2017. CHS-3 is a member of the BMC and provided me with background information on the Target Subjects, with whom CHS-3 is closely associated. CHS-3 is motivated to assist the FBI to help prevent bloodshed between the BMC and MMC. CHS-3 is an experienced informant and has conducted controlled buys, introduced undercover agents to targets of FBI investigations, and worn covert FBI recording devices. Information from CHS-3 has resulted in numerous arrests and the seizures of controlled substances, firearms, and stolen vehicles. CHS-3 does not have any pending charges and has not received any financial assistance from the FBI. CHS-3 has a felony conviction for a narcotics crime. I found information from CHS-3 to be reliable because much of it was corroborated by independent source information, undercover FBI agents, other law enforcement investigations, controlled drug buys, and physical and electronic surveillance. To my knowledge, CHS-3's information has not been found to be false or misleading.

89.     **CHS-4** is an FBI CHS and BMC member. CHS-4 has served as an ATF informant. ATF case agents described CHS-4 as a reliable informant whose information contributed to numerous investigative leads and search warrants. CHS-4 provided me with background information on the Target Subjects, with whom CHS-4 is closely associated. CHS-4 is motivated to assist the FBI to help prevent bloodshed between the BMC and the MMC. CHS-4 provided me with background information on the Target Subjects and the BMC, to include the gang's history, structure, goals,

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

recruiting and intelligence collection efforts on rival OMG members. CHS-4 has not received monetary compensation from the FBI, nor does CHS-4 have pending criminal charges. CHS-4 has been convicted of violent and narcotics crimes. I consider the information CHS-4 provided to be reliable because much of it was corroborated through law enforcement investigation, information from other CHS, social media postings, and physical surveillance. To my knowledge, CHS-4's information has not been found to be false or misleading.

90.     **CHS-5** is a citizen informant and former FBI CHS. CHS-5 cooperated with the FBI in 2010. CHS-5 is a member of the BMC and provided me with background information on the Target Subjects, with whom CHS-5 is closely associated. CHS-5 is motivated to assist the FBI to help prevent bloodshed between the BMC and MMC. CHS-5 as a reliable informant whose information contributed to numerous investigative leads. CHS-5 provided me with background information on the Target Subjects and the BMC, to include the gang's history, structure, goals, recruiting and intelligence collection efforts on rival OMG members. CHS-5 does not have any felony convictions or pending charges. CHS-5 has received approximately $5,000 in financial assistance from the FBI. I found information from CHS-5 to be reliable because much of it was corroborated by independent source information, other law enforcement investigations, and physical and electronic surveillance. To my knowledge, CHS-5's information has not been found to be false or misleading.

91.     **CHS-6** is a citizen informant and member of the BMC. CHS-6 has not previously cooperated with law enforcement and is only doing so to prevent bloodshed between the BMC and MMC. CHS-6 provided me with background information on the Target Subjects and the BMC, to include the gang's history, structure, goals, recruiting and intelligence collection efforts on rival OMG members. CHS-6 has not received monetary compensation from the FBI, nor does

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

CHS-6 have pending criminal charges. CHS-6 does not have any felony convictions. I consider the information CHS-6 provided to be reliable because much of it was corroborated through law enforcement investigation, information from other CHS, social media postings, and physical surveillance. To my knowledge, CHS-6's information has not been found to be false or misleading.

92.    **CHS-7** is a citizen informant and member of the BMC. CHS-7 has not previously cooperated with law enforcement and is only doing so to prevent bloodshed between the BMC and MMC. CHS-7 provided me with background information on the Target Subjects and the BMC, to include the gang's history, structure, goals, recruiting and intelligence collection efforts on rival OMG members. CHS-7 has not received monetary compensation from the FBI, nor does CHS-7 have pending criminal charges. CHS-7 does not have any felony convictions. I consider the information CHS-7 provided to be reliable because much of it was corroborated through law enforcement investigation, information from other CHS, and physical surveillance. To my knowledge, CHS-7's information has not been found to be false or misleading.

93.    **CHS-8** is a former FBI CHS and cooperated with the FBI in 2017. CHS-8 is a close associate of the BMC and provided me with background information on the Target Subjects, with whom CHS-8 is closely associated. CHS-8 is motivated to assist the FBI to help prevent bloodshed between the BMC and MMC. CHS-8 is an experienced informant and has conducted controlled buys, introduced undercover agents to targets of FBI investigations, and worn covert FBI recording devices. Information from CHS-8 has resulted in numerous arrests and the seizures of controlled substances, firearms, and stolen vehicles. CHS-8 does not have any pending charges and does not have any felony convictions. CHS-8 has received approximately $8,000 in financial assistance from the FBI. I found information from CHS-8 to be reliable

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

because much of it was corroborated by independent source information, undercover FBI agents, other law enforcement investigations, controlled drug buys, and physical and electronic surveillance. To my knowledge, CHS-8's information has not been found to be false or misleading.

94.    **CHS-9** is a citizen informant and member of a motorcycle club in New Mexico. The MC to which CHS-9 currently belongs can be described as a "civilian" club and not an OMG. CHS-9 has not previously worked with law enforcement and is motivated to assist the FBI in an effort to reduce motorcycle gang violence and intimidation in New Mexico. CHS-9 provided me with background information on the Target Subjects and the BMC, to include the BMC's interactions with civilian clubs, campaign of intimidation, political interactions with other clubs and the council of clubs,[12] recruiting and intelligence collection efforts on rival OMG members. CHS-9 is motivated to assist the FBI to help prevent bloodshed between the BMC and other clubs. CHS-9 has not received monetary compensation from the FBI, nor does CHS-9 have pending criminal charges. CHS-9 does not have any felony convictions. I consider the information CHS-9 provided to be reliable because much of it was corroborated through law enforcement investigation, information from other CHS, and physical surveillance. To my knowledge, CHS-9's information has not been found to be false or misleading.

95.    **CHS-10** is a citizen informant and member of a motorcycle club in New Mexico. The MC in which CHS-10 currently belongs can be described as a "civilian" club and not an OMG. CHS-10 has not previously worked with law enforcement and is motivated to assist the FBI in an effort to reduce motorcycle gang violence and intimidation in New Mexico. CHS-10 provided

---

[12] The council of clubs, also referred to as coalition of clubs or confederation of clubs (COC), has been established in all 50 states and exist to facilitate communication among the various motorcycle clubs, support legislation for motorcyclists, and enhance and promote motorcycling.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

me with background information on the Target Subjects and the BMC, to include the BMC's history, interactions with civilian clubs, campaign of intimidation, political interactions with other clubs and the coalition of clubs, recruiting and intelligence collection efforts on rival OMG members. CHS-10 has not received monetary compensation from the FBI, nor does CHS-10 have pending criminal charges. CHS-10 does not have any felony convictions. I consider the information CHS-10 provided to be reliable because much of it was corroborated through law enforcement investigation, information from other CHS, and physical surveillance. To my knowledge, CHS-10's information has not been found to be false or misleading.

96.    **CHS-11** is a citizen informant and member of a motorcycle club in New Mexico. The MC in which CHS-11 currently belongs can be described as a "civilian" club and not an OMG. CHS-11 has not previously worked with law enforcement and is motivated to assist the FBI in an effort to reduce motorcycle gang violence and intimidation in New Mexico. CHS-11 provided me with background information on the Target Subjects and the BMC, to include the BMC's history, interactions with civilian clubs, campaign of intimidation, political interactions with other clubs and the coalition of clubs, recruiting and intelligence collection efforts on rival OMG members. CHS-11 has not received monetary compensation from the FBI, nor does CHS-11 have pending criminal charges. CHS-11 does not have any felony convictions. I consider the information CHS-11 provided to be reliable because much of it was corroborated through law enforcement investigation, information from other CHS, and physical surveillance. To my knowledge, CHS-11's information has not been found to be false or misleading.

97.    **CHS-12** is an FBI CHS and has been cooperating with the FBI for approximately seven years. CHS-12 has testified as a government witness in numerous federal jury trials. CHS-12 is an experienced informant and has conducted controlled buys, introduced undercover agents to

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

targets of FBI investigations, worn covert FBI recording devices on the street and in a maximum-security prison facility. CHS-12 does not have any pending charges and has received approximately $27,500 in financial assistance from the FBI. CHS-12 has felony convictions for various violent and narcotic crimes. I found information from CHS-12 to be reliable because much of it was corroborated by independent source information, undercover FBI agents, other law enforcement investigations, controlled drug buys, and physical and electronic surveillance. To my knowledge, CHS-12's information has not been found to be false or misleading.

98.    **CHS-13** is a citizen informant and former FBI CHS. CHS-13 is a longtime Sureños member and served as a liaison between the Sureños and SNM in state and federal prison, and on the street. I recruited CHS-13 as a source of information several years ago because I was investigating criminal activities perpetrated by the Sureños and Mexican Mafia in New Mexico. CHS-13 aided me in the collection of evidence against members of the Sureños and SNM gangs. CHS-13 has assisted the FBI in New Mexico and California with gang investigations and spent several months utilizing a consensually monitored cellular telephone to speak with targets of FBI investigations. CHS-13 has also worn covert recording devices during meetings with gang members and organized crime figures. Information provided by CHS-13 has led to the issuance of 33 federal search warrants, ten state search warrants, the arrest of multiple suspects, and the recovery of controlled substances, firearms, ammunition and U.S. currency. CHS-13 also provided the FBI with information about serial armed robbery crews and persons believed to be transporting firearms to criminal elements in Mexico. CHS-13 is motivated to assist the FBI to help reduce violent crime and drugs in the community. CHS-13 has prior felony convictions for human trafficking, armed robberies, aggravated battery, and drug distribution. CHS-13 does not have any pending charges and has received approximately $14,000 in financial assistance from

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

the FBI. I consider the information CHS-13 provided to be reliable because much of it was corroborated through law enforcement investigation, wire interception, controlled buys, and physical and electronic surveillance. To my knowledge, CHS-13's information has not been found to be false or misleading.

99.     **CHS-14** is a citizen informant and close associate of the BMC.  CHS-14 has not previously worked with law enforcement and is motivated to assist the FBI in an effort to reduce motorcycle gang violence in New Mexico. CHS-14 provided me with background information on the Target Subjects and the BMC, to include the BMC's recent history of drug trafficking, interactions other clubs, recruiting, and intelligence collection efforts on rival OMG members. CHS-14 has not received monetary compensation from the FBI, nor does CHS-14 have pending criminal charges. CHS-14 does not have any felony convictions. I consider the information CHS-14 provided to be reliable because much of it was corroborated through law enforcement investigation, information from other CHS, and physical surveillance. To my knowledge, CHS-14's information has not been found to be false or misleading.

100.    **CHS-15** is a citizen informant and former FBI CHS. CHS-15 may best be described as a "professional informant." CHS-15 served as an FBI CHS from 2012-2014. I reopened CHS-15 as an FBI informant in within the last several years because CHS-15 had joined a BMC support club. CHS-15 has also worked as a professional CHS for several local law enforcement agencies in New Mexico. Information provided by CHS-15 has resulted in several arrests and the issuance of numerous search warrants, and the seizure of controlled substances, U.S. currency, firearms, and stolen vehicles. CHS-15 provided me with background information on the Target Subjects and the BMC, to include the gang's history, structure, goals, recruiting and intelligence collection efforts on rival OMG members. CHS-15 is motivated to assist the FBI to rid the BMC of

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

problematic members and create a peace treaty between the BMC and MMC. CHS-15 has been paid approximately $8,000 for assisting the FBI over the years. CHS-15 does not have any felony convictions or pending charges. I consider the information CHS-15 provided to be reliable because much of it was corroborated through law enforcement investigation, controlled drug buys, information from other CHS, social media postings, and physical surveillance. To my knowledge, CHS-15's information has not been found to be false or misleading.

101.    **CHS-16** is a citizen informant and former BMC prospect. CHS-16 has known the Target Subjects for about three years. While prospecting with the BMC in New Mexico, CHS-16 became disillusioned with the BMC after CHS-16 discovered a couple of the full-patch members had "bad charges." CHS-16 didn't have a problem putting in work and committing crimes for the BMC but did not want to associate with certain members. CHS-16 confronted one such BMC member who had been charged with assaulting a "civilian" female and was "black-balled by the club" after that. CHS-16 is motivated to assist the FBI to rid the BMC of problematic members and create a more peaceful motorcycle community. CHS-16 has not been paid for assisting the FBI. I tend to view CHS-16 as a citizen informant, as CHS-16 only came forward to prevent violent crime. Moreover, the information CHS-16 provided to the FBI could be a statement against interest, as CHS-16 recently assisted BMC members spy on MMC members, distributed stolen firearms to BMC members, and sold controlled substances. CHS-16 is not pending any charges and has prior felony convictions for aggravated assault with a deadly weapon, shooting at or from a motor vehicle, false imprisonment, and possession of a controlled substance. CHS-16 provided me with background information on the Target Subjects and the BMC, to include the gang's structure, goals, recruiting and intelligence collection efforts on rival OMG members. I consider the information CHS-16 provided to be reliable because much of it was corroborated

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

through law enforcement investigation, information from other CHS, social media postings, and physical surveillance. To my knowledge, CHS-16's information has not been found to be false or misleading.

102.   **CHS-17** is a citizen informant and member of the BMC. CHS-17 has not previously cooperated with law enforcement and is only doing so to prevent bloodshed between the BMC and MMC. CHS-17 provided agents with background information on the Target Subjects and the BMC, to include the gang's history, structure, goals, recruiting and intelligence collection efforts on rival OMG members. CHS-17 has not received monetary compensation from the FBI, nor does CHS-17 have pending criminal charges. CHS-17 has prior felony convictions for embezzlement, writing worthless checks, and murder. I consider the information CHS-17 provided to be reliable because much of it was corroborated through law enforcement investigation, information from other CHS, social media postings, and physical surveillance. To my knowledge, CHS-17's information has not been found to be false or misleading.

## **STATEMENT OF PROBABLE CAUSE**

103.   This affidavit is being submitted for 25 search warrants to aid the FBI in addressing several imminent threats made by members LEVI LUCERO, ROBERT SALAZAR, JOEL GUTIERREZ, ERIK ASTORGA, GREGORY ARMENTA, ALBERT ARMIJO, DONNY CRAPSE, ED SANCHEZ SOLIS, LAWRENCE SELVA, CHARLES RUSSELL, JOSE MAESTAS, KENNETH MARTINEZ, SKYLER ELWESS, LEX BLUEEYES, JESUS RODRIGUEZ, JONATHAN BIVINS, WILLIAM ROMERO, ALCARIO BUSTAMANTES, RICARDO SAUCEDO, MICHAEL SAUCEDO, BILLY DOZER, SCOTT STEVENS, TERRY CLAUNCH, ZACHARY CARRIZAL, JOAQUIN MARTINEZ (hereinafter "the Target Subjects") and other BMC members. The threats have been directed at rival motorcycle clubs

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

and their supporters. Much of the threat information was corroborated by BMC members and well-placed associates of the gang, to include several of the CHS herein (who were introduced above).

104.    Beginning in or about May 2023 and continuing through the present day, the Target Subjects were members of the BMC or support clubs under the leadership of the BMC. The Target Subjects and others, known and unknown, are suspected of possessing firearms, conspiring to kill and assault rival motorcycle club members, and recruit new members into the BMC, considering the war between the BMC and MMC. Based on information provided by various CHS, the BMC, including the Target Subjects, are looking for opportunities to kill or assault MMC members, Water Dogs MC members, and any other club(s) not aligned with the BMC to make "examples" of them and strengthen the image and reputation of the BMC.

105.    Several CHS in New Mexico and Texas reported that the BMC national leadership, including multiple chapter presidents all over the country, to include New Mexico, are concerned the BMC look weak for having failed to avenge the shooting deaths of two BMC members during the May 2023, Memorial Day weekend motorcycle rally in Red River, NM.

**Conspiracy to Commit Murder and Assault in Aid of Racketeering**

106.    Based on numerous CHS reports, the Target Subjects are engaged in a conspiracy to commit violent crimes in aid of racketeering, to include murder, assault with a deadly weapon, and assault resulting in great bodily injury.

107.    CHS-1, CHS-2, CHS-4, CHS-5, CHS-6, CHS-7, CHS-8, CHS-15, and CHS-16 reported the Target Subjects were actively conducting physical surveillance on members of the MMC, and their support clubs, in and around New Mexico. The purpose of the surveillance was to acquire the home and work addresses of the intended targets, as well as travel routes to and from

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

work, so the BMC could assault or kill them. Within the past three months, CHS-1, CHS-2, CHS-4, CHS-5, CHS-6, and CHS-7 were tasked with researching several MMC members and supporters and reporting their findings back to BMC leadership. CHS-1, CHS-2, CHS-4, CHS-5, CHS-6, and CHS-7 were told to note such things as the existence of residential security systems, exterior camera systems, dogs, children, and police vehicles parked in nearby driveways. The sources reported that BMC member, ROBERT SALAZAR, often utilized a tow truck to scout MMC locations around Albuquerque. According to the sources, other BMC members often accompanied SALAZAR in the tow truck. CHS-1, CHS-2, CHS-4, CHS-5, CHS-6, and CHS-7 reported BMC members provided the results of their reconnaissance work to their respective chapter Sergeant at Arms, Vice President, and/or President, who they believed were keeping files or notes on the intended targets. CHS-1, CHS-2, CHS-4, CHS-5, CHS-6, and CHS-7 reported the intelligence collection efforts were ongoing within the BMC. The sources reported all surveillance activities were being reported to BMC National Treasurer/Secretary JOAQUIN MARTINEZ, aka: "Ope," who was the highest-ranking BMC member in New Mexico. MARTINEZ reportedly kept the other national officers apprised of BMC activities.

108.    CHS-1, CHS-2, CHS-4, CHS-5, CHS-6, and CHS-7 said the New Mexico BMC members, to include the Target Subjects, were in communication with BMC members in Texas and Oklahoma who were conducting similar research on MMC members for purposes of targeting the MMC. CHS-1, CHS-2, CHS-4, CHS-5, CHS-6, and CHS-7 attended several BMC meetings and witnessed the Target Subjects discuss upcoming MMC motorcycle runs and events. During those meetings, the Target Subjects discussed potential plans to shoot at MMC members from side streets, at intersections, on freeway overpasses, or the open roadway. CHS-1, CHS-2, CHS-4, CHS-5, CHS-6, and CHS-7 identified the most active and vocal members

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

advocating for revenge were Albuquerque members: LEVI LUCERO, ROBERT SALAZAR, JOEL GUTIERREZ, ERIK ASTORGA, GREGORY ARMENTA, ALBERT ARMIJO; Los Lunas and Belen members: DONNY CRAPSE, ED SANCHEZ SOLIS, LAWRENCE SELVA; Grants members: CHARLES RUSSELL, JOSE MAESTAS; Four Corners members: KENNETH MARTINEZ, SKYLER ELWESS, LEX BLUEEYES; Hobbs member: JESUS RODRIGUEZ; Alamogordo members: JONATHAN BIVINS, WILLIAM ROMERO, ALCARIO BUSTAMANTES, RICARDO SAUCEDO, MICHAEL SAUCEDO, BILLY DOZER; and Ruidoso members: SCOTT STEVENS, TERRY CLAUNCH, and ZACHARY CARRIZAL. The aforementioned members all reported to JOAQUIN MARTINEZ.

109.    CHS-1, CHS-2, CHS-4, CHS-5, CHS-6, CHS-7, CHS-8, CHS-9, CHS-10, CHS-11, CHS-12, CHS-13, CHS-14, CHS-15, and CHS-16 reported the BMC are trying to locate members of the Water Dogs MC to kill them. CHS-1, CHS-2, CHS-4, CHS-5, CHS-6, CHS-7, CHS-8, CHS-9, CHS-10, CHS-11, CHS-12, CHS-13, CHS-14, CHS-15, and CHS-16 reported the BMC would kill or assault any person wearing Water Dogs MC colors in the future. CHS-1, CHS-2, CHS-4, CHS-5, CHS-6, and CHS-7 reported BMC national officers, like JOAQUIN MARTINEZ, had issued directives to all BMC members to "handle" the Water Dogs MC, but to be smart about it. The sources related the BMC did not want to look weak, kill civilians in the crossfire, or be the subjects of a federal RICO investigation.

110.    CHS-1 said that BMC members were actively searching for any member of the Water Dogs MC. The BMC leadership have repeatedly told BMC members they must retaliate against the Water Dogs MC for killing two of their members in Red River, NM. CHS-1 is certain the BMC will kill members of the Water Dogs MC as soon as they can. CHS-1 also reported the Target Subjects were currently engaged in planning attacks on members of the MMC. CHS-1

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

said the plans include shooting at MMC members while they ride from one location to another and using a large truck or van to run several of the MMC members off the road when they travelled at a high rate of speed. CHS-1 said the BMC members were anxious to hit the MMC and the Water Dogs MC to make a statement. CHS-1 said the Target Subjects were the most vocal and enthusiastic about striking the MMC and Water Dogs MC. CHS-1 said the Target Subjects were actively planning an attack and that it would occur within the next few months.

111.    CHS-2 reported the BMC have been laying low since the Red River, NM, shooting, and BMC leaders thought law enforcement was monitoring them. CHS-2 said the BMC were planning to retaliate against the Water Dogs MC and planned to intensify the conflict with the MMC. According to CHS-2, the BMC were scouting potential Water Dogs MC and MMC targets. CHS-2 said the BMC will be patient and wait until things cooled down before striking their targets.

112.    CHS-2 said BMC members had been in touch with members of the SNM and Burqueños prison gangs to try and "hit" a specific Water Dogs MC member who was recently incarcerated in New Mexico. CHS-2 said the thought was that the SNM or Burqueños could hit the Water Dogs MC member because the BMC knew the intended target was being moved from jail to jail for his protection. CHS-2 said the BMC were aware of the jail moves because they had tracked the jail rosters of the various facilities, and in one case a BMC member had called the jail claiming to be the attorney for the Water Dogs MC member and acted irate because his client had been moved without his knowledge.

113.    The Water Dogs MC member was subsequently released from jail and CHS-2 thought the BMC had concluded their discussions with the SNM and Burqueños; however, CHS-2 was not certain.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

114.    CHS-2 reported BMC member, GREGORY ARMENTA, as having several connections with other gang members and ex-convicts who had been to federal prison. CHS-2 said a lot of old school gang members in New Mexico, who had done federal prison time together, kept in touch and shared information on the street, to include which groups or gangs had "greenlights" and for what reason.

115.    CHS-3 said the BMC were planning to attack the MMC this summer but were being patient because they thought law enforcement officers were watching the BMC. CHS-3 said the BMC have long memories and will never forget the Water Dogs MC. CHS-3 said the Water Dogs MC were all dead men walking as far as the BMC was concerned. CHS-3 explained the war with the MMC has been going on for several years and a truce is unlikely because the BMC will not recognize any other 1%er clubs in New Mexico. CHS-3 described most BMC members were advocating for a vehicle borne ambush of the MMC because it would be safer and more effective for the BMC participants. CHS-3 went on to say, motorcycle versus motorcycle violence was unlikely, unless it was spur-of-the-moment or a random sighting of Water Dogs MC or MMC members. CHS-3 explained all BMC members would fight rivals if provoked, the majority of BMC members would go on the offensive against rivals, but only a select few would serve as "the tip of the spear" and actually hunt the MMC and Water Dogs MC members. CHS-3 said most chapters had guys that were down for whatever needed to be done and would seek out violent confrontations. CHS-3 said, like any organization, there were weaker men who only acted hard when surrounded by their brothers.

116.    CHS-3 related CHARLES RUSSELL and JOSE MAESTAS in Grants were planning to hit some MMC members when they rode across I-40 from Arizona to Albuquerque or Oklahoma City. CHS-3 said KENNETH MARTINEZ, SKYLER ELWESS, LEX BLUEEYS, and other

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

BMC members from the Four Corners had plans to hit some MMC members as they traveled from Arizona to Colorado. CHS-3 also heard from other BMC members that KENNETH MARTINEZ, SKYLER ELWESS, and LEX BLUEEYS had been doing surveillance in Colorado on a member of the Water Dogs MC who had allegedly moved there after the Red River incident.

117.    CHS-3 said the BMC had been practicing firing pistols and short barreled rifles with their left hands. CHS-3 explained such firing drills were important because the throttle on a motorcycle was on the right-hand grip and a rider would have to keep his right hand on the throttle while firing left-handed. CHS-3 said most Bandidos, to include the Target Subjects, had been practicing shooting with their left hand. CHS-3 said the Target Subjects often utilized a shooting range on a BMC member's property in rural Lincoln County, NM.[13] CHS-3 said the BMC would utilize members who were military veterans or rifle hunters to shoot rivals from a distance, like a sniper on the battlefield. Otherwise, the BMC would hit MMC members at red lights or on the road, from an unassuming vehicle. CHS-3 said the BMC would not hit MMC or Water Dogs MC members at their houses because "we don't want bullets hitting kids or wives." CHS-3 related the BMC leadership were pushing all BMC members to actively assist in locating and studying the BMC's rivals.

118.    CHS-3 said several of the Target Subjects discussed having a lone BMC member lure MMC members into an ambush in an isolated section of town or stretch of highway. The majority of the Target Subjects favored that plan and were discussing when and how best to conduct the ambush.

---

[13] I believe the BMC members CHS-3 referenced is ZACHARY CARRIZAL who resides at Subject Premises A-25. Other CHS reported the same information.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

119.    CHS-4 said the BMC were at war with the MMC and any of their support clubs. CHS-4 reported that all BMC members carried firearms anytime they wore their colors. CHS-4 said the BMC members, to include the Target Subjects, stored firearms on their person, motorcycles, and in their vehicles and residences. CHS-4 said many BMC members were not felons and were lawfully able to purchase their own guns. CHS-4 said those same members (non-felons) frequently purchased, traded, or sold guns to the BMC members who were felons. CHS-4 knew several BMC members to have obtained firearms from a BMC supporter who had a federal firearms license (FFL) in Arizona. CHS-4 said the FFL dealer in Arizona would send weapons to BMC members upon request, to include AR-15 and AK-47 rifles, fully automatic machine guns, and ammunition.

120.    CHS-4 said the BMC preferred hitting rivals on the roadway, to include at intersections or during road trips when lone MMC members broke down on the side of the road. CHS-4 explained the BMC would put members or supporters in vans or pick-up trucks to shoot at MMC members or run them off the road. CHS-4 said the BMC preferred road ambushes because it minimized civilian involvement, and it was easier to sneak up on MMC members when in a vehicle. CHS-4 said several of the Target Subjects discussed having a lone BMC member lure MMC members into an ambush in an isolated section of roadway where armed BMC members would be waiting. CHS-4 explained the prior BMC versus MMC shootings and fights in which members were wearing colors, were random and only occurred because the participants had stumbled upon one another. CHS-4 said the BMC currently have a "shoot on sight" order for any Water Dogs MC members and a "smash on sight" (assault) order for any MMC members encountered.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

121.    CHS-4 reported ZACHARY CARRIZAL maintained a makeshift shooting range on his property in Arabela, NM, (Subject Premises A-25) and had several firearms at his home. CHS-4 said ZACHARY CARRIZAL would let BMC members practice shooting on the property, which was located outside Ruidoso. CHS-4 and other BMC members practiced riding their motorcycles around the property while shooting pistols with their left hands. CHS-4 explained this was an important skill to master, as a BMC rider needed their right hand to control the throttle while shooting with their left hand.

122.    CHS-5 said the BMC were keeping intelligence files on members of the MMC and Water Dogs MC. CHS-5 explained the BMC operated like a military unit and would utilize individual members skill sets to best target the MMC. For example, CHS-5 knew which BMC members had military backgrounds, or which BMC members were big game hunters. CHS-5 said the BMC would utilize former military marksman and skilled hunters to snipe at rivals or Water Dog MC members once the BMC had some pattern of life intelligence on the intended targets. CHS-5 said the BMC were still in the planning phases of the next MMC attack. CHS-5 reported the Target Subjects were actively advocating for such an attack and pushing up the timeline.

123.    CHS-5 explained there had been several unplanned BMC versus MMC shootings in New Mexico, but they just went down when the rivals ran into each other unexpectedly. CHS-5 said that was what happened when MMC Sergeant at Arms WILLIAM WESTFALL was shot in Albuquerque last year.

124.    CHS-6 said the BMC were conducting reconnaissance on MMC members in New Mexico. CHS-6 said the BMC members, including the Target Subjects, their wives, girlfriends, and associates, were actively scouting MMC houses, businesses, and locations frequented by MMC members to observe their vulnerabilities and when best to attack them. CHS-6 said the

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

BMC around New Mexico were well armed and every member carried a firearm. CHS-6 said that when the firearms weren't on their persons, BMC members stored the weapons in their residences and/or motorcycle saddlebags.

125.    CHS-6 said the BMC were having follow vehicles with members or associates trail BMC members when they went on mandatory runs or attended meetings. CHS-6 explained the trail vehicles were occupied by two or more members, each armed with AR-15s or similar rifles with multiple high-capacity magazines. CHS-6 said the BMC referred to the armed follow vehicles as "war wagons" or "heavy gunners." According to CHS-6, the men in the follow vehicles wore ballistic vests and were tasked with confronting any person, motorcyclist, or vehicle that looked suspicious or threatened the BMC riders. CHS-6 said the BMC were also using scout vehicles or scout riders (not wearing colors) to check the roadway, overpasses, offramps and travel routes on runs to look for potential ambush points. CHS-6 said the BMC, to include many of the Target Subjects, were planning an offensive against the MMC in the coming months. CHS-6 said the Water Dogs MC were as good as dead and pointed out that the Water Dogs MC members had not been observed in New Mexico since the Red River shootout. CHS-6 said the members of the Water Dogs MC left the state according to BMC leadership but would be back because they would have to sell their homes in New Mexico and sign real estate documents. CHS-6 said the BMC were waiting for the Water Dogs MC to return so that they could kill them.

126.    CHS-6 said several BMC members told CHS-6 that BMC members in the Four Corners chapter had been traveling to Colorado to locate a Water Dogs MC member who was in hiding.

127.    CHS-7 said the BMC were preparing to attack the MMC, who they believed to be "trespassers" in New Mexico. CHS-7 agreed that the MMC should not be in New Mexico, but disagreed with killing them. CHS-7 thought the BMC should just stomp out the MMC members

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

the old fashion way (fist fights and bar brawls). CHS-7 said the MMC members were all thugs and gangsters that originated from East Los Angeles. CHS-7 went on to say many MMC members were street gang members who didn't even own motorcycles. CHS-7 reported BMC leadership wanted to kill as many MMC members in New Mexico as possible as a means of eradication.

128.    CHS-7 said the Water Dogs MC were as good as dead and the BMC would kill anyone wearing a Water Dogs MC patch. CHS-7 indicated the greenlight on the Water Dogs MC would last forever. CHS-7 said the Target Subjects were the most vocal in going after the MMC and believed the Target Subjects would be in possession of physical and electronic communications regarding the pending violence directed at the MMC. CHS-7 said all plans had to be approved by JOAQUIN MARTINEZ, who was a National member of the BMC and "top dog" in New Mexico.

129.    CHS-8 is in communication with several BMC "old ladies" (wives or girlfriends) and is part of an informal group of BMC wives that keep track of BMC happenings. CHS-8 and several of CHS-8's confidants were concerned the BMC was about to attack the MMC. CHS-8 reported meeting with numerous BMC wives who heard their husbands (or boyfriends) were wearing bulletproof vests under their cuts when they went on rides and were carrying firearms everywhere they went. One wife told CHS-8 her husband had been increasing his use of methamphetamine because he had been tasked with watching a MMC member's house all night and then had to go to work. CHS-8 reported had a recent conversation with a girlfriend of a BMC member, who told CHS-8 that her boyfriend had been bringing home all kinds of rifles and ammunition, "the kind of rifles the military used." The girlfriend of the BMC member told CHS-8 she was afraid because her boyfriend was a convicted felon, and she knew he could go back to

prison for a long time for having the guns. CHS-8 reported having overheard multiple conversations in which BMC members were planning to retaliate against the Water Dogs MC and MMC. CHS-8 believed the BMC was being patient and waiting for the right circumstance to attack the MMC and Water Dogs MC.

130.    CHS-9 reported receiving multiple threats from BMC members indicating they wanted to kill CHS-9 for being a part of the Water Dogs MC. CHS-9 said he and other Water Dogs MC members tried to exist with all other motorcycle clubs in New Mexico but faced repeated harassment by BMC members. CHS-9 said the harassment started shortly after the birth of the Water Dogs MC because the Water Dogs MC would not wear a BMC support patch on their cuts. CHS-9 said the founder of the Water Dogs MC wanted a gang free club that just rode motorcycles and didn't get involved with 1%ers. CHS-9 reported the BMC were furious with the Water Dogs MC for not wearing a BMC support patch, which the BMC equated with disrespect according to CHS-9. CHS-9 pointed out that every other motorcycle club in New Mexico wore a BMC support patch.[14] As such, the BMC systematically targeted the Water Dogs MC. CHS-9 said the Target Subjects were the primary instigators of the intimidation and violence toward the Water Dogs MC. CHS-9 has been told by several individuals that the Target Subjects and other BMC members were looking for CHS-9 to kill CHS-9.

131.    CHS-10 reported receiving multiple threats from BMC members indicating they wanted to kill CHS-10 for being a member of the Water Dogs MC. CHS-10 said BMC members had brandished weapons at CHS-10 and other Water Dogs MC members for the past couple of years.

---

[14] CHS-9 clarified some military clubs did not wear a BMC support patch, nor did law enforcement motorcycle clubs. CHS-9 and other CHS reported the Marine Corps MC did not wear BMC support patches and told the BMC they (the Marine Corps veterans) had worn red and gold since the inception of the Marine Corps. Several CHS reported the BMC did not force members of veterans based MCs to wear BMC support patches.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

CHS-10 said the BMC were intimidating the Water Dogs MC members because they did not

bow down to the BMC. CHS-10 explained the Water Dogs MC were an independent motorcycle

club that did not want to pay homage to any of the 1%er gangs in New Mexico or elsewhere.

CHS-10 said the Target Subjects were the primary BMC members advocating for revenge and

CHS-10 received multiple reports of BMC members looking for CHS-10 to kill him.

132.   CHS-11 reported having been contacted by multiple BMC members who were inquiring

if CHS-11 knew the home addresses of any of the Water Dogs MC members.  CHS-11 said

BMC members, to include several of the Target Subjects, put the word out to all of the

motorcycle clubs around the state to stay away from the Water Dogs MC members and to not be

caught supporting them. CHS-11 went on to say the BMC had repeatedly made it known over

the years that New Mexico motorcycle clubs were not to support the MMC, who were an enemy

of the BMC. Any club that defied that order would have their patches stripped according to

CHS-11.

133.   CHS-12 reported that BMC members reached out to members of the SNM prison gang a

couple of months ago to hit an incarcerated Water Dogs MC member who had been in jail in

relation to the Red River shooting. CHS-12 knew of two BMC members in Albuquerque who

were also members of SNM.[15] CHS-12 said the BMC often requested SNM support when

---

[15] I am aware of two current BMC members in New Mexico who are also validated SNM members. One such member, JUAN AVILA, aka: "Cisco," is currently serving a term of supervised release under the jurisdiction of the United States Probation Office in relation to a conviction for being a felon in possession of a firearm. AVILA first came to the attention of federal agents when he was contacted by reputed drug trafficker ROBERT PADILLA, aka: "Fat Head," who requested AVILA and other BMC members assault a male who had upset PADILLA. The telephone call was intercepted on a federal wiretap targeting the PADILLA DTO in Las Vegas, NM. PADILLA was subsequently charged with drug trafficking, racketeering, and murdering an FBI informant who had served as a government witness in the federal racketeering case against the SNM gang. PADILLA is currently awaiting trial in that matter (see Case #22-

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

violence was needed, particularly in prison or jail. CHS-12 explained that SNM had been utilized by the BMC several times over the years to hit people in prison or jail or to collect drug debts. CHS-12 reported having heard through official SNM channels that there was a greenlight on the Water Dogs MC and the BMC would pay a reward to anyone who took out a Water Dogs MC member.

134.    CHS-17 explained to agents the BMC sought relationships and communications with the other gangs that operated around the BMC chapters. This was done to build stronger alliances, create allies, recruit new members, sell drugs, enhance awareness of law enforcement activities, and control certain types of crime in the area. CHS-17 said that when he/she ran a chapter, he/she met with other gang leaders in town on a weekly basis to maintain communications and organize certain criminal activities. CHS-17 said the BMC sometimes committed crimes such as assaults, for other gangs. Similarly, the BMC would distance themselves from some crimes by asking other gangs to assault certain people.

135.    When questioned about the BMC utilizing members from other chapters or states to commit violence locally, CHS-1, CHS-2, CHS-3, CHS-4, CHS-5, CHS-6, and CHS-7 all related that was a common practice within the BMC. The sources explained brothers from other chapters, to include out of state chapters, would come into New Mexico and take out rivals or other persons who had run afoul of the BMC so the local members would have alibis and not be blamed for the crime. In turn, local BMC members might be called upon to travel to Texas,

---

CR-00634-JB). *See* Colleen Heild, Albuquerque Journal, Charges filed in 2019 killing of federal witness (April 21, 2022), *available at* https://www.abqjournal.com/news/local/charges-filed-in-2019-killing-of-federal-witness/article_1d670117-dfc1-5801-9e5f-9c027e44e56d.html;

Louis Casiano, Fox News, Witness against violent New Mexico prison gang gunned down outside home (July 27, 2019), *available at* https://www.foxnews.com/us/witness-against-violent-prison-gang-gunned-down-outside-home

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

Oklahoma, Washington, or other states to "put in work" (commit violent acts) for the BMC. The sources surmised some of the recent shootings in New Mexico had been conducted in this manner, and future homicides would occur in a similar fashion. The sources said when those types of operations occurred, they would be very secretive and only talked about in very small circles within the BMC, as not all members could be trusted to keep quiet. Evidence of such communications could be found within conspirators' cellular telephones according to several sources.

136.   Based on my experiences investigating the BMC, utilizing BMC members and associates as informants, and debriefing BMC members, I am aware members of the BMC keep intelligence information, such as names, nicknames, addresses, photographs, maps, descriptions, and notations on their rivals. Moreover, it has been my experience that such information is stored in the residences, vehicles, cellular telephones, and computers of BMC members.

**Unlawful Firearms Possession & Use of Firearms in Furtherance of Violent Crime**

137.   CHS-1, CHS-2, CHS-3, CHS-4, CHS-5, CHS-6, and CHS-7 reported the Target Subjects and other BMC members were constantly armed with firearms. The sources reported the BMC did not follow the law and were unconcerned if members were prohibited from possessing firearms under federal law. CHS-1, CHS-2, CHS-3, CHS-4, CHS-5, CHS-6, and CHS-7 said BMC members routinely shared firearms, provided firearms to BMC members who were felons or otherwise prohibited persons, and removed serial numbers from firearms that were to be utilized in violent crimes. CHS-1, CHS-2, CHS-3, CHS-4, CHS-5, CHS-6, and CHS-7 reported BMC members frequently traded guns with support club members or out-of-state BMC members when the guns had been utilized in crimes or were stolen.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

138.    Several CHS reported BMC members had acquired AR-15 drop in auto sears and dozens of Glock auto sear switches and passed them out to members in Texas and New Mexico, to include many of the Target Subjects. Multiple CHS reported ALBERT ARMIJO in Rio Rancho had Glock switches for sale and could install them for other BMC members. Sources also reported ED SOLIS SANCHEZ and LAWRENCE SELVA were distributing Glock switches and drop in AR-15 auto sear devices and I am aware that AR-15 and Glock auto sear switches are commonly available and can convert such weapons into machineguns. In fact, the auto sear switches are themselves considered machineguns under federal law.

139.    Numerous sources reported that BMC members were practicing firing guns left-handed while riding their motorcycles, a technique that allowed them to still maneuver the motorcycle with their right hand on the throttle. CHS-1, CHS-2, CHS-3, CHS-4, CHS-5, CHS-6, and CHS-7 reported BMC members who could lawfully purchase firearms would do so for BMC members who were felons. CHS-1, CHS-2, CHS-3, CHS-4, CHS-5, CHS-6, and CHS-7 advised the BMC maintained a steady supply of firearms for protection, intimidation, power, and to be utilized against rivals such as the MMC. The sources also reported BMC members, including some of the Target Subjects, possessed firearms that had been altered into machineguns and rifles and shotguns that had been shortened or sawed off to better conceal the weapons.

140.    CHS-13 reported several BMC members had reached out to CHS-13 and CHS-13's associates for firearms and ballistic vests. BMC members, some of which include the Target Subjects, indicated they needed AR-15s and high-capacity magazines to take care of the MMC members. CHS-13 observed BMC members purchase firearms and ballistic vests from gang members in Albuquerque and Los Lunas on numerous occasions. CHS-13 reported DONNY CRASPE had relationships with the street gangs in Belen and Los Lunas. CHS-13 knew

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

JOAQUIN MARTINEZ to have family and drug connections with Brew Town Locos gang members in Albuquerque. CHS-13 said several BMC members dealt drugs and firearms with Peckerwood (white power) gang members around New Mexico.

141.    CHS-1, CHS-2, CHS-3, CHS-4, CHS-5, CHS-6, and CHS-7 reported most of the BMC members used cocaine or methamphetamine on a regular basis.[16] The sources explained cocaine usage at parties was commonplace and not considered drug use or addiction. Similarly, the BMC ignore the fact that many members used methamphetamine regularly. The sources said BMC members often equated meth use to World War II Nazi soldiers using meth to be "super soldiers," awake, and alert.

142.    Whether the methamphetamine use among BMC members was recreational or an addictive trait, I have found it to be commonplace. Thus far, all the BMC members I have investigated and arrested have been users of methamphetamine. Following the recent Red River shootout, NMSP officers arrested two ranking BMC members (a chapter president from Texas, a sergeant at arms from Texas, and an Albuquerque member) for possession of methamphetamine and cocaine, among other charges.[17]

143.    CHS-3, CHS-4, CHS-5, CHS-6, and CHS-7 independently said drug use within the BMC was discouraged, or shunned, except for cocaine, which was considered a party drug. The

---

[16] Guillermo Contreras, El Paso Times, Bandidos members use cocaine and meth per national president (May 3, 2018), *available at* https://www.elpasotimes.com/story/news/crime/2018/05/03/bandidos-trial-president-jeffrey-pike-cocaine-use/577731002/

[17]    BMC chapter President MATTHEW JACKSON was charged with possession of methamphetamine and carrying a firearm in a liquor establishment (Case No. D-820-CR-2023-o0087), BMC Sergeant-at-Arms CHRISTOPHER GARCIA sustained a gunshot wound to the abdomen during the shootout with the Water Dogs MC and was subsequently charged with possession of cocaine (Case No. D-820-CR-2023-00086), and BMC member HENRY LIN was charged with possession of methamphetamine (Case No. M-53-FR-2023-00152).

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

sources explained most BMC members nonetheless used cocaine and methamphetamine but did not talk about it. Regarding drug use within the BMC, one source said, "We're Bandidos, not Boy Scouts."

144.    During the surveillance phase leading up to the submission of this application for search warrants, OMGTF investigators were monitoring BMC Albuquerque member, HENRY LIN, aka: "Covid Kid," or "Chinaman," in an attempt to locate his current residence. OMGTF members observed LIN staying in area motels and on one occasion observed him moving firearms from a vehicle to a motel room.  BCSO detectives sought a search warrant for the motel room, as LIN was wanted on an outstanding felony warrant for failure to appear, on the original charge of possession of methamphetamine. Prior to the service of the warrant, BCSO detectives learned the motel LIN was at was under unrelated surveillance by another law enforcement task force and the service of a search warrant at that moment would be detrimental to the other law enforcement operation. BCSO detectives decided to resume surveillance on LIN the following day; however, LIN was stopped by an APD patrol officer and arrested on his outstanding warrant. OMGTF investigators monitored LIN's jail calls, and heard him discussing drug activities and the whereabouts of his firearms.

145.    Some of the Target Subjects do not have prior felony convictions; however, I believe many use or are addicted to controlled substances and thereby prohibited from possessing firearms or ammunition pursuant to 18 U.S.C. § 922(g)(3). Moreover, I believe BMC members are acquiring and possessing firearms and ammunition as tools to be utilized in their war with the MMC. Possession of firearms in that manner would be in violation of 18 U.S.C. §§ 1962, 1959, and 924(c).

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

146.    CHS-1, CHS-2, CHS-3, CHS-4, CHS-5, CHS-6, and CHS-7 reported that the Target Subjects were always armed with firearms and maintained firearms and ammunition in their residences.

**Possession of Body Armor by Violent Felons**

147.    CHS-1, CHS-2, CHS-3, CHS-4, CHS-5, CHS-6, CHS-7, CHS-8, and CHS-13 reported that some of the Target Subjects were in possession of ballistic armor, wearing ballistic armor while on BMC rides, passing ballistic armor to other members of the BMC many of which had prior felony convictions for violent offenses and wearing ballistic armor, while armed with AR-15 rifles, and serving as force protection for the BMC.

148.    Following the May 2023, shooting at the Red River Motorcycle Rally, law enforcement received reports and commercial surveillance videos indicating numerous BMC members donning ballistic vests prior to their arrival in Red River. In one gas station video, BMC riders were observed retrieving ballistic vests from a support vehicle and putting them on before riding their motorcycles away from the scene.

149.    Based on my experiences investigating the BMC, I am aware that many BMC members keep ballistic vests in their residences when not wearing them.

150.    I am aware that ballistic vests can collect the DNA of the person wearing the armored vests and such DNA evidence could be examined to determine who possessed the ballistic vest.

151.    Some of the Target Subjects may be eligible to possess body armor; however, it is unlawful to pass such armor to fellow members who have prior felony convictions for violent crimes. I believe the requested search warrants will enable the FBI to remove body armor from violent felons and confirm whether the passing of such armor violated 18 U.S.C. § 931.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

**Firearms Trafficking**

152.    CHS-3, CHS-4, CHS-5, CHS-13, and CHS-16 reported BMC members in New Mexico, to include the Target Subjects, were involved in purchasing or otherwise acquiring firearms and providing them to BMC members or other gang members in states where firearms laws were more restrictive.

153.    CHS-1, CHS-2, CHS-3, CHS-4, CHS-5, CHS-6, and CHS-7 reported the Target Subjects and other BMC members were always armed and were unconcerned if members were prohibited from possessing firearms under federal law.  CHS-1, CHS-2, CHS-3, CHS-4, CHS-5, CHS-6, and CHS-7 reported BMC members frequently traded guns with support club members or out-of-state BMC members when the guns were stolen or had been utilized in crimes. CHS-1, CHS-2, CHS-3, CHS-4, CHS-5, CHS-6, and CHS-7 said the Target Subjects had provided firearms to other BMC members who were felons or had domestic violence convictions. CHS-1, CHS-3, and CHS-5 reported BMC members had obtained and utilized explosives in the past to target rivals, but such items were difficult acquire.[18]

154.    CHS-1, CHS-2, CHS-3, CHS-4, CHS-5, CHS-6, and CHS-7 reported the Target Subjects were always armed with firearms and maintained firearms and ammunition in their residences.

155.    Several CHS reported BMC members had acquired AR-15 drop in auto sears and dozens of Glock auto sear switches and passed them out to members in New Mexico, to include many of

---

[18] Kelsey Bradshaw, My SanAntonio, Motorcycle gang fight involving Bandidos leads Texas police to explosives, 11 arrests made (Nov. 2, 2016), *available at* https://www.mysanantonio.com/news/local/article/El-Paso-police-arrest-7-bikers-10473037.php Daniel Borunda. El Paso Times, 7 bikers arrested explosives found at home (Nov. 1, 2016), https://www.elpasotimes.com/story/news/crime/2016/11/01/bomb-squad-called-horizon-city-home/93118564/ The Independent, A Hell's Angels club house burns after being hit by an anti-tank missile (April 17, 1996), *available at* https://www.independent.co.uk/news/world/copenhagen-a-hell-s-angels-club-house-burns-after-being-hit-by-an-ant-itank-missile-1305480.html

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

the Target Subjects. AR-15 and Glock auto sear switches convert such weapons into machineguns. The auto sear switches are themselves considered machineguns under federal law.

156.    CHS-5 reported the Target Subjects in Albuquerque and Los Lunas transported firearms to BMC members in El Paso, Texas, on several occasions. According to CHS-5, the firearms were smuggled into Mexico and provided to cartel representatives in exchange for methamphetamine and cocaine.

157.    CHS-3 and CHS-8 reported similar accounts of New Mexico BMC members removing serial numbers from firearms and shipping them to BMC members in Washington, who smuggled the guns to BMC members in Canada – where firearms laws were extremely restrictive. CHS-1, CHS-2, CHS-3, CHS-4, CHS-5, CHS-6, and CHS-7 reported the Target Subjects and other BMC members were involved in removing serial numbers from firearms and shipping them to BMC members in other states. CHS-5, CHS-6, and CHS-7 indicated the Target Subjects regularly sent firearms to Peckerwoods (white power gang members) in California because firearm laws there were too restrictive. CHS-6, CHS-6, and CHS-7 said many of the white BMC members identified and socialized with Peckerwoods in and out of prison.

158.    CHS-1, CHS-2, CHS-3, CHS-4, CHS-5, CHS-6, CHS-7, CHS-8, CHS-13, CHS-15, and CHS-16 reported BMC members, to include the Target Subjects, were heavily involved in acquiring firearms for transfer, distribution, or sale to various people, to include prohibited persons and other gang members. The aforementioned CHS all described the BMC members in New Mexico, to include the Target Subjects, as being armed with multiple firearms, accumulators of many shared firearms within the club, and freely distributing guns and ammunition to dangerous people in the community. I believe such actions violate the National Gun Control Act of 1968, as well as several provisions under Title 18 of the United States Code.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

159.    I am aware that DNA evidence and latent fingerprints can be collected from the surface of firearms. I am aware spent cartridges may be found at the Subject Premises and such cartridges may be subject to NIBIN examinations.[19] I have had numerous NIBIN leads that helped solve homicides, drive-by shootings, and other firearm related assaults. I believe such evidence may be utilized by the FBI in the instant investigation to establish firearms trafficking by the Target Subjects.

**Conspiracy to Distribute Controlled Substances**

160.    CHS-1, CHS-2, CHS-3, CHS-4, CHS-5, CHS-6, CHS-7, CHS-8, CHS-12, CHS-14, CHS-15 all reported members of the BMC regularly sold drugs. CHS-1, CHS-2, CHS-3, CHS-4, CHS-5, CHS-6, and CHS-7 acknowledged the BMC do not officially condone such actions, but wholly turn a blind eye to it.[20]

---

[19] NIBIN is a national database of digital images of spent bullets and cartridge cases that were found at crime scenes or test-fired from confiscated weapons. The ATF manages the system and provides the equipment to crime labs around the country. A firearms examiner uses ballistic imaging to convert the spent rounds into two- or three-dimensional digital images that are uploaded into NIBIN. NIBIN can be searched for possible matches — that is, other rounds that have similar tool marks and thus may have been fired from the same gun. After a possible match, or "hit" is identified, the crime lab secures the actual spent round(s) and compares them under a microscope to confirm the hit. Then, the lab sends information on the hit (a hit report) to investigators. Source: https://nij.ojp.gov/topics/articles/national-integrated-ballistic-information-network-nibin

[20] Federal Bureau of Investigation, Nearly 40 Members and Associates of Bandido Outlaw Motorcycle Gang Charged in Three Districts for Alleged Drug and Firearm Offenses (Sept. 27, 2011), *available at* https://archives.fbi.gov/archives/sanantonio/press-releases/2011/nearly-40-members-and-associates-of-bandido-outlaw-motorcycle-gang-charged-in-three-districts-for-alleged-drug-and-firearm-offenses; Carly Moore, Fox 31, 8 Bandidos Motorcycle Club members indicted for drug trafficking, leader still at-large (Jan. 28, 2015), *available at* https://kdvr.com/news/8-bandidos-motorcycle-club-members-indicted-for-drug-trafficking-leader-still-at-large/; Associated Press, Motorcycle Gang Arrested In Idaho In Drug Raid (Oct. 12, 2010), *available at* https://www.khq.com/news/update-motorcycle-gang-arrested-in-idaho-in-drug-raid/article_d96449ec-ffb3-5cb0-ae0b-3845728b7771.html;   Guillermo   Contreras, Associated Press, Police arrest regional Bandidos president for drug trafficking (April 27, 2017),

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

161.    CHS-1, CHS-2, CHS-3, CHS-4, CHS-5, CHS-6, and CHS-7 reported the Washington state chapters of the BMC were currently flush with funds and throwing some of the best parties in the BMC because the Washington chapters were selling a lot of dope. The sources pointed out that the National Vice President was in Washington state and condoned drug sales, thus the chapters were flourishing in profits.

162.    CHS-1, CHS-2, CHS-3, CHS-4, CHS-5, CHS-6, and CHS-7 observed BMC members, to include many of the Target Subjects, sell drugs to other members, support club personnel, and other persons on a regular basis. In some instances, the Target Subjects did not sell drugs to other persons, but directed would-be drug buyers to other Target Subjects who had controlled substances on hand, according to the sources. CHS-1, CHS-2, CHS-3, CHS-4, CHS-5, CHS-6, and CHS-7 explained BMC members could sell drugs if they did it on their own time, paid their monthly dues to the BMC, and didn't discredit the club. CHS-1, CHS-2, CHS-3, CHS-4, CHS-5, CHS-6, and CHS-7 explained most of the Target Subjects sold smaller amounts of drugs and none of them were "getting rich" or "doing big things" with their profits. The sources described the drug sales consisted of user quantities of cocaine and methamphetamine that were sold in bathrooms at biker bars or in the parking lot before long motorcycle runs.

163.    CHS-1, CHS-2, CHS-3, CHS-4, CHS-5, CHS-6, and CHS-7 described GREGORY ARMENTA, who is on federal supervision for being a felon in possession of a firearm (03-CR-00280-WJ) as the biggest BMC drug dealer in the Albuquerque area. The sources said all significant drug proceeds went through BMC National Treasurer-Secretary JOAQUIN

---

*available              at*              https://apnews.com/article/arrests-san-antonio-793d8a52990249c59cb3762be9e50604.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

MARTINEZ, who mixed drug money with legitimate BMC funding streams as a means to clean the drug money.[21]

164. CHS-1 and CHS-5 reported BMC members in El Paso, Texas, worked with the Target Subjects in Alamogordo and Ruidoso to move drugs to the Target Subjects in Albuquerque, where the drugs were distributed. CHS-1 and CHS-5 had participated in such activity in the past and knew it to still be occurring today. The sources reported the Target Subjects in Alamogordo, Ruidoso, and Albuquerque were involved in moving drugs from El Paso to Albuquerque.

165. CHS-3 and CHS-7 reported the Target Subjects in Alamogordo and Ruidoso were transporting drugs from the border to the Target Subjects in Albuquerque, who took part in sending the drugs to the Target Subjects in the Four Corners area and to BMC members in Oklahoma.

166. CHS-2 reported individual Bandidos would hook up with other BMC members and sell drugs, but it would not be an official chapter thing unless the president okayed it. CHS-2 said some chapter presidents were in support of drug sales. CHS-2 said JOAQUIN MARTINEZ had to approve all BMC activities in New Mexico.

167. CHS-3 reported BMC members in El Paso were working with BMC members in Las Cruces to transport drugs to the Target Subjects in Albuquerque, who would distribute the drugs. CHS-3 had received drugs from El Paso members via this method in the past and was aware it was still occurring today. CHS-3 said a portion of the proceeds were sent to JOAQUIN MARTINEZ to be laundered or mixed with BMC chapter dues.

---

[21] I am aware that JOAQUIN MARTINEZ is registered as the Director of USARG, Inc., which formerly used the trading name "Bandidos Motorcycle Club, United States." USARG financial records indicate multiple bulk cash transactions and at least one financial transaction related to the purchase of firearms.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

168.    CHS-12 reported that CHS-12 and other members of the SNM had collected drug debts for BMC members over the past 20 or so years. CHS-12 sold bulk quantities of drugs to BMC members in the past, and at times CHS-12 and other SNM members purchased bulk quantities of drugs from BMC members. CHS-12 said anyone who wanted to do business with the BMC in New Mexico had to go through JOAQUIN MARTINEZ, aka: "Ope," to get approval. CHS-12 said MARTINEZ was the top BMC member in New Mexico.

169.    CHS-14 has sold drugs for multiple BMC members around New Mexico for several years. CHS-14 provided specific details regarding the Target Subjects being directly or indirectly involved in drug trafficking. For example, CHS-14 was tasked with driving to Ruidoso and Alamogordo on multiple occasions to pick up bulk quantities of methamphetamine from the Target Subjects there and drive the methamphetamine to Target Subjects in Albuquerque, where it was further distributed. CHS-14 also picked drugs up in Grants, Hobbs, Las Cruces, and the Four Corners areas. CHS-14 has been present at more than fifty BMC social gatherings, where members traded, sold, or distributed cocaine, and methamphetamine to other BMC members and associates. CHS-14 has been tasked with collecting drug debts on behalf of BMC members on more than one hundred occasions. According to CHS-14, anytime a person refused to pay a drug debt, CHS-14 would notify the BMC and they would assault the person to collect the money and teach them a lesson.

**Extortion, Robbery and Theft of Motorcycle Vests and Patches**

170.    CHS-1, CHS-2, CHS-4, CHS-5, CHS-6, and CHS-7 all reported BMC members in New Mexico, to include the Target Subjects, were involved in the forcible removal of club "colors" or "cuts" (vests bearing a particular club's patches and insignia) from people. The sources reported the Target Subjects were using force and fear to induce other motorcycle riders to remove their

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

colors. CHS-1, CHS-2, CHS-4, CHS-5, CHS-6, and CHS-7 had all been present with one or more of the Target Subjects in recent months when they produced firearms or other weapons and demanded a person remove their colors. The Target Subjects and other BMC members regularly boasted of such conquests and hung the seized vests upside-down inside their residences or garages as trophies. CHS-1, CHS-2, CHS-4, CHS-5, CHS-6, and CHS-7 helped the Target Subjects forcibly steal vests from motorcycle club members on multiple occasions in recent years. All of those robberies occurred within the District of New Mexico, and most went unreported to law enforcement, as many citizen motorcycle clubs were reluctant to report BMC members to law enforcement.

171.    CHS-11, who belongs to a motorcycle club that is forced to wear a BMC support patch, complained that the New Mexico council of clubs (see footnote 12) was a puppet for whatever the BMC wanted. CHS-11 commented, "Motorcycle riders join organizations like the COC to preserve their freedoms and rights. It's ironic that all of the non-outlaw clubs have to follow the BMC's guidance, get their club patches approved by the BMC before wearing them, and have to bow down to whatever the BMC say. CHS-11 added, "We ride motorcycles to be free souls, join clubs to ride with likeminded people, but get intimidated and oppressed whenever the BMC come around."

172.    Another civilian motorcycle club member that I spoke with asked, "Why do we need their (BMC) permission to start a club? Why can't a group of friends get together and ride around without having to make sure we let them ride in front, park in the front, or be the first to go through an intersection at a red light? The simple answer is, if we don't, we get beat up and have our motorcycles damaged. If it happens more than once, we face having our patches removed, and not being allowed to ride as a group."

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

173.    CHS-3 explained the BMC ran all of the COCs in New Mexico. CHS-3 pointed out that the MMC were not members of the COC in Albuquerque, even though the COC is supposed to be open to everyone. The fact that the MMC were not members of the COC demonstrated the BMCs control over the COC, according to CHS-3. CHS-3 went on to say the COC did a good job of bringing all of the clubs together to better communicate and support biker-friendly laws, but the COC always looked to the BMC when a new club sought approval to establish itself in New Mexico. CHS-3 said only the BMC could approve a motorcycle club patch in New Mexico.

174.    CHS-4 said the BMC were tight with the COC and the BMC influenced all COC decisions. CHS-5 went on to say only the BMC could issue or pull MC patches in New Mexico. CHS-4 described the BMC as having an "unspoken intimidation" over all New Mexico clubs. CHS-4 said the intimidation would be very public and violent if a club were to openly defy the BMC or disrespect them.

175.    CHS-15 related several instances when CHS-15 helped BMC members take patches at gunpoint from smaller club members in New Mexico. CHS-15 and the BMC support club CHS-15 belongs to often serve as scouts or extra eyes for the BMC. CHS-15 spoke of numerous instances when BMC members assaulted or brandished weapons at people and robbed them of their cuts for wearing patches not approved by the BMC, disrespecting the BMC, or being suspected of supporting the MMC or another rival club.

176.    CHS-1, CHS-2, CHS-4, CHS-5, CHS-6, and CHS-7 reported most BMC members in New Mexico were in possession of patches they stole from other motorcyclists. The sources reported the BMC members wore the stolen patches under their vests - sewn upside down on the inside of the BMC member's vest. Similarly, most BMC members kept stolen patches and cuts in their residences, where they were hung upside down on the wall like trophies.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

177.    I believe stolen patches, vests, clothing, and the like, are evidence of BMC intimidation, assaults, robberies, and extortion.

178.    CHS-15 was with BMC members when they followed a lone OMG member to a gas station and confronted the biker for "flying his colors" in New Mexico without permission. The BMC members brandished firearms and took the biker's vest at gunpoint. The BMC members told the biker they'd kill him if they saw him wearing his colors in New Mexico again.

179.    CHS-1, CHS-5, CHS-6, and CHS-7 reported BMC members, to include the Target Subjects, regularly participated in extortion schemes to swindle money out of people. For example, several BMC members, to include the Target Subjects, hosted private strip club parties during Covid and hired exotic dancers to attend BMC-sponsored parties. The sources reported the Target Subjects extorted the dancers for fifty percent of the dancer's earnings and intimidated all of the non-BMC patrons at the parties to empty their pockets of cash. BMC members walked around with a donation bucket in one hand and a hammer in the other. They told the patrons they should "fill the bucket or feel the hammer."

180.    In another BMC extortion scheme, the Target Subjects and other members invited members of a smaller motorcycle club to what the BMC described as a BBQ and fundraiser for a charity. The BMC suspected the smaller club of associating with a rival OMG and the event was actually an organized fleecing and robbery. When the smaller motorcycle club arrived, the Target Subjects and other BMC members invited them in, surrounded them, advised them they were no longer a motorcycle club and took their patches at gunpoint. Once all the patches had been collected, the BMC told their victims to "donate" to their charity, collected money from the victims at gunpoint, and instructed them to ride away before they took their motorcycles.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

181.    Civilian motorcycle clubs are not the only victims of the BMC's robbery and extortion plots.  The BMC sometimes turn on their own, as was the case a few years ago when the BMC's National President, JEFFREY PIKE, directed several BMC members from Texas to come to New Mexico to deal with a group of disobedient BMC members. The Texas BMC members beat up the New Mexico members, forcibly took 16 sets of BMC patches from them, burned the patches, and threw 16 New Mexico members out of the BMC. This particular incident was charged as count 12 in a multi-count VICAR case against JEFFREY PIKE and National Vice President JOHN PORTILLO, in the Western District of Texas (Case No. SA-15-CR-820-DAE).

### Motorcycle Theft

182.    CHS-1 said the BMC routinely stole Harley Davidson motorcycles from locations around New Mexico and had inside help from BMC supporters that worked at the various Harley Davidson dealerships.[22] CHS-1 reported BMC sources inside the Harley Davidson dealerships would keep an eye out for certain motorcycles and provide BMC members with the motorcycle make, model, and address of the owner. CHS-1 said BMC members, to include some of the Target Subjects, would scope out the motorcycle owner's house and wait for an opportune time to steal the motorcycle. CHS-1 said the Target Subjects in Albuquerque and Alamogordo were some of the best motorcycle thieves and each chapter had a van the BMC members utilized when stealing motorcycles.  CHS-1 explained, the Albuquerque and Alamogordo BMC members would pull up to the intended target's house, back the van up to the motorcycle, wrap a rope or wench line around the bike, pull and lift the motorcycle into the van, and drive away. CHS-1 said

---

[22] In recent years, I have recovered 26 stolen motorcycles and vehicles from BMC members and prospective members in New Mexico. Thus far, I have not encountered any employees at Harley Davidson being involved in motorcycle theft or related conspiracy. If the FBI develops additional information on insider threats at any of the Harley Davidson dealerships, we will work with the company to identify that subjects(s) and arrest them.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

a couple of the Albuquerque Bandidos created a fraudulent vehicle repossession business to better conceal their motorcycle theft activities. CHS-1 said ROBERT SALAZAR utilized a tow truck to steal motorcycles and could get a motorcycle onto a tow truck in seconds.

183.    CHS-3 reported several BMC members, to include some of the Target Subjects, were involved in stealing former BMC members motorcycles. According to BMC practices, BMC members confiscate the motorcycle of any member who was thrown out of the club. Similarly, BMC members in New Mexico, to include some of the Target Subjects, have been sent to Texas and Oklahoma to confiscate motorcycles from former members. CHS-3 said if the former member was well liked, some of the BMC members would work with the person so they could report their motorcycle stolen and collect money from the insurance company. CHS-3 said that happened frequently. The BMC then dismantled the "stolen" motorcycle for parts and replaced the forks and engine, because they contained identification numbers.

184.    CHS-5, CHS-6, and CHS-7 said individual BMC members and chapters participated in Harley Davidson theft, which was dependent on the approval of the chapter president. CHS-5, CHS-6 and CHS-7 reported many of the Target Subjects were involved in Harley Davidson theft or the transfer of stolen motorcycle parts to other BMC members, to include BMC members in other chapters and outside New Mexico.

185.    It has been my experience that members of the BMC engage in motorcycle theft and keep stolen motorcycles, or stolen motorcycle parts, at their residences, places of business, and the residences and businesses of their associates.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

## **THE TARGET SUBJECTS**

 

186.    JOAQUIN MARTINEZ who appears in the photos above, is the BMC National "Tresurer" and "Secrtary" and according to multiple sources, the most powerful BMC memebr in New Mexico. MARTINEZ is registered as the Director of USARG, Inc., which formerly used the trading name "Bandidos Motorcycle Club, United States." USARG financial records indicate recent bulk cash transactions and at least one financial transaction related to the purchase of firearms.

187.    Law enforcement officers have observed MARTINEZ wear BMC colors on numerous occasions. MARTINEZ has four prior arrests in New Mexico for residential burglary, possession of a controlled substance, domestic violence assault, and DUI. MARTINEZ does not have any felony convictios.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

 

188.    LEVI LUCERO, who appears in the photos above, is a BMC member. Law enforcement officers have observed LUCERO wear BMC colors on numerous occasions. LUCERO has at least two prior arrests in New Mexico for trafficking cocaine and aggravated DUI. LUCERO does not have any felony convictions.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

 

189.    ROBERT SALAZAR, who appears in the photos above, is a BMC member. Law enforcement officers have observed SALAZAR wear BMC colors on numerous occasions. SALAZAR has at least six prior arrests in New Mexico for aggravated assault, aggravated assault with a deadly weapon (x2), auto burglary, conspiracy to commit auto burglary, possession of drug paraphernalia, reckless driving, domestic violence aggravated battery causing great bodily harm and DUI. SALAZAR has a felony conviction for conspiracy to commit auto burglary.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

 

190.    JOEL GUTIERREZ, who appears in the photos above, is a BMC member. Law enforcement officers have observed GUTIERREZ wear BMC colors on numerous occasions. GUTIERREZ does not have any prior arrests.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

 

191.    ERIK ASTORGA, who appears in the photos above, is a BMC member. Law enforcement officers have observed ASTORGA wear BMC colors on numerous occasions. ASTORGA has at least one prior arrest in New Mexico for shoplifting property valued at $500-$2500 and one felony conviction for attempted shoplifting of property valued at $500-$2500.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

 

192.    GREGORY ARMENTA, who appears in the photos above, is a BMC member. Law enforcement officers have observed ARMENTA wear BMC colors on numerous occasions. ARMENTA has at least six prior arrests in New Mexico for possession with intent to distribute methamphetamine, conspiracy to distribute a controlled substance, being a felon in possession of a firearm, drive by shooting, tampering with evidence, and aggravated battery with a deadly weapon. ARMENTA has two prior felony convictions in federal court for possession with intent to distribute methamphetamine (Case No. 03-CR-00280-WJ) and being a felon in possession of a firearm (Case No. 18-CR-3315-JCH). AREMENTA is currenty on federal supervision for a prior conviction of being a felon in possession of a firearm.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS





193.    ALBERT ARMIJO, who appears in the photos above, is a BMC member. Law

enforcement officers have observed ARMIJO wear BMC colors on numerous occasions.

ARMIJO does not have any prior arrests.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

 

194.   DONNY CRAPSE, who appears in the photos above, is a BMC member. Law enforcement officers have observed CRAPSE wear BMC colors on numerous occasions. CRAPSE has at least four arrests in New Mexico, Oklahoma, and Nevada for residential burglary, possession of a controlled substance (x2), and carrying a concealed firearm without a permit. CRAPSE has one conviction for attempted possession of a controlled substance.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

 

195.    ED SANCHEZ SOLIS, who appears in the photos above, is a BMC member. Law enforcement officers have observed SOLIS wear BMC colors on numerous occasions, to include during the May 2023 Red River Motorcycle Rally. SOLIS has at least four prior arrests in New Mexico and Kansas for criminal use of a weapon, carrying a concealed weapon, contributing to the delinquency of a minor, and DUI (x2). SOLIS does not have any felony convictions.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

 

196.    LAWRENCE SELVA, who appears in the photos above, is a BMC member. Law enforcement officers have observed SELVA wear BMC colors on numerous occasions, to include during the May 2023 Red River Motorcycle Rally. SELVA does not have any prior arrests.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

 

197.    CHARLES RUSSELL, who appears in the photos above, is a BMC member. Law enforcement officers have observed RUSSELL wear BMC colors on numerous occasions, to include during the May 2023 Red River Motorcycle Rally. RUSSELL does not have any prior arrests.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

 

198.    JOSE MAESTAS, who appears in the photos above, is a BMC member. Law enforcement officers have observed MAESTAS wear BMC colors on numerous occasions, to include during the May 2023 Red River Motorcycle Rally. MAESTAS has at least three prior arrests in California and New Mexico for DUI, operating a watercraft vehicle under the influence, and driving with a suspended license. MAESTAS does not have any felony convictions.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

 

199.    KENNETH MARTINEZ, who appears in the photos above, is a BMC member. Law enforcement officers have observed MARTINEZ wear BMC colors on numerous occasions, to include during the May 2023 Red River Motorcycle Rally. MARTINEZ has at least seven prior arrests in New Mexico for distribution of marijuana, contributing to the delinquency of a minor, assault, aggravated battery, negligent use of a deadly weapon, aggravated assault, and aggravated battery domestic violence. MARTINEZ has felony convictions for aggravated assault, domestic violence, and distribution of marijuana.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

 

200.    SKYLER ELWESS, who appears in the photos above, is a BMC member. Law enforcement officers have observed ELWESS wear BMC colors on numerous occasions, to include during the May 2023 Red River Motorcycle Rally. ELWESS has at least twenty-three prior arrests in New Mexico, Colorado, and Texas for possession with intent to distribute a controlled substance, receiving stolen property, DWI, negligent use of a deadly weapon, possession of methamphetamine (x2), possession of cocaine, possession with intent to distribute marijuana, possession of a dangerous drug, DUI, fraud, fugitive from justice, and failure to appear (x3). ELWESS has prior felony convictions for possession with intent to distribute marijuana.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

 

201.    LEX BLUEEYES, who appears in the photos above, is a BMC prospective member. Law enforcement officers have observed BLUEEYES wear BMC prospect colors on numerous occasions, to include during the May 2023 Red River Motorcycle Rally. BLUEEYES has at least three prior arrests in New Mexico for DUI, contempt of court, and driving with a suspended license. BLUEEYES does not have any felony convictions.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

 

202.    JESUS RODRIGUEZ, who appears in the photos above, is a BMC member. Law enforcement officers have observed RODRIGUEZ wear BMC colors on numerous occasions. RODRIGUEZ has at least two prior arrests in New Mexico for driving on a suspended license and failure to appear. RODRIGUEZ does not have any felony convictions.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

 

203.    JONATHAN BIVINS, who appears in the photos above, is a BMC member. Law enforcement officers have observed BIVINS wear BMC colors on numerous occasions, to include during the May 2023 Red River Motorcycle Rally. BIVINS has at least six prior arrests in New Mexico for possession of cocaine, negligent use of a weapon, being a felon in possession of a firearm, possession of drug paraphernalia, and DUI (x2). BIVINS has felony convictions for possession of a controlled substance, negligent use of a deadly weapon and being a felon in possession of a firearm.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS





204.    WILLIAM ROMERO, who appears in the photos above, is a BMC member. Law enforcement officers have observed ROMERO wear BMC colors on numerous occasions, to include during the May 2023 Red River Motorcycle Rally. ROMERO has at least one prior arrest in New Mexico for DUI. ROMERO does not have any felony convictions.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

 

205.    ALCARIO BUSTAMANTES, who appears in the photos above, is a BMC member. BUSTAMANTES is the Alamogordo BMC Chapter President and was observed by law enforcement officers in his BMC vest at the May 2023 Red River Motorcycle Rally. BUSTAMANTE has at least two prior arrests in New Mexico for aggravated battery with a deadly weapon, conspiracy to commit aggravated battery with a deadly weapon, accessory, and DUI. BUSTAMANTE does not have any felony convictions.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

 

206.   RICARDO SAUCEDO, who appears in the photos above, is a BMC member. SAUCEDO has at least eight prior arrests in New Mexico for trafficking cocaine, possession of a controlled substance (x2), being a felon in possession of a firearm (x2), aggravated fleeing, resisting arrest, escape, hit and run, and negligent use of a deadly weapon. SAUCEDO has felony convictions for trafficking cocaine and being a felon in possession of a firearm.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

 

207.    MICHAEL SAUCEDO, who appears in the photos above, is a BMC member. SAUCEDO has at least two prior arrests in New Mexico for trafficking a controlled substance (x2) and one prior felony conviction for trafficking a controlled substance.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

 

208.    BILLY DOZER, who appears in the photos above, is a BMC member in the Alamogordo chapter. Law enforcement officers have observed DOZER wear his BMC vest on numerous occasions, to include during the May 2023 Red River Motorcycle Rally. Rally. DOZER has at least thirteen arrests in New Mexico for aggravated battery with a deadly weapon resulting in great bodily injury, conspiracy, criminal trespass, contributing to the delinquency of a minor, trafficking a controlled substance (x2), battery (x2), assault, resisting arrest, domestic violence, and DUI. DOZER has felony convictions for trafficking a controlled substance (x2) and aggravated battery with a deadly weapon resulting in great bodily injury.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

 

209.   SCOTT STEVENS, who appears in the photos above, is a BMC member. Law enforcement officers have observed STEVENS wear BMC colors on numerous occasions. STEVENS has at least five prior arrests in New Mexico and Texas for unlawful carrying of a firearm (x2), disorderly conduct, negligent use of a firearm, unlawful possession of a firearm, and DUI. STEVENS does not have any felony convictions.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

 

210.    TERRY CLAUNCH, who appears in the photos above, is a BMC member. Law enforcement officers have observed CLAUNCH wear BMC colors on numerous occasions. CLAUNCH has at least three prior arrests in Texas and New Mexico for unlawful carrying of a firearm, fraud, and trafficking a controlled substance. CLAUNCH does not have any felony convictions.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

 

211.    ZACHARY CARRIZAL, who appears in the photos above, is a BMC member. CARRIZAL has at least ten prior arrests in Texas for unlawful carrying of a firearm (x3), possession of marijuana, obstruction of justice, failure to appear, DUI, and driving with a suspended licesne. CARRIZAL does not have any felony convictions.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

## THE SUBJECT PREMISES

212.   Investigators determined the Target Subjects to reside at the Subject Premises described below via New Mexico Department of Motor Vehicle records, law enforcement reports or 911 calls, property records, court records, public records such as business licenses, information from neighbors living near the Subject Premises, commercial legal databases such as LexisNexis, consumer credit reporting agencies such as Equifax and Experian, and physical surveillance by law enforcement officers.

213.   **Subject Premises A-1:** I believe JOAQUIN MARTINEZ lives at Subject Premises A-1, located at 109 Bellrose Avenue NW, Albuquerque, New Mexico. Subject Premises A-1 may be described as a single-story, brown in color, stucco residence with a pitched, shingle roof.  The front door faces south.  The numbers 109 are posted on the mailbox and above the front door. A color photograph of the Subject Premises has been attached and incorporated in Attachment A-1.

Indicia of Residence:

  a)  In March 2023, MARTINEZ obtained a New Mexico business license and liquor control license for "Sewn Up, LLC." MARTINEZ listed the Subject Premises as his address on the applications.

  b)  MARTINEZ's Dodge Ram truck, Harley Davidson motorcycle, and utility trailer are registered to MARTINEZ at his parent's house; however, can be observed on the Bernalillo County Property Assessors satellite map for the Subject Premises.

  c)  LexisNexis and consumer credit reporting agencies list the Subject Premises as MARTINEZ's current residence.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

    d) OMGTF investigators and FBI SWAT agents have had MARTINEZ under periodic surveillance for the past six weeks and observed him to reside at Subject Premises A-1. The most recent observations were within the past five days.

    e) Attachment A-1 contains a color photograph of Subject Premises A-1. MARTINEZ is depicted in that photo sitting on the front porch, drinking beer.

214. **Subject Premises A-2:** I believe LEVI LUCERO lives at Subject Premises A-2, located at 315 63rd Street SW, Albuquerque, New Mexico. Subject Premises A-2 may be described as a single story residence with brown siding and a pitched roof. The front door is covered with a white metal security door. There is a chain-link fence around most of the property that is covered with a green privacy screen. The numbers 315 are posted on the mailbox in front of the residence. A color photograph of the Subject Premises has been attached and incorporated in Attachment A-2.

    Indicia of Residence:

    a) The Subject Premises is listed as LUCERO's residence on his valid New Mexico driver's license.

    b) Official law enforcement records list the Subject Premises as his residence.

    c) LexisNexis and consumer credit reporting agencies list the Subject Premises as MARTINEZ' residence.

    d) OMGTF investigators and FBI SWAT agents have had LUCERO under periodic surveillance for the past six weeks and observed him to reside at Subject Premises A-2. The most recent observations were within the past five days.

215. **Subject Premises A-3:** I believe ROBERT SALAZAR lives at Subject Premises A-3, located at 10200 2nd Street NW, #120, Albuquerque, New Mexico. Subject Premises A-3 may be

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

described as single wide manufactured home within the Village Park trailer park. The Subject Premises is orangish-brown in color with green trim. The skirting portion of the trailer is white in color. The number 120 is posted on the side of the trailer and in a window within the trailer. A color photograph of the Subject Premises has been attached and incorporated in Attachment A-3.

Indicia of Residence:

a) Official law enforcement reports list the Subject Premises as SALAZAR's residence.

b) The Subject Premises is listed as SALAZAR's residence on his valid New Mexico driver's license.

c) LexisNexis and consumer credit reporting agencies list the Subject Premises as SALAZAR's residence.

d) OMGTF investigators and FBI SWAT agents have had SALAZAR under periodic surveillance for the past six weeks and observed him to reside at Subject Premises A-3. The most recent observations were within the past five days.

216. **Subject Premises A-4:** I believe JOEL GUTIERREZ lives at Subject Premises A-4, located at 7300 Hanover Road NW, Albuquerque, New Mexico. Subject Premises A-4 may be described as a single story residence with peach colored siding and a two car garage with white garage doors. The front door is white, and the numbers 7300 are posted on the front porch. A color photograph of the Subject Premises has been attached and incorporated in Attachment A-4.

Indicia of Residence:

a) The Subject Premises is listed as GUTIERREZ' residence on his valid New Mexico driver's license.

b) Official law enforcement records list the Subject Premises as his residence.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

  c) LexisNexis and consumer credit reporting agencies list the Subject Premises as GUTIERREZ' residence.

  d) OMGTF investigators and FBI SWAT agents have had GUTIERREZ under periodic surveillance for the past six weeks and observed him to reside at Subject Premises A-4. The most recent observations were within the past five days.

217. **Subject Premises A-5:** I believe ERIK ASTORGA lives at Subject Premises A-5, located at 824 Cagua Drive SE, Albuquerque, New Mexico. Subject Premises A-5 may be described as single story residence with tan siding and white trim. The numbers 824 are posted next to the front door and on the curb in front of the house. A color photograph of the Subject Premises has been attached and incorporated in Attachment A-5.

Indicia of Residence:

  a) Official police reports list the Subject Premises as ASTORGA's residence. The most recent law enforcement incident occurred on July 10, 2023, and pertained to a domestic dispute between ASTORGA and his wife at the Subject Premises.

  b) LexisNexis and consumer credit reporting agencies list the Subject Premises as occupied by ASTORGA.

  c) Subject Premises A-5 is owned by BMC member DONNY CRAPSE (Target Subject #8).

  d) OMGTF investigators and FBI SWAT agents have had ASTORGA under periodic surveillance for the past six weeks and observed him to reside at Subject Premises A-5. The most recent observations were within the past five days.

218. **Subject Premises A-6:** I believe GREGORY ARMENTA lives at Subject Premises A-6, located at 7600 Via Belleza SW, Albuquerque, New Mexico. Subject Premises A-6 may be

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

described as a single story residence with light tan stucco siding and tan trim. The front door faces north and covered with a metal security screen door. The numbers 7600 are posted on the front of the house, next to the garage. A color photograph of the Subject Premises has been attached and incorporated in Attachment A-6.

Indicia of Residence:

    a) ARMENTA is on federal supervision and the Subject Premises is listed as his residence of record. USPO officers have visited with ARMENTA at the Subject Premises and believe him to live there.

    b) LexisNexis and consumer credit reporting agencies list the Subject Premises as ARMENTA's residence.

    c) OMGTF investigators and FBI SWAT agents have had ARMENTA under periodic surveillance for the past six weeks and observed him to reside at Subject Premises A-6. The most recent observations were within the past five days.

219. **Subject Premises A-7:** I believe ALBERT ARMIJO lives at Subject Premises A-7, located at 913 Perry Meadows Drive NE, Rio Rancho, New Mexico. Subject Premises A-7 may be described as a single story residence with light tan color siding and trim. There is a white metal security screen door over the front door. The numbers 913 are posted on the front of the house. A color photograph of the Subject Premises has been attached and incorporated in Attachment A-7.

Indicia of Residence:

    a) ARMIJO's valid New Mexico driver's license lists the Subject Premises as ARMIJO's residence.

    b) Official police records list the Subject Premises as ARMIJO's residence.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

    c) LexisNexis and consumer credit reporting agencies list the Subject Premises as ARMIJO's residence.

    d) OMGTF investigators and FBI SWAT agents have had ARMENTA under periodic surveillance for the past six weeks and observed him to reside at Subject Premises A-7. The most recent observations were within the past five days.

220.   **Subject Premises A-8:** I believe DONNY CRAPSE lives at Subject Premises A-8, located at 1523 Tierra Verde Loop NW, Los Lunas, New Mexico. Subject Premises A-8 may be described as single story residence with tan and light brown siding. There is a brown metal gate located off of the driveway that leads to the front door. The numbers 1523 are posted on the front of the house. A color photograph of the Subject Premises has been attached and incorporated in Attachment A-8.

Indicia of Residence:

    a) CRAPSE's vehicles are registered to the Subject Premises.

    b) Official police reports list the Subject Premises as CRAPSE's residence.

    c) LexisNexis and consumer credit reporting agencies list the Subject Premises as CRAPSE's residence.

    d) OMGTF investigators and FBI SWAT agents have had CRAPSE under periodic surveillance for the past six weeks and observed him to reside at Subject Premises A-8. The most recent observations were within the past five days.

221.   **Subject Premises A-9:** I believe ED SANCHEZ SOLIS lives at Subject Premises A-9, located at 108 Horner Street, Belen, New Mexico. Subject Premises A-9 may be described as a single story residence with red brick siding, tan siding, and a silver colored metal roof. A metal chain link fence encompasses the property. The numbers 108 are posted on the mailbox in front

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

of the residence. A color photograph of the Subject Premises has been attached and incorporated in Attachment A-9.

Indicia of Residence:

 a)  SANCHEZ SOLIS's valid New Mexico driver's license lists the Subject Premises as SANCHEZ SOLIS's residence.

 b)  LexisNexis and consumer credit reporting agencies list the Subject Premises as SANCHEZ SOLIS's residence.

 c)  Official police records list the Subject Premises as SANCHEZ SOLIS's residence.

 d)  OMGTF investigators and FBI SWAT agents have had SANCHEZ SOLIS under periodic surveillance for the past six weeks and observed him to reside at Subject Premises A-9. The most recent observations were within the past five days.

222. **Subject Premises A-10:** I believe LAWRENCE SELVA lives at Subject Premises A-10, located at 1 Buckskin Lane, Tome, New Mexico. Subject Premises A-10 may be described as a single wide trailer with tan siding and red and brown trim. The property is enclosed with wood and metal range fencing. There are several outbuildings and vehicles on the property. The Subject Premises is the first property on Buckskin Lane, from Tavalopa Road. A color photograph of the Subject Premises has been attached and incorporated in Attachment A-10.

Indicia of Residence:

 a)  SELVA's valid New Mexico driver's license lists the Subject Premises as his residence.

 b)  Official police records list the Subject Premises as SELVA's residence.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

    c) LexisNexis and consumer credit reporting agencies list the Subject Premises as SELVA's residence.

    d) OMGTF investigators and FBI SWAT agents have had SELVA under periodic surveillance for the past six weeks and observed him to reside at Subject Premises A-10. The most recent observations were within the past five days.

223.  **Subject Premises A-11:** I believe CHARLES RUSSELL lives at Subject Premises A-11, located at 900 Jackson Avenue, Grants, New Mexico. Subject Premises A-11 may be described as a single-story residence with tan siding, blue trim, and a red garage door. The numbers 900 are posted on the front of the house. The premises is surrounded by a brick and wrought iron fence. A color photograph of the Subject Premises has been attached and incorporated in Attachment A-11.

Indicia of Residence:

    a) RUSSELL's valid New Mexico driver's license lists the Subject Premises as RUSSELL's residence.

    b) LexisNexis and consumer credit reporting agencies list the Subject Premises as RUSSELL's residence.

    c) Official police records list the Subject Premises as RUSSELL's residence.

    d) OMGTF investigators and FBI SWAT agents have had RUSSELL under periodic surveillance for the past six weeks and observed him to reside at Subject Premises A-11. The most recent observations were within the past five days.

224.  **Subject Premises A-12:** I believe JOSE MAESTAS lives at Subject Premises A-12, located at 107 Main Street, San Rafael, New Mexico. Subject Premises A-12 may be described as a single story residence with white siding and blue trim. The residence has a blue metal roof,

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

and the numbers 107 are posted on the front of the house, near the front door. A color photograph of the Subject Premises has been attached and incorporated in Attachment A-12.

Indicia of Residence:

a)  MAESTAS' valid New Mexico driver's license lists the Subject Premises as his residence.

b)  MAESTAS' vehicles are registered to the Subject Premises.

c)  LexisNexis and consumer credit reporting agencies list the Subject Premises as MAESTAS' residence.

d)  Law enforcement records list the Subject Premises as MAESTAS residence.

e)  OMGTF investigators and FBI SWAT agents have had MAESTAS under periodic surveillance for the past six weeks and observed him to reside at Subject Premises A-12. The most recent observations were within the past five days.

225.   **Subject Premises A-13:** I believe KENNETH MARTINEZ lives at Subject Premises A-#13, located at 616 E. Princeton Avenue, Gallup, New Mexico. Subject Premises A-13 may be described as a single story residence with brown siding and brown trim. There is a small white cinder block wall in front of the residence. The front door has a white storm door over the front door. A color photograph of the Subject Premises has been attached and incorporated in Attachment A-13.

Indicia of Residence:

a)  MARTINEZ's valid New Mexico driver's license lists the Subject Premises as his residence.

b)  MARTINEZ's vehicles are registered to the Subject Premises.

c)  Law enforcement records list the Subject Premises as MARTINEZ's residence.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

d) LexisNexis and consumer credit reporting agencies list the Subject Premises as MARTINEZ' residence.

e) OMGTF investigators and FBI SWAT agents have had MARTINEZ under periodic surveillance for the past six weeks and observed him to reside at Subject Premises A-13. The most recent observations were within the past five days.

226. **Subject Premises A-14:** I believe SKYLER ELWESS lives at Subject Premises A-14, located at 1101 N. Laguna Avenue, Farmington, New Mexico. Subject Premises A-14 may be described as a single story residence with gray siding, tan trim, and the numbers 1101 are posted next to the front door. A color photograph of the Subject Premises has been attached and incorporated in Attachment A-14.

Indicia of Residence:

a) ELWESS's New Mexico driver's license lists the Subject Premises as his residence.

b) Police records indicate ELWESS lives at the Subject Premises.

c) LexisNexis and consumer credit reporting agencies list the Subject Premises as ELWESS' residence.

d) OMGTF investigators and FBI SWAT agents have had ELWESS under periodic surveillance for the past six weeks and observed him to reside at Subject Premises A-14. The most recent observations were within the past five days.

227. **Subject Premises A-15:** I believe LEX BLUEEYES lives at Subject Premises A-15, located at 3005 Bella Donna Lane, Farmington, New Mexico. Subject Premises A-15 may be described as two story residence with tan siding and brown wood trim. The garage door and front door are white in color. The numbers 3005 are posted on the front of the house above the garage

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

door. A color photograph of the Subject Premises has been attached and incorporated in Attachment A-15.

Indicia of Residence:

a) BLUEEYES's valid New Mexico driver's license lists the Subject Premises as his residence.

b) BLUEEYES**'s** vehicles are registered to the Subject Premises.

c) Law enforcement records list the Subject Premises as BLUEEYES's residence.

d) LexisNexis and consumer credit reporting agencies list the Subject Premises as BLUEEYES's residence.

e) OMGTF investigators and FBI SWAT agents have had BLUEEYES under periodic surveillance for the past six weeks and observed him to reside at Subject Premises A-15. The most recent observations were within the past five days.

228. **Subject Premises A-16:** I believe JESUS RODRIGUEZ lives at Subject Premises A-16, located at 901 East Lincoln Road, Hobbs, New Mexico. Subject Premises A-16 may be described as single story residence with red siding, white and blue trim, and a white front door. The numbers 901 are posted on the front of the residence near the front door. A wood picket fence surrounds the backyard of the Subject Premises. A color photograph of the Subject Premises has been attached and incorporated in Attachment A-16.

Indicia of Residence:

a) RODRIGUEZ' valid New Mexico driver's license lists the Subject Premises as his residence.

b) RODRIGUEZ**'** vehicles are registered to the Subject Premises.

c) Law enforcement records list the Subject Premises as RODRIGUEZ' residence.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

    d) LexisNexis and consumer credit reporting agencies list the Subject Premises as RODRIGUEZ' residence.

    e) OMGTF investigators and FBI SWAT agents have had RODRIGUEZ under periodic surveillance for the past six weeks and observed him to reside at Subject Premises A-16. The most recent observations were within the past five days.

229. **Subject Premises A-17:** I believe JONATHAN BIVINS lives at Subject Premises A-17, located at 1503 Park Avenue, Alamogordo, New Mexico. Subject Premises A-17 may be described as a single story residence with red brick siding and white trim. A white metal security screen door is attached to the front door. The numbers 1503 are posted on the front of the house near the front door. A color photograph of the Subject Premises has been attached and incorporated in Attachment A-17.

Indicia of Residence:

    a) BIVINS's valid New Mexico driver's license lists the Subject Premises as his residence.

    b) BIVINS's vehicles are registered to the Subject Premises.

    c) Law enforcement records list the Subject Premises as BIVINS's residence.

    d) LexisNexis and consumer credit reporting agencies list the Subject Premises as BIVINS's residence.

    e) OMGTF investigators and FBI SWAT agents have had BIVINS under periodic surveillance for the past six weeks and observed him to reside at Subject Premises A-17. The most recent observations were within the past five days.

230. **Subject Premises A-18:** I believe WILLIAM ROMERO lives at Subject Premises A-18, located at 1432 Vermont Avenue, Alamogordo, New Mexico. Subject Premises A-18 may be

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

described as a single story residence with white siding and white trim. There is a security storm door over the front door and the numbers 1432 are posted above the front door and on the mailbox in front of the house. A color photograph of the Subject Premises has been attached and incorporated in Attachment A-18.

Indicia of Residence:

    a) ROMOERO's valid New Mexico driver's license lists the Subject Premises as his residence.

    b) ROMERO's vehicles are registered to the Subject Premises.

    c) Law enforcement records list the Subject Premises as ROMERO's residence.

    d) LexisNexis and consumer credit reporting agencies list the Subject Premises as ROMERO's residence.

    e) OMGTF investigators and FBI SWAT agents have had ROMERO under periodic surveillance for the past six weeks and observed him to reside at the Subject Premises A-18. The most recent observations were within the past five days.

231.    **Subject Premises A-19:** I believe ALCARIO BUSTAMANTES lives at Subject Premises A-19, located at 1503 Hawaii Avenue, Alamogordo, New Mexico. Subject Premises A-19 may be described as a single story residence with white siding, brown trim, and a brown roof. The front door has a white metal security screen door over the front door. The numbers 1503 are posted on the front porch and on the mailbox in front of the residence. A color photograph of the Subject Premises has been attached and incorporated in Attachment A-19.

    a) BUSTAMANTES's valid New Mexico driver's license lists the Subject Premises as his residence.

    b) BUSTAMANTES's vehicles are registered to the Subject Premises.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

   c) Law enforcement records list the Subject Premises as BUSTAMANTES's
   residence.

   d) OMGTF investigators and FBI SWAT agents have had BUSTAMANTES under
   surveillance for the past six weeks and observed him to reside at Subject Premises
   A-19. The most recent observations were within the past five days.

232.   **Subject Premises A-20:** I believe RICHARD SAUCEDO lives at Subject Premises A-
20, located at 715 Maryland Avenue, Alamogordo, New Mexico. Subject Premises A-20 may be
described as two story residence with tan siding, brown and white trim, and a light green metal
roof. The numbers 715 are posted on the front of the residence, above the front door. A color
photograph of the Subject Premises has been attached and incorporated in Attachment A-20.

Indicia of Residence:

   a) RICHARD SAUCEDO's vehicles are registered to the Subject Premises.

   b) Law enforcement records list the Subject Premises as SAUCEDO's residence.

   c) RICHARD SAUCEDO's valid New Mexico driver's license lists his home
   address as being at his son's residence, which is located next door (Subject
   Premises A-21).

   d) LexisNexis and consumer credit reporting agencies list the Subject Premises as
   RICHARD SAUCEDO's residence.

   e) OMGTF investigators and FBI SWAT agents have had RICHARD SAUCEDO
   under periodic surveillance for the past six weeks and observed him to reside at
   Subject Premises A-20. The most recent observations were within the past five
   days.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

233.  **Subject Premises A-21:** I believe MICHAEL SAUCEDO lives at Subject Premises A-21, located at 711 ½ Maryland Avenue, Alamogordo, New Mexico.[23] Subject Premises A-21 may be described as a single story residence with tan siding and green and white trim. A chain link fence encloses the property and the numbers 711 ½ are posted on the gate in front of the residence. Subject Premises A-21 is located next door to Subject Premises A-20. A color photograph of the Subject Premises has been attached and incorporated in Attachment A-21.

Indicia of Residence:

a)  MICHAEL SAUCEDO's valid New Mexico driver's license lists the Subject Premises as his residence.

b)  MICHAEL SAUCEDO's vehicles are registered to the Subject Premises.

c)  Law enforcement records list the Subject Premises as MICHAEL SAUCEDO's residence.

d)  LexisNexis and consumer credit reporting agencies list the Subject Premises as MICHAEL SAUCEDO's residence.

e)  OMGTF investigators and FBI SWAT agents have had MICHAEL SAUCEDO under periodic surveillance for the past six weeks and observed him to reside at Subject Premises A-21. The most recent observations were within the past five days.

---

[23] Although MICHAEL SAUCEDO lists his address as 711 ½ Maryland Avenue, Alamogordo, Otero County parcel records and maps simply identify the property as 711 Maryland Avenue. Moreover, I have spoken with detectives with the Otero County Sheriff's Office, who are familiar with the premises, and confirmed MICHAEL SAUCEDO and his father RICHARD SAUCEDO have dominion and control over all the buildings, storage sheds, and vehicles located at 711, 711 ½, and 715 Maryland Avenue, Alamogordo. The properties are located next to each other and share a common property line. Otero County property records list 711 Maryland Avenue, Alamogordo, as being owned by "Saucedo & Saucedo et al."

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

234.  **Subject Premises A-22:** I believe BILY DOZER lives at Subject Premises A-22, located at 2302 Pine Drive, Alamogordo, New Mexico. Subject Premises A-22 may be described as a single story residence with light blue siding and white trim. The front door is dark in color and has a white security storm door over it. The numbers 2302 are posted on the mailbox in front of the residence. A color photograph of the Subject Premises has been attached and incorporated in Attachment A-22.

Indicia of Residence:

a)  DOZER's valid New Mexico driver's license lists the Subject Premises as his residence.

b)  DOZER's vehicles are registered to the Subject Premises.

c)  Law enforcement records list the Subject Premises as DOZER's residence.

d)  LexisNexis and consumer credit reporting agencies list the Subject Premises as DOZER's residence.

e)  OMGTF investigators and FBI SWAT agents have had DOZER under periodic surveillance for the past six weeks and observed him to reside at Subject Premises A-22. The most recent observations were within the past five days.

235.  **Subject Premises A-23:** I believe SCOTT STEVENS lives at Subject Premises A-23, located at 145 Willie Horton Drive, Ruidoso, New Mexico. Subject Premises A-23 may be described as a two story residence with tan siding and brown trim. The front door and garage door are brown in color. The numbers 145 are posted in large digits above the garage. A color photograph of the Subject Premises has been attached and incorporated in Attachment A-23.

Indicia of Residence:

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

a)  STEVENS's valid New Mexico driver's license lists the Subject Premises as his residence.

b)  STEVENS's vehicles are registered to the Subject Premises.

c)  Law enforcement records list the Subject Premises as STEVENS's residence.

d)  LexisNexis and consumer credit reporting agencies list the Subject Premises as STEVENS's residence.

e)  OMGTF investigators and FBI SWAT agents have had STEVENS under periodic surveillance for the past six weeks and observed him to reside at Subject Premises A-23. The most recent observations were within the past five days.

236.  **Subject Premises A-24:** I believe TERRY CLAUNCH lives at Subject Premises A-24, located at 113 W. Fourth Street, Capitan, New Mexico. Subject Premises A-24 contains two structures located side by side.[24] The northern structure is a singlewide mobile home with white siding and brown trim. The numbers 113 are posted on the front of the trailer; however, the residence is actually located at 115 West Fourth Street according to the Lincoln County property records. A sign that reads "Claunch Cozy Cottage" is hung on the front porch. The southern structure is a two story building with brown siding and may be utilized for storage, as the front door has a pad lock that locks from the outside. The brown building is located at 113 West Fourth Street according to Lincoln County property records. I believe both structures are utilized

---

[24] Lincoln County property records indicate that 113 West Fourth Street and 115 West Fourth Street are owned by the same person. Physical surveillance of the location confirmed CLAUNCH has dominion and control over the northern and southern structures, as surveillance agents observed CLAUNCH freely enter and exit both buildings without knocking. The northern structure (the white single wide mobile home) is located at 115 West Fourth Street, but bears the number 113 in two places on the front of the dwelling. A sign bearing Claunch's name appears next to the front door. The southern structure (brown 2-story wood building) is located at 113 West Fourth Street and is likely a storage house or used for similar purposes.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

by CLAUNCH. A color photograph of the Subject Premises has been attached and incorporated in Attachment A-24.

<u>Indicia of Residence:</u>

    a) CLAUNCH's valid New Mexico driver's license lists the Subject Premises as his residence.

    b) CLAUNCH's vehicles are registered to the Subject Premises.

    c) Law enforcement records list the Subject Premises as CLAUNCH's residence.

    d) LexisNexis and consumer credit reporting agencies list the Subject Premises as CLAUNCH's residence.

    e) OMGTF investigators and FBI SWAT agents have had CLAUNCH under periodic surveillance for the past six weeks and observed him to reside at Subject Premises A-24. The most recent observations were within the past five days.

237.   **<u>Subject Premises A-25:</u>** I believe ZACHARY CARRIZAL lives at Subject Premises A-25, located at 1896 Arabela Road, Arabela, New Mexico. Subject Premises A-25 may be described as a very rural property enclosed by wood and metal cattle fencing. There are several structures, vehicles, motorcycle, RV trailers, and semitruck trailers on the property. The main structure appears to be brown in color and is single story. The numbers 1896 are posted on a metal gate at the entrance to the property. A color photograph of the Subject Premises has been attached and incorporated in Attachment A-25.

<u>Indicia of Residence:</u>

    a) Lincoln County property records list CARRIZAL as the owner of the Subejct premises.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

b) LexisNexis and consumer credit reporting agencies list the Subject Premises as CARRIZAL's residence.

c) Neighbors reported seeing CARRIZAL at the Subject Premises on a regular basis.

d) Law enforcement records list the Subject Premises as CARRIZAL's residence.

e) OMGTF investigators and FBI SWAT agents have had CARRIZAL under periodic surveillance for the past six weeks and observed him to reside at Subject Premises A-25. The most recent observations were within the past five days.

## SEARCHING FOR GANG TATTOOS

238.   When the search warrants are executed, agents will attempt to interview the Target Subjects about their affiliation with the BMC. I believe gang tattoos to be significant evidence of gang affiliation and such tattoos may constitute an overt act, in-so-much-as gang-specific tattoos enable a person to maintain or increase their position within the gang. I have successfully charged several gang members with overt acts, within the context of a RICO conspiracy, for having one or more gang specific tattoos.

239.   It has been my experience that many people lie when speaking with law enforcement and will sometimes go to great lengths to conceal their gang ties. Furthermore, the Target Subjects may exercise their constitutional right to refrain from speaking with FBI agents. In an effort to discern and document the Target Subject's gang affiliation, I am requesting agents be permitted to search the Target Subject's bodies, above the waist and below the thighs, for tattoos. All of the Target Subjects are male.

240.   I am aware BMC members have distinct tattoos that represent their dedication to the BMC criminal enterprise. The members display these tattoos to gain respect within the enterprise and to intimidate non-members. I am seeking the court's permission to utilize law enforcement

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

photographers to photograph and document the Target Subject's tattoos. Such photo documentation would help positively identify the Target Subjects and better document and determine their gang affiliation. Law enforcement records, jail photographs, and social media photos that I have reviewed in this case indicate that all of the Target Subjects have one or more tattoos on their bodies.

241.    I am aware that some of the tattoos evidencing membership in or association with the BMC include, but are not limited to: the letters "BFFB," the words "Bandit," "Bandido," or "Bandidos MC," the symbols "1%" or "1%er," chapter names, and other imagery that may signify the BMC. Some example BMC tattoos have been included below.

 

 

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

## SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS

242.     As described above and in Attachment B, this application seeks permission to search for records that might be found at the Subject Premises, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, this warrant would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

243.     I submit that if a computer or storage medium is found on the Subject Premises, there is probable cause to believe the records referenced above will be stored on that computer or storage medium, for at least the following reasons:

   a)   Based on my knowledge and training, I know that forensic examiners can recover computer files or remnants of such file's months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

   b)   Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

    c) Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how an individual has used a computer, what the person used it for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

    d) Similarly, files that an individual viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

244.　As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described in the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the premises because:

    a) Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which the computer created them, although it is possible for a user to later falsify this information.

b) As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when someone accessed or used the computer or storage media.  For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

associated with user accounts, electronic storage media that connected with the computer and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

c) A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d) The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records sought, a review team cannot always readily review computer evidence or data in order to pass it along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e) Further, in finding evidence of how a person used a computer, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f) I know that when an individual uses a computer to research or plan a homicide or other violent crime, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The computer is an instrumentality of the crime because someone used it as a means of committing the criminal offense.  The computer is also likely to be a storage medium for evidence of crime.  From my training, I

believe that a computer used to commit a crime of this type may contain evidence of how the Target Subject used the computer; sent or received data; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

245.   Based upon my training and information relayed to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact disks, magnetic tapes, memory cards, memory chips, and online or offsite storage servers maintained by corporations, including but not limited to "cloud" storage.  I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

a)  Searching computer systems is a highly technical process, which requires specific expertise and specialized equipment.  There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software, website, or operating system that is being searched;

b)  Searching computer systems requires the use of precise, scientific procedures, which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Computer

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted. Further, the examination may employ techniques that would damage or destroy the device, but result in a forensically sound copy of data stored on the device;

c) The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises; and

d) Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.  Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened.  Therefore, a substantial amount of time is necessary to extract and sort

through data that is concealed or encrypted to determine whether it is contraband, evidence, fruits, or instrumentalities of a crime.

246.    Additionally, based upon my training and information related to me by agents and others involved in the forensic examination of computers, I know that routers, modems, and network equipment used to connect computers to the Internet often provide valuable evidence of, and are instrumentalities of, a crime.  This is equally true of wireless routers, which create localized networks that allow individuals to connect to the Internet wirelessly.  Though wireless networks may be secured (in that they require an individual to enter an alphanumeric key or password before gaining access to the network) or unsecured (in that an individual may access the wireless network without a key or password). Wireless routers for both secured and unsecured wireless networks may yield significant evidence of, or serve as instrumentalities of, a crime—including, for example, serving as the instrument through which the perpetrator of the Internet-based crime connected to the Internet and, potentially, containing logging information regarding the time and date of a perpetrator's network activity as well as identifying information for the specific device(s) the perpetrator used to access the network.  Moreover, I know that individuals who have set up either a secured or unsecured wireless network in their residence are often among the primary users of that wireless network.

247.    Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

### BIOMETRIC ACCESS TO DEVICES

248.    I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password.  These biometric features include fingerprint scanners, facial recognition features and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

a) If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints.  For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device.  Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device.  The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

b) If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face.  For example, this feature is available on certain Android devices and is called "Trusted Face."  During the Trusted Face registration process, the user holds the device in front of his or her

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

face.  The device's front-facing camera then analyzes, and records data based on the user's facial characteristics.  The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face.  Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

c)  If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises.  For example, on certain Microsoft devices, this feature is called "Windows Hello."  During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face.  The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises.  The device can then be unlocked if the infrared-sensitive camera detects the registered irises.  Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

d)  In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password.  Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.  This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

e) As discussed in this Affidavit, I have reason to believe that one or more digital devices will be found during the search.  The passcode or password that would unlock the devices subject to search under this warrant currently is not known to law enforcement.  Thus, law enforcement personnel may not otherwise be able to access the data contained within the devices, making the use of biometric features necessary to the execution of the search authorized by this warrant.

f) I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled.  This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time.  For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or (2) when the device has not been unlocked using a fingerprint for 8 hours *and* the passcode or password has not been entered in the last 6 days.  Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours.  Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g) Due to the foregoing, if law enforcement personnel encounter any devices that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, I request permission to: (1) press or swipe the

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

fingers (including thumbs) of the Target Subject to the fingerprint scanner of the devices found at the Subject Premises; (2) hold the devices found at the Subject Premises in front of the face of the Target Subject and activate the facial recognition feature; and/or (3) hold the devices found at the Subject Premises in front of the face of the Target Subject and activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant.   The proposed warrant does not authorize law enforcement to request that the Target Subject state or otherwise provide the password or any other means that may be used to unlock or access the devices. Moreover, the proposed warrant does not authorize law enforcement to ask the Target Subject to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

**EVIDENCE SOUGHT PURSUANT TO THE REQUESTED SEARCH WARRANTS**

249.   Based on the information contained herein, I believe there is probable cause to believe evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 1962(c), 1959(a), 1951, 931, 924(c), 922(g), 922(j) 922(n), 875, 2312, 2313, 371, 2, and 21 U.S.C. §§ 846 and 841(a)(1), will be found within the Subject Premises when the requested warrants are executed. The specific items being sought pursuant to the requested search warrants include:

  a) Evidence of membership or affiliation with the Bandidos Motorcycle Club (BMC): to include any documents, photographs, clothing, patches, stickers, drawings, writings, or objects depicting BMC member's names, initials,

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

monikers, officer role, chapter assignment, or any other item depicting potential gang membership, affiliation, activity or identity;

b) Rival motorcycle club lists or photographs, "green light" lists, murder/assault lists, witness or confidential informant lists, inmate lists, address and telephone number lists, letters, law enforcement reports, judgments, pre-sentencing reports, newspaper articles, computer generated reports or printouts, legal documents, detention facility inmate number lists or addresses for rival motorcycle clubs;

c) Vests, patches, shirts, hats, or similar items bearing the name, moniker, logo, or insignia of a potential rival motorcycle club, that may have been acquired through threats or violence;

d) Firearms, magazines, and ammunition;

e) Body armor and ballistic vests;

f) Controlled substances, drug packaging material, paraphernalia and scales;

g) United States currency;

h) Documentary evidence of drug trafficking, to include records, receipts, notes, ledgers, money orders money order receipts, pre-paid money cards such as MoneyPak, Green Dot, Wal-Mart, or other debit cards and any documents relating to transporting, ordering, purchasing or distributing drugs;

i) Cellular telephones and other digital devices, such as computers, laptops, tablets, or similar electronic storage devices;

j) Tattoos evidencing membership or affiliation with the BMC, to include the letters "BFFB," the words "Bandit," "Bandido," or "Bandidos MC," the

symbols "1%" or "1%er," chapter names, and other imagery that may signify the BMC. Such tattoos will be photographed by agents.

## **NIGHTIME SERVICE REQUEST**

250.    I am requesting the Court authorize the FBI to serve these warrants prior to 6:00 a.m., as set forth under Fed. R. Crim. Proc. 41(e)(2)(A)(ii).  Agents and officers will be attempting to serve the requested search warrants and several related arrest warrants in closely coordinated and simultaneous raids. Multiple FBI SWAT teams have been briefed on this operation and will be utilized to execute the search warrants. State police tactical teams will be working in conjunction with the FBI teams and serving search warrants in some of the same neighborhoods. I am requesting the Court authorize the FBI to serve the requested search warrants for a number of factors:

a)  the search warrants will need to be executed in a closely coordinated and simultaneous sequence;

b)  the locations and persons to be searched are spread over a significant distance and in different cities around New Mexico;

c)  the Target Subjects reportedly believe law enforcement officers to be watching them and are in close communication with one another;

d)  many of the Subject Premises are believed to be equipped with cameras;

e)  many of the Subject Premises are located near schools and/or school bus stops, and I would like to avoid school-age children congregating around bus stops or otherwise traveling toward schools. I believe school busses in the targeted areas start picking up children as early as 7:15 a.m.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

      f)   It is essential to the investigation that agents execute the requested search warrants at a time when the Target Subjects are home, as their persons will be searched for gang-related tattoos.

      g)   Furthermore, I anticipate firearms will be present at the Subject Premises and/or on the Target Subjects. I would like to recover those firearms and collect appropriate evidence to mitigate future violence perpetrated by the Target Subjects.

251.    Therefore, I am requesting authorization to serve the requested search warrants at any time of the day or night. With the Courts authorization, I will instruct FBI and NMSP SWAT teams to begin serving the requested search warrants at approximately 4:00 a.m.

<u>**CONCLUSION**</u>

252.    Based on the information set forth above, there is probable cause to believe that items more fully described in Attachment B and consisting of evidence, contraband, instrumentalities and/or fruits of violations of 18 U.S.C. §§ 1962(c), 1959(a), 1951, 931, 924(c), 922(g), 922(j) 922(n), 875, 371, 2 and 21 U.S.C. §§ 846 and 841(a)(1), will be found at the locations more fully described in Attachments A-1 through A-25. Further, based upon the foregoing paragraphs, judicial authority is specifically requested to allow the FBI and NMSP SWAT teams to execute the requested search warrants as early at 4:00 a.m.

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

253.    This application was reviewed and approved by Assistant United States Attorneys, Joseph Spindle and David Hirsch, of the Organized Crime Section of the United States Attorney's Office for the District of New Mexico.

Respectfully submitted,

Bryan Acee
FBI Special Agent
Violent Gang Task Force

Electronically submitted and telephonically sworn to me on <u>August 28, 2023</u>.

The Honorable Karen B. Molzen
United States Magistrate Judge
District of New Mexico

**ATTACHMENT A**
**A-1**
**PERSON AND PREMISES TO BE SEARCHED**

**Person to be searched:** The Person of JOAQUIN MARTINEZ, provided that this person is located at the subject premises and/or within the District of New Mexico at the time of the search. The Subject will be searched for tattoos evidencing membership in or association with the BMC. A color photograph of the Subject follows:



**Premises to be searched:** Subject Premises A-1, located at 109 Bellrose Avenue NW, Albuquerque, New Mexico. The Subject Premises A-1 may be described as a single-story, brown in color, stucco residence with a pitched, shingle roof.  The front door faces south. The address 109 is clearly marked on the mailbox and the roof trim above the front door.  A color photograph is posted below.



The search of the Subject Premises shall include the entire residence, all the attached and unattached garages, all outbuildings, trash cans, storage containers, and all persons located in the Subject Premises in or on which the items to be seized could be concealed.  The search shall also include all vehicles parked at, or in the front of, the Subject Premises.[1]

---

[1] Only vehicles parked at the Subject Premises or in the front of the Subject Premises and having an apparent connection to the Subject Premises will be searched.  Connection to the Subject Premises may be established by way of prior law enforcement observation, vehicle registration, subject admission, or possession of an ignition key.

Attachment A, Page 1

**ATTACHMENT A**
**A-2**
**PERSON AND PREMISES TO BE SEARCHED**

**Person to be searched:** The person of LEVI LUCERO, provided that this person is located at the subject premises and/or within the District of New Mexico at the time of the search. The Subject will be searched for tattoos evidencing membership in or association with the BMC. A color photograph of the Subject follows:



**Premises to be searched:** Subject Premises A-2, located at 315 63rd Street SW, Albuquerque, New Mexico. Subject Premises A-2 may be described as a single-story residence that has brown in color stucco and pitched roof. The residence is on the west side of 63rd St and faces east. The front door to the residence is on the east side of the residence and faces east. The front door has a white in color metal security door. There is a chain-linked fence around most of the property that is covered with a green privacy screen. The numbers 315 are posted in the mailbox in front of the residence. Color photographs are posted bellow.



The search of the Subject Premises shall include the entire residence, all the attached and unattached garages, all outbuildings, trash cans, storage containers, and all persons located in the Subject Premises in or on which the items to be seized could be concealed. The search shall also include all vehicles parked at, or in the front of, the Subject Premises.[2]

---

[2] Only vehicles parked at the Subject Premises or in the front of the Subject Premises and having an apparent connection to the Subject Premises will be searched. Connection to the Subject Premises may be established by way of prior law enforcement observation, vehicle registration, subject admission, or possession of an ignition key.

Attachment A, Page 2

**ATTACHMENT A**
**A-3**
**PERSON AND PROPERTY TO BE SEARCHED**

**Person to be searched:** The Person of ROBERT SALAZAR, provided that this person is located at the Subject Premises and/or within the District of New Mexico at the time of the search. The Subject will be searched for tattoos evidencing membership in or association with the BMC. A color photograph of the Subject follows:



**Premises to be searched:** Subject Premises A-3, located at 10200 2nd Street NW, #120, Albuquerque, New Mexico. Subject Premises A-3 may be described as single wide manufactured home within the Village Park trailer park. The Subject Premises is orangish-brown in color with green trim. The skirting portion of the trailer is white in color. The number 120 is posted on the side of the trailer and in a window within the trailer. Color photographs of the Subject Premises are posted below.

 

The search of the Subject Premises shall include the entire residence, all the attached and unattached garages, all outbuildings, trash cans, storage containers, and all persons located in the Subject Premises in or on which the items to be seized could be concealed. The search shall also include all vehicles parked at, or in the front of, the Subject Premises.[3]

---

[3] Only vehicles parked at the Subject Premises or in the front of the Subject Premises and having an apparent connection to the Subject Premises will be searched. Connection to the Subject Premises may be established by way of prior law enforcement observation, vehicle registration, subject admission, or possession of an ignition key.

Attachment A, Page 3

**ATTACHMENT A**
**A-4**
**PERSON AND PREMISES TO BE SEARCHED**

**Person to be searched:**  The Person of JOEL GUTIERREZ, provided that this person is located at the subject premises and/or within the District of New Mexico at the time of the search warrant. The Subject with be searched for tattoos evidencing membership in or association with the BMC. A color photograph of the Subject follows:



**Premises to be searched:** Subject Premises A-4, located at 7300 Hanover Road NW, Albuquerque, New Mexico.  The Subject Premises A-4 may be described as a single-story residence with peach colored siding and a two-car garage with white garage doors.  The front door is white, and the number 7300 are posted on the front porch.  A color photograph of the Subject Premises is posted below.



The search of the Subject Premises shall include the entire residence, all the attached and unattached garages, all outbuildings, trash cans, storage containers, and all persons located in the Subject Premises in or on which the items to be seized could be concealed. The search shall also include all vehicles parked at, or in the front of, the Subject Premises.[4]

---

[4] Only vehicles parked at the Subject Premises or in the front of the Subject Premises and having an apparent connection to the Subject Premises will be searched.  Connection to the Subject Premises may be established by way of prior law enforcement observation, vehicle registration, subject admission, or possession of an ignition key.

**ATTACHMENT A**
**A-5**
**PERSONS AND PREMISES TO BE SEARCHED**

**Persons to be searched:** The Person of ERIK ASTORGA, provided that this person is located at the Subject Premises and/or within the District of New Mexico at the time of the search.  The Subject will be searched for tattoos evidencing membership in or association with the BMC.  A color photograph of the Defendant follows:



**Premises to be searched**: Subject Premises A-5, located at 824 Cagua Drive SE, Albuquerque, New Mexico.  Subject Premises A-5 may be described as a single-story residence with tan siding and white trim.  The numbers 824 are posted next to the front door and on the curb in the front of the house.  A color photograph of the Subject Premises is posted below.



The search of the Subject Premises shall include the entire residence, all the attached and unattached garages, all outbuildings, trash cans, storage containers, and all persons located in the Subject Premises in or on which the items to be seized could be concealed. The search shall also include all vehicles parked at, or in the front of, the Subject Premises.[5]

---

[5] Only vehicles parked at the Subject Premises or in the front of the Subject Premises and having an apparent connection to the Subject Premises will be searched.  Connection to the Subject Premises may be established by way of prior law enforcement observation, vehicle registration, subject admission, or possession of an ignition key.

**ATTACHMENT A**
**A-6**
**PERSON AND PREMISES TO BE SEARCHED**

**Person to be searched:** The Person of GREGORY ARMENTA, provided that this person is located at the subject Premises and/or withing the District of New Mexico at the time of the search. The Subject will be searched for tattoos evidencing membership in or association with the BMC. A color photograph of the Subject follows:



**Premises to be searched**: Subject Premises A-6, located at 7600 Via Belleza SW, Albuquerque, New Mexico.  Subject Premises A-6 may be described as a single-story residence with light tan stucco siding and tan trim.  The front door faces north and covered with a metal security screen door.  The number 7600 are posted on the front of the house, next to the garage.  Color photographs are posted below.



The search of the Subject Premises shall include the entire residence, all the attached and unattached garages, all outbuildings, trash cans, storage containers, and all persons located in the Subject Premises in or on which the items to be seized could be concealed. The search shall also include all vehicles parked at, or in the front of, the Subject Premises.[6]

---

[6] Only vehicles parked at the Subject Premises or in the front of the Subject Premises and having an apparent connection to the Subject Premises will be searched.  Connection to the Subject Premises may be established by way of prior law enforcement observation, vehicle registration, subject admission, or possession of an ignition key.

**ATTACHMENT A**
**A-7**
**PERSON AND PREMISES TO BE SEARCHED**

**Person to be searched:** The Person of ALBERT ARMIJO, provided that this person is located at the Subject Premises and/or within the District of New Mexico at the time of the search.  The Subject will be searched for tattoos evidencing membership in or association with the BMC.  A color photograph of the Subject follows:



**Premises to be searched:** Subject Premises A-7, located at 913 Perry Meadows Drive NE, Rio Rancho, New Mexico.  Subject Premises A-7 may be described as a single-story residence with light tan color siding and trim.  There is a white metal security screen door over the front door.  The numbers 913 are posted on the front of the house.  Color photographs are posted below.

 

The search of the Subject Premises shall include the entire residence, all the attached and unattached garages, all outbuildings, trash cans, storage containers, and all persons located in the Subject Premises in or on which the items to be seized could be concealed. The search shall also include all vehicles parked at, or in the front of, the Subject Premises.[7]

---

[7] Only vehicles parked at the Subject Premises or in the front of the Subject Premises and having an apparent connection to the Subject Premises will be searched.  Connection to the Subject Premises may be established by way of prior law enforcement observation, vehicle registration, subject admission, or possession of an ignition key.

**ATTACHMENT A**
**A-8**
**PERSON AND PREMISES TO BE SEARCHED**

**Person to be searched**: The Person of DONNY CRAPSE, provided that this person is located at the Subject Premises and/or within the District of New Mexico at the time of the search. The Subject will be searched for tattoos evidencing membership in or association with the BMC. A color photograph of the Subject follows:



**Premises to be searched:** Subject Premises A-8, located at 1523 Tierra Verde Loop NW, Los Lunas, New Mexico. Subject Premises A-8 may be described as single-story residence with tan light brown siding. There is a brown metal gate located off of the driveway that leads to the front door. The numbers 1523 are posted on the front of the house. Color photographs of the Subject Premises are listed below.




The search of the Subject Premises shall include the entire residence, all the attached and unattached garages, all outbuildings, trash cans, storage containers, and all persons located in the Subject Premises in or on which the items to be seized could be concealed. The search shall also include all vehicles parked at, or in the front of, the Subject Premises.[8]

---

[8] Only vehicles parked at the Subject Premises or in the front of the Subject Premises and having an apparent connection to the Subject Premises will be searched. Connection to the Subject Premises may be established by way of prior law enforcement observation, vehicle registration, subject admission, or possession of an ignition key.

**ATTACHMENT A**
**A-9**
**PERSON AND PREMISES TO BE SEARCHED**

**Person to be searched:** The Person of ED SANCHEZ SOLIS, provided that this person is located at the Subject Premises and/or within the District of New Mexico at the time of the search. The Subject will be searched for tattoos evidencing membership in or association with the BMC. A color photograph of the Defendant follows:



**Premises to be searched**: Subject Premises A-9, located at 108 Horner Street, Belen, New Mexico. Subject Premises A-9 may be described as a single-story residence with red brick siding, tan siding, and a silver colored metal roof. A metal chain link fence encompasses the property. The number 108 are posted on the mailbox in front of the residence. Color photographs are posted below.

 

The search of the Subject Premises shall include the entire residence, all the attached and unattached garages, all outbuildings, trash cans, storage containers, and all persons located in the Subject Premises in or on which the items to be seized could be concealed. The search shall also include all vehicles parked at, or in the front of, the Subject Premises.[9]

---

[9] Only vehicles parked at the Subject Premises or in the front of the Subject Premises and having an apparent connection to the Subject Premises will be searched. Connection to the Subject Premises may be established by way of prior law enforcement observation, vehicle registration, subject admission, or possession of an ignition key.

**ATTACHMENT A**
**A-10**
**PERSON AND PREMISES TO BE SEARCHED**

**Person to be Searched**: The Person of LAWWRENCE SELVA, provided that this person is located at the Subject Premises and/or within the District of New Mexico at the time of the search. The Subject will be searched for tattoos evidencing membership in or association with the BMC. A color photograph of the Subject follows:



**Premises to be searched:** Subject Premises A-10, located at 1 Buckskin Lane, Tome, New Mexico.  Subject Premises A-10 may be described as a singlewide trailer with tan siding and red and brown trim.  The property is enclosed with wood and metal range fencing.  There are several outbuildings and vehicles on the property.  A color photograph is posted below.



The search of the Subject Premises shall include the entire residence, all the attached and unattached garages, all outbuildings, trash cans, storage containers, and all persons located in the Subject Premises in or on which the items to be seized could be concealed. The search shall also include all vehicles parked at, or in the front of, the Subject Premises.[10]

---

[10] Only vehicles parked at the Subject Premises or in the front of the Subject Premises and having an apparent connection to the Subject Premises will be searched.  Connection to the Subject Premises may be established by way of prior law enforcement observation, vehicle registration, subject admission, or possession of an ignition key.

Attachment A, Page 10

## ATTACHMENT A
### A-11
### PERSON AND PREMISES TO BE SEARCHED

**Person to be searched**: The Person of CHARLES RUSSELL, provided that this person is located at the subject premises and/or within the District of New Mexico at the time of the search. The Subject will be searched for tattoos evidencing membership in or association with the BMC. A color photograph of the Subject follows:



**Premises to be searched**: Subject Premises A-11, located at 900 Jackson Avenue, Grants, New Mexico. The Subject Premises A-11 may be described as a single-story residence with tan siding, blue trim, and red garage door. The numbers 900 are posted on the front of the house. The premises is surrounded by a brick and wrought iron fence. A color photograph is posted below.



The search of the Subject Premises shall include the entire residence, all the attached and unattached garages, all outbuildings, trash cans, storage containers, and all persons located in the Subject Premises in or on which the items to be seized could be concealed. The search shall also include all vehicles parked at, or in the front of, the Subject Premises.[11]

---

[11] Only vehicles parked at the Subject Premises or in the front of the Subject Premises and having an apparent connection to the Subject Premises will be searched. Connection to the Subject Premises may be established by way of prior law enforcement observation, vehicle registration, subject admission, or possession of an ignition key.

**ATTACHMENT A**
**A-12**
**PERSON AND PREMISES TO BE SEARCHED**

**Person to be searched:** The Person of JOSE MAESTAS, provided that this person is located at the Subject Premises and/or within the District of New Mexico at the time of the search.  The Subject will be searched for tattoos for evidencing membership in or association with the BMC. A color photograph of the Subject follows:



**Premises to be searched**: Subject Premises A-12, located at 107 Main Street, San Rafael, New Mexico.  Subject Premises A-12 may be described as a single-story residence with white siding and blue trim.  The residence has a blue metal roof, and the numbers 107 are posted on the front of the house, near the front door.  A color photograph is posted below.



The search of the Subject Premises shall include the entire residence, all the attached and unattached garages, all outbuildings, trash cans, storage containers, and all persons located in the Subject Premises in or on which the items to be seized could be concealed. The search shall also include all vehicles parked at, or in the front of, the Subject Premises.[12]

---

[12] Only vehicles parked at the Subject Premises or in the front of the Subject Premises and having an apparent connection to the Subject Premises will be searched.  Connection to the Subject Premises may be established by way of prior law enforcement observation, vehicle registration, subject admission, or possession of an ignition key.

Attachment A, Page 12

**ATTACHMENT A**
**A-13**
**PERSON AND PREMISES TO BE SEARCHED**

**Person to be searched:** The Person of KENNETH MARTINEZ, provided that this person is located at the Subject Premises and/or within the District of New Mexico at the time of the search. The Subject will be searched for tattoos evidencing membership in or association with the BMC. A color photograph of the Defendant follows:



**Premises to be searched:** Subject Premises A-13, located at 616 E. Princeton Avenue, Gallup, New Mexico. Subject Premises A-13 may be described as a single-story residence with brown siding and brown trim. There is a small white cinder block wall in front of the residence. The front door has a white storm door over the front door. A color photograph is posted below.



The search of the Subject Premises shall include the entire residence, all the attached and unattached garages, all outbuildings, trash cans, storage containers, and all persons located in the Subject Premises in or on which the items to be seized could be concealed. The search shall also include all vehicles parked at, or in the front of, the Subject Premises.[13]

---

[13] Only vehicles parked at the Subject Premises or in the front of the Subject Premises and having an apparent connection to the Subject Premises will be searched. Connection to the Subject Premises may be established by way of prior law enforcement observation, vehicle registration, subject admission, or possession of an ignition key.

**ATTACHMENT A**
**A-14**
**PERSON AND PREMISES TO BE SEARCHED**

**Person to be searched:** The Person of SKYLER ELWESS, provided that this person is located at the subject premises and/or within the District of New Mexico at the time of the search.  The Subject will be searched for tattoos evidencing membership in or association with the BMC.  A color photograph of the Subject follows:



**Premises to be searched:**   Subject Premises A-14, located at 1101 N. Laguna Avenue, Farmington, New Mexico.  Subject Premises A-14 may be described as a single-story residence with gray siding, tan trim, and the numbers 1101 are posted next to the front door.  A color photograph of the Subject Premises is posted below.



The search of the Subject Premises shall include the entire residence, all the attached and unattached garages, all outbuildings, trash cans, storage containers, and all persons located in the Subject Premises in or on which the items to be seized could be concealed. The search shall also include all vehicles parked at, or in the front of, the Subject Premises.[14]

---

[14] Only vehicles parked at the Subject Premises or in the front of the Subject Premises and having an apparent connection to the Subject Premises will be searched.  Connection to the Subject Premises may be established by way of prior law enforcement observation, vehicle registration, subject admission, or possession of an ignition key.

**ATTACHMENT A**
**A-15**
**PERSON AND PREMISES TO BE SEARCHED**

**Person to be searched:** The Person of LEX BLUEEYES, provided that this person is located at the Subject Premises and/or within the District of New Mexico at the time of the search.  The Subject will be searched for tattoos evidencing membership in or association with the BMC.  A color photograph of the Subject follows:



**Premises to be searched**: Subject Premises A-15, located at 3005 Bella Donna Lane, Farmington, New Mexico. Subject Premises A-15 may be described as a two-story residence with tan siding and brown wood trim.  The garage door and front door are white in color.  The number 3005 are posted on the front of the house above the garage door.  A color photograph of the Subject Premises is posted below.



The search of the Subject Premises shall include the entire residence, all the attached and unattached garages, all outbuildings, trash cans, storage containers, and all persons located in the Subject Premises in or on which the items to be seized could be concealed. The search shall also include all vehicles parked at, or in the front of, the Subject Premises.[15]

---

[15] Only vehicles parked at the Subject Premises or in the front of the Subject Premises and having an apparent connection to the Subject Premises will be searched.  Connection to the Subject Premises may be established by way of prior law enforcement observation, vehicle registration, subject admission, or possession of an ignition key.

**ATTACHMENT A**
**A-16**
**PERSON AND PREMISES TO BE SEARCHED**

**Person to be searched:** The Person of JESUS RODRIGUEZ, provide that this person is located at the Subject Premises and/or withing the District of New Mexico at the time of the search. The Subject will be searched for tattoos evidencing membership in or association with the BMC. A color photograph of the Subject follows:



**Premises to be searched**: Subject Premises A-16, located at 901 East Lincoln Road, Hobbs, New Mexico. Subject Premises A-16 may be described as single-story residence with red siding, white and blue trim, and a white front door. The numbers 901 are posted on the front door. A wood picket fence surrounds the backyard of the Subject Premises. A color photograph of the Subject Premises is posted below.



The search of the Subject Premises shall include the entire residence, all the attached and unattached garages, all outbuildings, trash cans, storage containers, and all persons located in the Subject Premises in or on which the items to be seized could be concealed. The search shall also include all vehicles parked at, or in the front of, the Subject Premises.[16]

---

[16] Only vehicles parked at the Subject Premises or in the front of the Subject Premises and having an apparent connection to the Subject Premises will be searched. Connection to the Subject Premises may be established by way of prior law enforcement observation, vehicle registration, subject admission, or possession of an ignition key.

**ATTACHMENT A**
**A-17**
**PERSON AND PREMISES TO BE SEARCHED**

**Person to be searched**: The Person of JONATAN BIVENS, provided that this person is located at the Subject Premises and/or withing the District of New Mexico at the time of the search. The Subject will be searched for tattoos evidencing membership in or association with the BMC.  A color photograph of the Subject follows:



**Premises to be searched**: Subject Premises A-17, located at 1503 Park Avenue, Alamogordo, New Mexico.  Subject Premises A-17 may be described as a single-story residence with red brick siding and white trim.  A white metal security screen door is attached to the front door.  The numbers 1503 are posted on the front of the house near the front door.  Color photographs of the Subject Premises are posted below.

 

The search of the Subject Premises shall include the entire residence, all the attached and unattached garages, all outbuildings, trash cans, storage containers, and all persons located in the Subject Premises in or on which the items to be seized could be concealed. The search shall also include all vehicles parked at, or in the front of, the Subject Premises.[17]

---

[17] Only vehicles parked at the Subject Premises or in the front of the Subject Premises and having an apparent connection to the Subject Premises will be searched.  Connection to the Subject Premises may be established by way of prior law enforcement observation, vehicle registration, subject admission, or possession of an ignition key.

**ATTACHMENT A**
**A-18**
**PERSON AND PREMISES TO BE SEARCHED**

**Person to be searched:** The Person of WILLIAM ROMERO, provided that this person is located at the Subject Premises and/or within the District of New Mexico at the time of the search.  The Subject will be searched for tattoos evidencing membership in or association with the BMC, or and any other gang.  A color photograph of the Subject follows:



**Premises to be searched:**  Subject Premises A-18, located at 1432 Vermont Avenue, Alamogordo, New Mexico.  Subject Premises A-18 may be described as a single-story residence with white siding and white trim.  There is a security storm door over the front door and the numbers 1432 are posted above the front door and on the mailbox in front of the house.  A color photograph of the Subject Premises is posted below.



The search of the Subject Premises shall include the entire residence, all the attached and unattached garages, all outbuildings, trash cans, storage containers, and all persons located in the Subject Premises in or on which the items to be seized could be concealed. The search shall also include all vehicles parked at, or in the front of, the Subject Premises.[18]

---

[18] Only vehicles parked at the Subject Premises or in the front of the Subject Premises and having an apparent connection to the Subject Premises will be searched.  Connection to the Subject Premises may be established by way of prior law enforcement observation, vehicle registration, subject admission, or possession of an ignition key.

Attachment A, Page 18

**ATTACHMENT A**
**A-19**
**PERSON AND PREMISES TO BE SEARCHED**

**Person to be searched:** The Person of ALCARIO BUSTAMANTES, provided that this person is located at the Subject Premises and/or within the District of New Mexico at the time of the search. The Subject will be searched for tattoos evidencing membership in or association with the BMC. A color photograph of the Subject follows:



**Premises to be searched:** Subject Premises A-19, located at 1503 Hawaii Avenue, Alamogordo, New Mexico.  Subject Premises A-19 may be described as a single-story residence with white siding, brown trim, and brown metal roof.  The front door has a white metal security screen door over the front door.  The numbers 1503 are posted on the front porch and on the mailbox in front of the residence. Color photographs of the Subject Premises are posted below.




The search of the Subject Premises shall include the entire residence, all the attached and unattached garages, all outbuildings, trash cans, storage containers, and all persons located in the Subject Premises in or on which the items to be seized could be concealed. The search shall also include all vehicles parked at, or in the front of, the Subject Premises.[19]

---

[19] Only vehicles parked at the Subject Premises or in the front of the Subject Premises and having an apparent connection to the Subject Premises will be searched.  Connection to the Subject Premises may be established by way of prior law enforcement observation, vehicle registration, subject admission, or possession of an ignition key.

**ATTACHMENT A**
**A-20**
**PERSON AND PREMISES TO BE SEARCHED**

**Person to be searched:** The Person of RICHARD SAUCEDO, provided that this person is located at the Subject Premises and/or within the District of New Mexico at the time of the search. The Subject will be searched for tattoos evidencing membership in or association with the BMC. A color photograph of the Subject follows:



**Premises to be searched:** Subject Premises A-20, located at 715 Maryland Avenue, Alamogordo, New Mexico. Subject Premises A-20 may be described as two-story residence with tan siding, brown and white trim, and a light green metal roof. The numbers 715 are posted on the front of the residence, above the front door. Color photographs of the Subject Premises are posted below.




The search of the Subject Premises shall include the entire residence, all the attached and unattached garages, all outbuildings, trash cans, storage containers, and all persons located in the Subject Premises in or on which the items to be seized could be concealed. The search shall also include all vehicles parked at, or in the front of, the Subject Premises.[20]

---

[20] Only vehicles parked at the Subject Premises or in the front of the Subject Premises and having an apparent connection to the Subject Premises will be searched. Connection to the Subject Premises may be established by way of prior law enforcement observation, vehicle registration, subject admission, or possession of an ignition key.

**ATTACHMENT A**
**A-21**
**PERSON AND PREMISES TO BE SEARCHED**

**Person to be searched:** The Person of MICHAEL SAUCEDO, provided that this person is located at the Subject Premises and/or within the District of New Mexico at the time of the search. The Subject will be searched for tattoos evidencing membership in or association with the BMC. A color photograph of the Subject follows:



**Premises to be searched:** Subject Premises A-21, located at 711 ½ Maryland Avenue, Alamogordo, New Mexico. Subject Premises A-21 may be described as a single-story residence with tan siding and green and white trim. A chain link fence enclosed the property and the numbers 711 ½ are posted on the gate in front of the residence. Color photographs of the Subject Premises are posted below.

 

The search of the Subject Premises shall include the entire residence, all the attached and unattached garages, all outbuildings, trash cans, storage containers, and all persons located in the Subject Premises in or on which the items to be seized could be concealed. The search shall also include all vehicles parked at, or in the front of, the Subject Premises.[21]

---

[21] Only vehicles parked at the Subject Premises or in the front of the Subject Premises and having an apparent connection to the Subject Premises will be searched. Connection to the Subject Premises may be established by way of prior law enforcement observation, vehicle registration, subject admission, or possession of an ignition key.

**ATTACHMENT A**
**A-22**
**PERSON AND PREMISES TO BE SEARCHED**

**Person to be searched**: The Person of BILLY DOZER, provided that this person is located at the Subject Premises and/or within the District of New Mexico at the time of the search.  The Subject will be searched for tattoos evidencing membership in or association with the BMC.  A color photograph of the Subject follows:



**Premises to be searched**: Subject Premises A-22, located at 2302 Pine Drive, Alamogordo, New Mexico.  Subject Premises A-22 may be described as a single-story residence with light blue siding and white trim.  The front door is dark in color and has a white security storm door over it.  The numbers 2302 are posed on the mailbox in front of the residence.  A color photograph of the Subject Premises is posted below.



The search of the Subject Premises shall include the entire residence, all the attached and unattached garages, all outbuildings, trash cans, storage containers, and all persons located in the Subject Premises in or on which the items to be seized could be concealed. The search shall also include all vehicles parked at, or in the front of, the Subject Premises.[22]

---

[22] Only vehicles parked at the Subject Premises or in the front of the Subject Premises and having an apparent connection to the Subject Premises will be searched.  Connection to the Subject Premises may be established by way of prior law enforcement observation, vehicle registration, subject admission, or possession of an ignition key.

**ATTACHMENT A**
**A-23**
**PERSON AND PREMISES TO BE SEARCHED**

**Person to be searched**:  The Person of SCOTT STEVENS, provided that this person is located at the Subject Premises and/or within the District of New Mexico at the time of the search.  The Subject will be searched for tattoos evidencing membership in or association with the BMC.  A color photograph of the Subject follows:



**Premises to be searched:**  Subject Premises A-23, located at 145 Willie Horton Drive, Ruidoso, New Mexico.  Subject Premises A-23 may be described as two-story residence with tan siding and brown trim.  The front door and garage door are brown in color.  The number 145 are posted in large digits above the garage.  A color photograph of the Subject Premises is posted below.



The search of the Subject Premises shall include the entire residence, all the attached and unattached garages, all outbuildings, trash cans, storage containers, and all persons located in the Subject Premises in or on which the items to be seized could be concealed. The search shall also include all vehicles parked at, or in the front of, the Subject Premises.[23]

---

[23] Only vehicles parked at the Subject Premises or in the front of the Subject Premises and having an apparent connection to the Subject Premises will be searched.  Connection to the Subject Premises may be established by way of prior law enforcement observation, vehicle registration, subject admission, or possession of an ignition key.

**ATTACHMENT A**
**A-24**
**PERSON AND PREMISES TO BE SEARCHED**

**Person to be searched**: The Person of TERRY CLAUNCH, provided that this person is located at the Subject Premises and/or within the District of New Mexico at the time of the search. The Subject will be searched for tattoos evidencing membership in or association with the BMC. A color photograph of the Subject follows:



**Premises to be searched:** Subject Premises A-24, located at 113 W. Fourth Street, Capitan, New Mexico. Subject Premises A-24 contains two structures located side by side. The northern structure is a singlewide mobile home with white siding and brown trim. The numbers 113 are posted on the front of the trailer; however, the residence is actually located at 115 West Fourth Street according to the Lincoln County property records. A sign that reads "Claunch Cozy Cottage" is hung on the front porch. The southern structure is a two story building with brown siding. The brown building is located at 113 West Fourth Street according to Lincoln County property records. For avoidance of doubt, Subject Premises A-24 includes both structures, regardless of their street addresses. A color photograph of the Subject Premises is posted below.



The search of the Subject Premises shall include the entire residence, all the attached and unattached garages, all outbuildings, trash cans, storage containers, and all persons located in the Subject Premises in or on which the items to be seized could be concealed. The search shall also include all vehicles parked at, or in the front of, the Subject Premises.[24]

---

[24] Only vehicles parked at the Subject Premises or in the front of the Subject Premises and having an apparent connection to the Subject Premises will be searched. Connection to the Subject Premises may be established by way of prior law enforcement observation, vehicle registration, subject admission, or possession of an ignition key.

## ATTACHMENT A
## PERSON AND PREMISES TO BE SEARCHED

**Person to be searched:** The Person of ZACHARY CARRIZAL, provided that this person is located at the Subject Premises and/or within the District of New Mexico at the time of the search. The Subject will be searched for tattoos evidencing membership in or association with the BMC. A color photograph of the Subject follows:



**Premises to be searched:** Subject Premises A-25, located at 1896 Arabela Road, Arabela, New Mexico. Subject Premises A-25 may be described as a very rural property enclosed by wood and metal cattle fencing. There are several structures, vehicles, motorcycles, RV trailers, and semitruck trailers on the property. The main structure appears to be brown in color and is single story. The numbers 1896 are posted on a metal gate at the entrance of the property. A color photograph of the Subject Premises is posted below.

 

The search of the Subject Premises shall include the entire residence, all the attached and unattached garages, all outbuildings, trash cans, storage containers, and all persons located in the Subject Premises in or on which the items to be seized could be concealed. The search shall also include all vehicles parked at, or in the front of, the Subject Premises.[25]

---

[25] Only vehicles parked at the Subject Premises or in the front of the Subject Premises and having an apparent connection to the Subject Premises will be searched. Connection to the Subject Premises may be established by way of prior law enforcement observation, vehicle registration, subject admission, or possession of an ignition key.

**ATTACHMENT B**
**Items to be Seized**

Evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended to use or which is or has been used as the means of committing a criminal offense, namely violations of: 18 U.S.C. § 1962(c) Racketeer Influenced and Corrupt Organizations (RICO); 18 U.S.C. § 1959(a) Violent Crimes in Aid of Racketeering (VICAR); 18 U.S.C. § 1951 Interference with commerce by threats or violence; 18 U.S.C. § 931 Possession of body armor by a violent felon; 18 U.S.C. § 924(c) Use of a firearm in furtherance of a crime of violence or drug trafficking crime; 18 U.S.C. § 922(g) Prohibited person in possession of a firearm or ammunition; 18 U.S.C. § 922(j) Possession of a stolen firearm; 18 U.S.C. § 875 Transmitting threatening communications; 18 U.S.C. § 2312 Transportation of stolen vehicles or property; 18 U.S.C. § 2313 Sale or receipt of stolen vehicles or property; 18 U.S.C. § 371 Conspiracy; 18 U.S.C. § 2 Aiding and abetting; 21 U.S.C. § 846 Conspiracy to distribute a controlled substance; and 21 U.S.C. § 841(a)(1) Possession with intent to distribute a controlled substance; to include:

1. Evidence of membership or affiliation with the Bandidos Motorcycle Club (BMC): to include any documents, photographs, patches, drawings, writings, or objects depicting BMC members' names, initials, monikers, officer roles, chapter assignments, or any other item depicting potential gang membership, affiliation, activity or identity;

2. Rival motorcycle club lists or photographs, "green light" lists, murder/assault lists, witness or confidential informant lists, inmate lists, address and telephone number lists, letters, law enforcement reports, judgments, pre-sentencing reports, newspaper articles, computer generated reports or printouts, legal documents, detention facility inmate number lists or addresses for rival motorcycle clubs;

3. Vests, patches, shirts, hats, or similar items bearing the name, moniker, logo, or insignia of a potential rival motorcycle club, that may have been acquired through threats or violence;

4. Firearms, magazines, and ammunition;

5. Body armor, to include: ballistic vests, plates, panels or plate carriers;

6. Controlled substances, drug packaging material, drug paraphernalia, and scales;

7. United States currency;

8. Documentary evidence of drug trafficking, to include records, receipts, notes, ledgers, money orders, pre-paid money cards such as MoneyPak, Green Dot, Wal-Mart, or other debit cards and any documents relating to transporting, ordering, purchasing or distributing drugs;

9. Cellular telephones and other digital devices, such as computers, laptops, tablets, PDAs or storage media that reasonably appear to contain some or all of the records, information, and/or evidence described herein;

10. Articles of property tending to establish the identity of persons in control of premises, vehicles, storage areas, and containers being searched, including utility company receipts, rent receipts, addressed envelopes, and keys; and

11. Safes, combination or key-lock strong boxes or other secure storage containers, and types of locked or containers, and hidden compartments that may contain any of the foregoing.

As used above, the terms "records" and "information" include all forms of creation or storage, including any form of computer, digital media, or storage media; any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "digital media" includes personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones.

The term "storage media" includes any physical object upon which electronic data can be recorded, such as hard disk, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium.

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computer, notebook computers, mobile phones, smartphones, tables, server computers, and network hardware.

**Motorcycle Authorization**: This warrant authorizes law enforcement officers to examine all motorcycles and motorcycle parts at the Subjects Premises to determine if they may be stolen.

**Biometric Access to Device Authorization:** Law enforcement officers are also specifically authorized to compel any Subject to provide biometric features, including pressing fingers (including thumbs) against and/or putting a face before the sensor, or any other security features requiring biometric recognition, of devices found at the premises for the purpose of attempting to unlock the devices' security features in order to search the contents as authorized by this warrant.

The warrant does not authorize law enforcement personnel to compel any other individuals found at the premises to provide biometric features, as described in the preceding paragraph, to access or otherwise unlock any device.

Further, this warrant does not authorize law enforcement personnel to request that the Subject state or otherwise provide the password or any other means that may be used to unlock or access the device(s), including by identifying the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI shall deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.